VICTOR A. VILAPLANA, CA Bar No. 58535
  vavilaplana@foley.com
MARSHALL J. HOGAN, CA Bar No. 286147
  mhogan@foley.com
FOLEY & LARDNER LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
P:  858.847.6700   F:   858.792.6773

JOHN A. SIMON (*Pro Hac Vice Pending*)
  jsimon@foley.com
FOLEY & LARDNER LLP
500 Woodward Avenue, Ste. 2700
Detroit, MI 48226-3489
P: 313.234.7100   F:313.234.2800

Proposed Attorneys for Debtor Quantum Fuel
Systems Technologies Worldwide, Inc., dba
Quantum Technologies

## UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| IN RE | CASE NO:  8:16-BK-11202 |
| QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC., DBA QUANTUM TECHNOLOGIES, | CHAPTER 11 |
| | JUDGE:      HON. MARK S. WALLACE |
| DEBTOR. | **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO (1) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (2) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (3) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | **HEARING DATE AND TIME:** **DATE:      MARCH 28, 2016** **TIME:      2:00 PM** **CTRM:     6C** **411 WEST FOURTH STREET** **SANTA ANA, CA 92701** |

TO THE HONORABLE MARK S. WALLACE UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER PARTIES IN INTEREST:

1

The debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), hereby moves (the "<u>Motion</u>"), pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, as amended (the "<u>Bankruptcy Rules</u>"), and Rules 2018-1(a)(9), 4001-2, and 9075-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California (the "<u>Local Bankruptcy Rules</u>"), on an emergency basis, for the entry of interim and final orders (respectively, the "<u>Interim Order</u>" and the "<u>Final Order</u>," collectively, the "<u>Financing Orders</u>"): (i) authorizing Debtor to use funds that may constitute cash collateral ("<u>Cash Collateral</u>") for payment of costs and expenses incurred in the ordinary course of Debtor's business and the management of its assets in accordance with the Budget, substantially in the form annexed hereto as **<u>Exhibit C</u>**; (ii) authorizing Debtor to obtain secured post-petition financing (the "<u>DIP Facility</u>") pursuant to the terms of the agreement between Debtor and Douglas Acquisitions LLC (the "<u>DIP Lender</u>"), substantially in the form annexed hereto as **<u>Exhibit B</u>** (the "<u>DIP Credit Agreement</u>"); (iii) granting liens and super-priority administrative status to DIP Lender; and (iv) granting related relief.

## I.    MATERIAL TERMS OF THE DIP FINANCING

In accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2, the Debtor provides the following statement of the proposed use of Cash Collateral and post-petition financing under the DIP Credit Facility[1]:

- **<u>Nature of DIP Facility</u>**: Secured, revolving credit facility made available through weekly advances pursuant to an approved budget (the "<u>Budget</u>"), subject to the satisfaction of conditions to each advance.

- **<u>Total Aggregate Outstanding Principal Amount of DIP Credit Facility</u>:** $6 million.

- **<u>Maturity Date</u>:** The earlier of the date that is 91 days after the Effective Date (as defined in the DIP Credit Agreement) and the date of acceleration, including acceleration arising in connection with the occurrence of an Event of Default (as defined in the DIP Credit Agreement).

- **<u>Events of Default</u>:** All events of default usual and customary for credit facilities of this size,

---

[1] This summary is qualified in its entirety by the terms of the DIP Credit Agreement, the Interim Order (attached hereto as **<u>Exhibit A</u>** in proposed form), and the Final Order.  To the extent anything in this Motion is inconsistent with those documents, the DIP Credit Agreement shall control.

4835-4822-8399.3

type, and purpose, including those set forth in the DIP Credit Agreement.

- **Interest Rate:** 7.5% per annum; during the continuance of an event of default, all obligations will bear interest at an additional 2% per annum.

- **Fees:** Commitment fee of 1% of the maximum principal commitment amount.

- **Liens**: Amounts borrowed under the DIP Credit Facility will be secured by a lien on all assets pursuant to section 364(c)(2), (c)(3), and (d) senior in right of priority to any prepetition claims and liens except for the Permitted Liens[2] and subject to the Carve-Out (the "DIP Lien").  The amounts borrowed will also constitute allowed superpriority claims in this case under section 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other claims of any kind, subject only to the Carve-Out (the "DIP Superpriority Claims").

- **Borrowing Conditions:**  All conditions that are usual and customary for credit facilities of this size, type, and purpose, including those set forth in the Interim Order.

- **Carve-Out**: the (a) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of the Debtor's attorneys, a chief restructuring officer for the Debtor, one financial advisor for the Debtor, one investment banker for the Debtor, a claims agent, and attorneys for the Creditors' Committee (collectively, the "Professionals"), but only to the extent approved by the DIP Lender in the Budget, and only if incurred before the delivery of a Carve-Out Trigger Notice (as defined below), and (c) unpaid and allowed fees and expenses of Professionals in an aggregate amount not to exceed $100,000 (the "Professional Expense Cap") incurred after delivery of notice by the DIP Lender to the Debtor (and its counsel), the U.S. Trustee, and Counsel to the Creditors' Committee, if applicable, that an Event of Default under the DIP Credit Agreement has occurred and is continuing (a "Carve-Out Trigger Notice"). For the avoidance of doubt, the Professional

---

[2] The Permitted Liens are defined in the DIP Credit Agreement as the "(i) Liens for unpaid taxes and taxes not yet due and payable, (ii) mechanic's, materialmen's or similar Liens that arise by operation of law, (iii) Capital Lease Obligations or purchase-money financings in existence on the Filing Date or permitted to be entered into hereunder, (iv) any personal property leases to the extent preserved by UCC financing statements filed in the appropriate office(s), (v) liens securing obligations outstanding on March 22, 2016 of not more than $1,300,815 owed to Bridge Bank."

4835-4822-8399.3

Expense Cap applies only after delivery of a Carve-Out Trigger Notice and it shall be reduced, dollar-for-dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals after delivery of a Carve-Out Trigger Notice.

Pursuant to Federal Rule 4001, the Debtor hereby provides the following disclosures with respect to the terms of the DIP Credit Facility term sheet and Interim Order[3]:

| Subject Matter | DIP Credit Agreement (Exhibit B hereto) | Interim Order (Exhibit A hereto) |
|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | §§ 2.9, 2.10, Ex. B recital 4 | ¶¶8-9 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | N/A | N/A |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | N/A | N/A |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | §§ 8.8 | ¶¶17-19 |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | N/A | N/A |

---

[3] Pursuant to Local Rule 4001-2, the Debtor files Form F 4001-2 concurrently herewith.

4835-4822-8399.3

| | | |
|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | N/A | N/A |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | N/A | N/A |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | N/A | N/A |
| The indemnification of an entity | § 8.5 | ¶ 5 |
| A release, waiver, or limitation of any right under Section 506(c) | N/A | N/A |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | N/A | N/A |
| Provisions that grant cross-collateralization protection to the prepetition secured creditors | N/A | N/A |
| Provisions that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against a secured creditor | N/A | N/A |
| Provisions that seek to waive or limit the estate's rights under 11 U.S.C. § 506(c) | N/A | N/A |
| Provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 | N/A | N/A |

4835-4822-8399.3

| | | |
|---|---|---|
| Provisions that deem secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b) | N/A | N/A |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that providedfor the professionals retained by the debtor with respect to a professional fee carve out | N/A | N/A |
| Pay down prepetition principal owed to a creditor | N/A | N/A |
| Findings of fact on matters extraneous to the approval process | N/A | N/A |

This Motion is based on the accompanying Memorandum of Points and Authorities, the First Day Declaration of William Brian Olson in Support of Voluntary Petition and First Day Motions ("Olson Decl."), the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**WHEREFORE,** the Debtor respectfully requests that the Court:

1) grant the relief requested in the Motion on an interim basis;

2) enter an Interim Order in substantially the same form as the order attached hereto as **Exhibit A**;

3) schedule a final hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

4) grant such further relief as the Court deems just and proper.

4835-4822-8399.3

DATE: MARCH 22, 2016                          **FOLEY & LARDNER LLP**


                                              _/s/ Victor A. Vilaplana_
                                              Victor A. Vilaplana

                                              John A. Simon (*Pro Hac Vice Pending*)
                                              One Detroit Center
                                              500 Woodward Avenue, Suite 2700
                                              Detroit, MI 48226-3489
                                              Telephone: (313) 234-7117
                                              Facsimile: (313) 234-2800

                                              -and-

                                              Victor A. Vilaplana
                                              Marshall J. Hogan
                                              3579 Valley Centre Drive, Suite 300
                                              San Diego, CA 92130
                                              Telephone: (858) 847-6759
                                              Facsimile: (858) 792-6773

                                              *Proposed Attorneys for Debtor Quantum Fuel
                                              Systems Technologies Worldwide, Inc., dba
                                              Quantum Technologies*

4835-4822-8399.3

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ...................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................. 1

        A.      Background .......................................................................................................... 1

        B.      Debtor's Formation and Business Overview ...................................................... 1

        C.      The Debtor's Business Operations...................................................................... 1

        D.      Debtor's Restructuring Efforts and Events Leading To Chapter 11 Filing ....... 2

        E.      Overview of Debtor's Secured Debt................................................................... 3
                1.      Bridge Bank Line of Credit...................................................................... 3
                2.      Convertible Notes .................................................................................... 3

        F.      The Debtor's Immediate Need for Access to Cash Collateral and Post-Petition

                Financing............................................................................................................. 5

III.    LEGAL ANALYSIS...................................................................................................... 6

        A.      The Debtor Should be Authorized to Use Cash Collateral to Operate and Maintain

                its Business and Preserve its Assets in Accordance With the Budget. ............... 6
                1.      Use of the Cash Collateral is Necessary to Preserve Value for the Estate. ........... 6
                2.      The Prepetition Secured Creditors' Interests are Adequately Protected................. 8

        B.      The Debtor Should be Authorized to Enter Into the DIP Credit Facility to

                Maintain its Business and to Preserve the Value of its Assets. ......................... 9
                1.      The Debtor is Unable to Obtain Unsecured Credit or Secured Credit On a
                        Junior Lien Basis.................................................................................... 11
                2.      The Terms of the Proposed DIP Facility From the DIP Lender Are Fair,
                        Reasonable, And Adequate...................................................................... 12
                3.      The Subordinated Liens Will be Adequately Protected........................... 13

        C.      The Scope of the Carve-Out is Appropriate. .................................................... 13

        D.      The DIP Lender Should be Entitled to the Protections Afforded to a Good Faith

                Lender Under Section 364(e)............................................................................. 14

        E.      Approval of the Interim Order Should be Granted, and a Final Hearing Set on

                Approval of the Final Order............................................................................... 15

IV.     WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE................................... 15

V.      NOTICE....................................................................................................................... 16

VI.     CONCLUSION............................................................................................................ 16

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*,
   789 F.2d 1085 (4th Cir. 1986) ........................................................................................13

*In re Ames Dept. Stores*,
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...................................................................10, 12, 13

*In re Aqua Assoc.*,
   123 B.R. 192 (Bankr. E. D. Pa. 1991) ...............................................................................11

*In re Cardinal Indus. Inc.*,
   118 B.R. 971 (Bankr. S.D. Ohio 1990)................................................................................8

*In re Continental Airlines, Inc.*,
   154 B.R. 176 (Bankr. D. Del. 1993) ..............................................................................8, 13

*In re Crouse Group, Inc.*,
   71 B.R. 544 (Bankr. E. D. Pa. 1987) ................................................................................11

*In re Dynaco Corporation*,
   162 B.R. 389 (Bankr. D.N.H. 1993) ...................................................................................7

*In re George Ruggiere Chrysler-Plymouth, Inc.*,
   727 F.2d 1017 (11th Cir. 1984) ...........................................................................................8

*In re Oak Glen R-Vee*,
   8 B.R. 213 (Bankr. C.D. Cal. 1981)....................................................................................7

*In re Photo Promotion Associates, Inc.*,
   87 B.R. 835 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989) ...........................10

*In re Simasko Production Co.*,
   47 B.R. 444 (D. Colo. 1985)..........................................................................................9, 12

*In re T.M. Sweeney & Sons LTL Services, Inc.*,
   131 B.R. 984 (Bankr. N. D. Ill. 1991) ...............................................................................10

*In re Tucson Industrial Partners*,
   129 B.R. 614 (B.A.P. 9th Cir. 1991)....................................................................................7

*In re Wrecclesham Grange, Inc.*,
   221 B.R. 978 (Bankr. M.D. Fla. 1997) ..........................................................................8, 13

*MNBank Dallas, N.A. v. O'Connor (In re O'Connor)*,
   808 F.2d 1393 (10th Cir. 1987) ...........................................................................................8

*Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC),*
    424 F.3d 963 (9th Cir. 2005) .................................................................................................15

**Statutes**

11 U.S.C. § 361 ......................................................................................................................8

11 U.S.C. § 363 ................................................................................................................6, 12

11 U.S.C. § 363(a) ................................................................................................................7

11 U.S.C. § 363(c)(1) ...........................................................................................................6

11 U.S.C. § 363(c)(2) ...........................................................................................................7

11 U. S.C. § 363(c)(2)(A) .....................................................................................................7

11 U.S.C. § 363(c)(2)(B) ......................................................................................................7

11 U.S.C. § 363(e) ................................................................................................................8

11 U.S.C. § 364(c) ....................................................................................................9, 10, 12

11 U.S.C. § 364(d) ...................................................................................................10, 11, 12

11 U.S.C. § 364(d)(1) .........................................................................................................10

11 U.S.C. § 364(e) ....................................................................................................6, 14, 15

11 U.S.C. § 507(b) ................................................................................................................9

11 U.S.C. § 1107(a) ..............................................................................................................6

28 U.S.C. § 157 .....................................................................................................................1

28 U.S.C. § 157(b)(2)(D) ......................................................................................................1

28 U.S.C. § 157(b)(2)(M) .....................................................................................................1

28 U.S.C. § 1334 ...................................................................................................................1

28 U.S.C. § 1408 ...................................................................................................................1

28 U.S.C. § 1409 ...................................................................................................................1

**Other Authorities**

Fed. R. Bankr. P. 2002 ........................................................................................................16

Fed. R. Bankr. P. 4001(b) ...................................................................................................15

Fed. R. Bankr. 4001(c) ........................................................................................................15

4835-4822-8399.3

Federal Rule 6004 ........................................................................................................................16

4835-4822-8399.3

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    JURISDICTION AND VENUE

This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(D), (M).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## II.    STATEMENT OF FACTS

### A.    Background

On March 22, 2016 (the "Petition Date"), the Debtor filed a petition for relief (the "Petition") under Chapter 11 of the Bankruptcy Code.  The Debtor intends to continue in possession of its property and to operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date of this filing, no official committee has been appointed.

### B.    Debtor's Formation and Business Overview

The Debtor is based in Lake Forest, California.  It is a Delaware corporation, formed in October 2000.  On July 23, 2002, the Debtor became a publicly traded company.  The Debtor is a leader in innovating, developing and producing compressed natural gas (CNG) fuel storage tanks and packaged fuel storage systems for heavy-, medium-, and light-duty trucks and passenger vehicles.  The Debtor also produces integrated vehicle system technologies, including engine and vehicle control systems and drivetrains.  The Debtor supplies its tanks and systems to truck and automotive original equipment manufacturers (OEM) and aftermarket and OEM truck integrators worldwide.

The Debtor's principal office is located in Lake Forest, California.  The Debtor conducts its corporate operations, manufacturing, assembly, design, testing, and research and development, in leased spaces of approximately 156,000 square feet. The Debtor has 111 full-time employees and 3 part-time employees, none of which are parties to a collective bargaining agreement.  During certain periods of peak demand, the Debtor has temporarily increased its workforce.

### C.    The Debtor's Business Operations

In May 2014, the Debtor announced a shift in its direction from a CNG tank product platform to a complete CNG fuel storage systems platform.  During the second half of 2014, the Debtor invested

significant human and financial resources into building its production capabilities and expanding its customer base. As a result, the Debtor significantly increased its market share during the second half of 2014.

Over the past two years, depressed oil prices have adversely affected the Debtor's growth. A critical factor in Debtor's success is the spread between the cost of diesel fuel and natural gas because the initial cost of a CNG fuel system is more expensive than a diesel fuel truck. As this spread has narrowed due to the declining oil prices, the Debtor has experienced decreased customer interest in investing in the Debtor's tanks and systems.

In the second half of 2015, the Debtor commenced research and development into to a new product offering for CNG "virtual pipeline" applications. Virtual pipeline is a process whereby natural gas is compressed and transported by truck rather than by pipe. During the second half of 2015 and continuing through the first few months of 2016, the Debtor focused on this application. However, the Debtor did not generate sufficient revenue and on March 14, 2016 it defaulted on a line of credit through Bridge Bank, discussed in greater detail below. This default constituted an Event of Default under agreements underlying two issuances of convertible notes, which are discussed in greater detail below.

### D.    Debtor's Restructuring Efforts and Events Leading To Chapter 11 Filing

Debtor undertook significant efforts prior to the Chapter 11 filing to restructure its obligations outside of Court. These efforts included attempts to raise additional equity and debt capital from third parties and significant discussions with secured creditors. Unfortunately, these efforts were not successful.

Debtor has also attempted to find a buyer that could purchase the business in its entirety. In that respect, Debtor entered into non-binding Letters of Intent with unrelated third parties and entered into discussions for the purchase of the Debtor's business. These discussions were not successful in part because the Noteholders (as defined below) were unwilling to consent to the transactions as proposed. Unfortunately, the Debtor was unable to find an alternate commercial lender for a refinancing or new loan, or to obtain the requisite consent of the holders of Convertible Notes to another transaction.

///

2

4835-4822-8399.3

### E.    Overview of Debtor's Secured Debt

#### 1.    Bridge Bank Line of Credit

On May 7, 2012, Debtor and Bridge Bank, National Association ("Bridge Bank"), entered into a Loan and Security Agreement that established a $10 million line of credit for Debtor's financing and liquidity needs (the "Bridge Bank LOC") and purporting to grant Bridge Bank a security interest in all of Debtor's existing and thereafter acquired assets and personal property. That agreement had a maturity date of May 7, 2014.

The Bridge Bank LOC has been modified several times.  On May 20, 2013, Debtor and Bridge Bank entered into a Loan and Security Modification Agreement that reduced the Bridge Bank LOC to $5 million.  On March 14, 2014, Debtor and Bridge Bank further modified the Bridge Bank LOC through the Second Loan and Security Modification Agreement that extended the maturity date to March 14, 2016.  On February 6, 2015, Debtor and Bridge Bank executed a Third Loan and Security Modification Agreement, which increased the Bridge Bank LOC to $7.5 million.  On January 2, 2014, Debtor and Bridge Bank executed an Intellectual Property Security Agreement asserting a security interest in Debtor's intellectual property in favor of Bridge Bank (collectively, all security interests held by Bridge Bank in assets and property of the Debtor, the "Bridge Bank Lien").

On March 14, 2016, the Bridge Bank LOC matured.  It was not paid and the Debtor is currently in default.  As of the Petition Date, approximately $1.3 million was outstanding.  As the collateral purportedly secured by the Bridge Bank Lien is valued at an amount significantly greater than $1.3 million, Bridge Bank appears to be over-collateralized.  In addition, the DIP Facility is expressly subject to "liens securing obligations outstanding on the Petition Date of not more than $1,300,815 owed to Bridge Bank, plus post-Filing Date interest to the extent required by law."

#### 2.    Convertible Notes

Debtor issued two sets of convertible notes under a Convertible Note and Warrant Purchase Agreement dated September 15, 2013 (the "2013 Note Agreement"), and a Convertible Note Purchase Agreement dated June 29, 2015 (the "2015 Note Agreement").

In accordance with the 2013 Note Agreement, Debtor raised capital through the execution a series of Senior Secured Convertible Notes issued to the following parties in the following amounts:

3

|                                         | **Initial Value** |
|-----------------------------------------|-------------------|
| Douglas Irrevocable Descendant's Trust  | $6,000,000.00     |
| K&M Douglas Trust                       | $4,000,000.00     |
| W. Brian Olson                          | $100,000.00       |
| Bradley Timon                           | $100,000.00       |
| Mark Arold                              | $25,000.00        |
| David & Kristina Mazaika Trust          | $100,000.00       |
| Jonathan Lundy                          | $50,000.00        |
| G. Scott Samuelsen                      | $50,000.00        |
| Timothy McGaw                           | $50,000.00        |
| Dave Wambeke                            | $125,000.00       |
| Kevin Harris                            | $150,000.00       |
| Brad Baker                              | $100,000.00       |
| Rick Hartfiel                           | $100,000.00       |
| Jim Zavoral                             | $50,000.00        |

In connection with signing the 2013 Note Agreement, Debtor and investor Kevin Douglas ("Douglas"), in his capacity as the "Collateral Agent," executed a Subordinated Security Agreement and a Subordinated Patent Security Agreement, both dated September 18, 2013. The Subordinated Security Agreement and Subordinated Patent Security Agreement assert certain security interests in favor of Douglas as the Collateral Agent for the benefit of the purchasers of the Senior Secured Convertible Notes.

In accordance with the 2015 Note Agreement, Debtor raised capital through the execution of a series of Senior Secured Series B Convertible Notes issued to the following parties in the following amounts:

|                                         | **Initial Value** |
|-----------------------------------------|-------------------|
| Douglas Irrevocable Descendant's Trust  | $900,000.00       |
| The K & M Douglas Trust                 | $600,000.00       |
| Daniel Kern                             | $500,000.00       |

Additionally, on June 29, 2015, holders of notes under the 2013 Note Agreement and 2015 Note Agreement (the "Noteholders") and Douglas, as the collateral agent, entered into an Intercreditor Agreement. The Intercreditor Agreement provides that all security interests owned by the Noteholders are equal and rank "pari passu" with each other. Also on June 29, 2015, Douglas, as the Collateral Agent, entered into a Subordination Agreement with Bridge Bank in which Douglas agreed to subordinate the security interests held by the Noteholders to Bridge Bank. Under the 2013 Note Agreement and 2015 Note Agreement, an "Event of Default" includes a default of the Bridge Bank

4

LOC.  In connection with the DIP Facility and this Motion, Douglas, on behalf of the Noteholders, has consented or is expected to consent to the subordination of the Noteholder liens to the DIP Lien.

The DIP Lender, Douglas Acquisitions LLC, is affiliated with Douglas.  Douglas is also affiliated with The Douglas Irrevocable Descendant's Trust and The K&M Douglas Trust, who hold an aggregate of $11.5 million in convertible notes pursuant to the 2013 Note Agreement and the 2015 Note Agreement.

### F.     The Debtor's Immediate Need for Access to Cash Collateral and Post-Petition Financing

The Debtor's access to Cash Collateral during the interim period (and thereafter) is absolutely necessary to preserve and maximize value for the Debtor's stakeholders.  The Debtor uses Cash Collateral in the ordinary course of business to procure goods and services from vendors, pay their employees, and satisfy other working capital needs.  Absent approval of the Interim Order (and, thereafter, use of Cash Collateral and authority to obtain debtor-in-possession financing to the Final Order), the Debtor will be effectively unable to fulfill its purchase orders, generate revenue, operate its business, or pay its employees, in addition to funding its reorganization process.  The Debtor's bankruptcy estate (the "Estate") will be immediately and irreparably harmed if the Debtor is unable to meet these financial obligations.  Thus, the Debtor respectfully requests authority to continue to use Cash Collateral, on a short-term basis and subject to the terms and conditions set forth in the Interim Order and, thereafter, in connection with the DIP Facility, on a longer-term basis pursuant to the Final Order.

Due to the Debtor's current financial condition, the use of Debtor's available funds alone will be insufficient to meet the Debtor's ability to pay immediate and ongoing expenses.  The Debtor requires funding to maintain its business and preserve the value of its assets while the Debtor pursues the sale and auction of its business as a going concern or other reorganization.

In light of the foregoing, the DIP Lender offered to provide the Debtor with the DIP Facility of up to approximately $6 million and to allow the Debtor to use the Cash Collateral subject to the terms of the DIP Credit Agreement, in the form substantially similar to **Exhibit B** attached hereto, and in accordance with the Budget, in the form substantially similar to **Exhibit C** attached hereto and as

5

4835-4822-8399.3

updated and approved by the DIP Lender from time to time in accordance with the DIP Credit Agreement.

Based on the Debtor's Budget, which sets forth the Debtor's projected cash receipts and cash disbursements for the 13-week period following the Petition Date, the Debtor believes that the proposed DIP Facility will provide it with sufficient funds to maintain operations until the Debtor is sold at auction process pursuant to section 363 of the Bankruptcy Code or otherwise restructures.

The Debtor was unable to obtain sufficient interim and long-term financing from sources other than the DIP Lender on terms and subject to conditions more favorable than under the DIP Credit Agreement. After considering alternatives, the Debtor concluded, in an exercise of its sound business judgment, that the DIP Facility proposed by the DIP Lender represents the best financing presently available to the Debtor. The terms of the DIP Credit Agreement are the result of arms-length negotiations between the Debtor and the DIP Lender. Thus, any credit or financing extended to the Debtor by the DIP Lender have been extended in good faith in accordance with section 364(e) of the Bankruptcy Code.

## III.   LEGAL ANALYSIS

### A.   The Debtor Should be Authorized to Use Cash Collateral to Operate and Maintain its Business and Preserve its Assets in Accordance With the Budget.

#### 1.   Use of the Cash Collateral is Necessary to Preserve Value for the Estate.

The Debtor's use of property of the estate is governed by Bankruptcy Code section 363. Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). A debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an

4835-4822-8399.3

interest [.]" 11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S.C. § 363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (B.A.P. 9th Cir. 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The Cash Collateral which the Debtor seeks to use under this Motion are (i) approximately $200,000 cash held in an account of Debtor at Bridge Bank, and (ii) the cash proceeds which are received post-petition.  The documents underlying the Bridge Bank LOC grant[4] a security interest in substantially all of Debtor's assets and property including cash proceeds from the sale of goods sold and services provided by the Debtor.  On March 20, 2016, two days prior to the Petition Date, and knowing of the Debtor's intention to file a Chapter 11 case, Bridge Bank seized all of the Debtor's cash on hand (approximately $1 million) at that date and applied it against the Bridge Bank LOC.  There remains approximately $200,000 in the Debtor's account at Bridge Bank and the Debtor hereby seeks to use that cash in addition to the cash proceeds which are received post-petition.

For all of the reasons discussed herein, the Debtor has no ability to continue to maintain its business operations or preserve the value of its assets unless the Debtor has the ability to use its Cash

---

[4] Debtor's counsel has not yet had the opportunity to review whether Bridge Bank's loan documents and purported security interest are valid, binding, or enforceable and Debtor therefore reserves all rights to challenge Bridge Bank's rights as appropriate.

7

Collateral to pay its projected expenses in accordance with the Budget.  The Debtor's inability to pay its expenses would cause immediate and irreparable harm to the Estate.  Indeed, the Debtor's inability to pay its expenses, including payroll, utilities, and other essential operating expenses would result in the shutdown of the Debtor's business and the destruction of the value (going-concern or otherwise) of the Debtor's business and assets.  The maintenance of the Debtor's business and preservation of the Debtor's assets are critical to maximizing value and providing for recoveries to creditors in this case.

### 2.    The Prepetition Secured Creditors' Interests are Adequately Protected.

Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.

Adequate protection can be provided in various forms.  *See e.g.*, *In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993) (courts have discretion to in determining what form of adequate protection to grant).  Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-exhaustive list of types of adequate protection, including lump sum or periodic cash payments, replacement liens, administrative priority claims and "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.  *See* 11 U.S.C. § 361.  What constitutes adequate protection is determined on a case-by-case basis.  *See e.g.*, *MNBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987); *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984) (recognizing that there must be "an individual determination" of whether a secured creditor's interest in cash collateral is adequately protected).

Courts recognize that the preservation of the going concern value of secured lenders' collateral constitutes adequate protection of such secured lenders' interest in such collateral.  *See, e.g.*, *In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) ("as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral."); *In re Cardinal Indus. Inc.*, 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) (ruling that secured

8

lenders were adequately protected by debtor's use of funds to maintain and manage encumbered properties).

In this case, the interests of all prepetition secured parties are adequately protected. The Noteholders have consented or are expected to consent to the Debtor's use of Cash Collateral. As for Bridge Bank, the Bridge Bank Lien in the Cash Collateral is adequately protected because Bridge Bank has a substantial equity cushion in the assets and property of the Debtor, which are worth significantly more than the approximately $1.3 million secured by the Bridge Bank Lien. In addition, the seniority of the Bridge Bank Lien is respected by the DIP Credit Facility and the liens granted thereunder, including the DIP Liens, will be subordinate to any liens and claims held by Bridge Bank. In addition, for any diminution of value of their liens, Bridge Bank will be entitled to claims pursuant to section 507(b) of the Bankruptcy Code.

The Debtor submits that the foregoing protections, as well as the fact that the use of Cash Collateral will enable the Debtor to preserve value by maintaining their properties and businesses, adequately protect the Noteholder's security interests and the Bridge Bank Lien from any diminution in value. Hence, the Debtor's requested use of Cash Collateral and the protections afforded the Noteholders and Bridge Bank are reasonable and appropriate under the circumstances.

In sum, the Debtor, together with the assistance of its financial and legal advisors, has concluded in the sound exercise of its business judgment that the use of Cash Collateral as contemplated by this Motion will help preserve the Debtor's value as a going concern pending the contemplated sale of substantially all assets of its assets. For the foregoing reasons, the Debtor submits that the requested use of Cash Collateral and the proposed protections afforded to Bridge Bank in the Financing Orders are reasonable and appropriate and in the best interests of the Debtor, its Estate and its creditors, and therefore should be authorized and approved by this Court.

**B.**    **The Debtor Should be Authorized to Enter Into the DIP Credit Facility to Maintain its Business and to Preserve the Value of its Assets.**

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing

4835-4822-8399.3

interim financing agreement where debtor's business judgment indicated financing was necessary and

reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with

respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business

judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

> (c) If the trustee [or debtor in possession] is unable to obtain unsecured
> credit allowable-under section 503(b)(1) of this title as an administrative
> expense, the court, after notice and a hearing, may authorize the obtaining
> of credit or the incurring of debt –
>
> (1)    with priority over any and all administrative expenses of
> the kind specified in section 503(b) or 507(b) of this title:
>
> (2)    secured by a lien on property of the estate that is not
> otherwise subject to a lien; or secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to

Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the

incurring of debt secured by a senior or equal lien only if –

> (1)  the trustee is unable to obtain such credit otherwise; and there is
> adequate protection of the interest of the holder of the lien on the property
> of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d)(1).

Section 364 is structured with an escalating series of inducements which a debtor in possession

may offer to attract credit during the post-petition period.  *In re Photo Promotion Associates, Inc.*, 87

B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989).  Where a trustee or debtor in

possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under

certain carefully proscribed conditions.  *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984,

989 (Bankr. N. D. Ill. 1991).  For example, if creditors are unwilling to extend unsecured credit to a

debtor in possession, further inducements are permitted, with court approval after notice and a hearing,

including, without limitation, liens equal to or senior to existing liens on encumbered property in

accordance with 11 U.S.C. § 364(d).  *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Two factors courts consider in determining whether to authorize post-petition financing which

contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable

10

to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E. D. Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E. D. Pa. 1991). In addition to the foregoing, a debtor-in-possession seeking to subordinate liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987). The Debtor submits that these standards have been satisfied in this case.

Subject to the approval of the Court, and in order to obtain the necessary DIP Facility, the Debtor has agreed to provide the DIP Lender with the following liens and priority, all subject only to the Carve-Out, for all amounts owed by the Debtor under the DIP Credit Agreement: (1) DIP Superiority Claims pursuant to Section 364(c)(1); (2) a perfected, first priority DIP Lien pursuant to Section 364(c)(2) and (d)(1) on all of the Debtor's tangible and intangible property that is not subject to Permitted Liens; and (3) a perfected lien upon all assets and property of the Debtor that is subject to Permitted Liens, junior to such Permitted Liens pursuant to section 364(c)(3); and (iv) other protections and inclusions in the DIP Credit Agreement and Financing Orders.

For the reasons explained herein, the Debtor believes that granting the DIP Lender the DIP Superpriority Claims and the DIP Lien (as well as all other protections provided under the DIP Credit Agreement) is warranted, appropriate and necessary given the circumstances of this case where the DIP Lender has agreed to provide the Debtor with critically necessary emergency DIP Facility, without which the Debtor would be forced to shut down its operations and liquidate.

### 1.    The Debtor is Unable to Obtain Unsecured Credit or Secured Credit On a Junior Lien Basis.

As discussed above and in the Olson Decl., despite the efforts of the Debtor and its advisors, the Debtor has been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b), (c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (d) without granting limited priming liens pursuant to section 364(d), or (ii) obtain postpetition financing or other

11

1   financial accommodations from any alternative prospective lender or group of lenders on more favorable

2   terms and conditions than those for which approval is sought herein.

3       Having determined that financing is available only under sections 364(c) and (d) of the

4   Bankruptcy Code, the Debtor commenced arms'-length negotiations with the DIP Lender over the DIP

5   Facility.  The DIP Lender was willing to provide the DIP Credit Facility only on the condition that the

6   Debtor, among other things, grant DIP Lender the DIP Lien and the DIP Superpriority Claims.

7       Due to the Debtor's failed efforts to obtain financing in some other form, the Debtor believes it

8   was required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly,

9   the DIP Facility reflects the exercise of the Debtor's sound business judgment. *See In re Ames Dep't*

10  *Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  The DIP Lender was unwilling to extend

11  financing on terms more favorable to the Debtor, and the Debtor was not able to obtain alternative

12  sources of financing upon more favorable terms.  The Debtor's ability to continue to operate its business

13  pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders

14  depends upon its ability to obtain the DIP Facility.  Without approval of the proposed financing, the

15  Debtor will not have sufficient funds to operate, which will jeopardize the successful sale of

16  substantially all of its assets or other chances of restructuring and likely diminish recoveries for their

17  stakeholders.

18      **2.    The Terms of the Proposed DIP Facility From the DIP Lender Are Fair,**

19      **Reasonable, And Adequate.**

20      Courts grant a debtor-in-possession considerable deference in acting in accordance with its

21  business judgment.  *See, e.g., In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

22  ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that

23  permit reasonable business judgment to be exercised so long as the financing agreement does not

24  contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit

25  the estate as it is to benefit parties in interest.") ; *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (D.

26  Colo. 1985) (authorizing interim financing agreement where debtor's best business judgment indicated

27  financing was necessary and reasonable for benefit of estate).  Section 364 of the Bankruptcy Code does

28  not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply

12

must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area).

The Debtor submits that the terms of the proposed DIP Facility from the DIP Lender are fair, reasonable and adequate. As noted above, the terms and conditions set forth in the DIP Credit Agreement were negotiated extensively, in good faith and at arms' length, by the parties. The DIP Lender has agreed to provide the DIP Facility to the Debtor in an effort to assist the Debtor in preserving the going-concern value of the Debtor's business and to facilitate the successful consummation of the sale of the Debtor's business. The Debtor submits in its business judgment that the benefits afforded to the Debtor by the DIP Facility offers the Debtor its best and, likely, only opportunity to maintain and preserve the value of its assets while pursuing the sale and/or reorganization of its business, which will benefit all creditors and parties in interest in this case.

### 3.    The Subordinated Liens Will be Adequately Protected.

As discussed in section IV.A.2, *supra*, adequate protection can be provided in various forms. *See e.g.*, *In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993) (courts have discretion to in determining what form of adequate protection to grant). In connection with the DIP Credit Agreement, the Noteholders have consented or are expected to consent to the "priming" of their liens by the DIP Lender, recognizing the value of the DIP Facility. The Noteholders are adequately protected by the preservation of the going concern value of the Debtor's business, which will help maximize the Debtor's value and the proceeds of the sale of the Debtor's business. *See, e.g.*, *In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) ("as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral.").

### C.    The Scope of the Carve-Out is Appropriate.

The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain

13

assistance from counsel throughout the debtor's reorganization. *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Subject to the Budget, the Carve-Out ensures that proceeds of the DIP Credit Facility may be used for the payment of U.S. Trustee fees and professional fees of the Debtor and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**D.      The DIP Lender Should be Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e).**

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

In this case, the DIP Credit Agreement and the Financing Orders are the result of (i) the Debtor's reasonable and informed determination that the DIP Lender has offered the most favorable terms available for obtaining critical postpetition financing, and (ii) are the product of extended arm's-length, good faith negotiations between and among the Debtor and the DIP Lender. The terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtor, its estates and creditors. The proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the Budget. No consideration is being provided to any

4835-4822-8399.3

party to the DIP Credit Agreement other than as described herein and the DIP Lender extended the DIP Facility in reliance upon the protections offered by section 364(e) of the Bankruptcy Code. Section 364(e) provides a lender with a presumption of good faith. *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005). Accordingly, the Debtors request that the Court find that the DIP Lender has acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

### E.    Approval of the Interim Order Should be Granted, and a Final Hearing Set on Approval of the Final Order.

Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral (and the obtaining of credit, if applicable) to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

In this case, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and (i) authorize the Debtor to use Cash Collateral pursuant to the Interim Order in order to maintain the ongoing business operations of the Debtor and avoid immediate and irreparable harm and prejudice to the Estate and all parties in interest, and (ii) schedule the Final Hearing, at which time approval of the DIP Credit Facility and use of Cash Collateral pursuant to the Final Order will be sought.

Absent authorization from the Court to obtain use of Cash Collateral, as requested by way of the Interim Order, on a short-term basis pending the Final Hearing and approval of the Final Order, the Debtor will be immediately and irreparably harmed. Accordingly, the relief requested is critical to preserving and maintaining the value of the Debtors' estates and facilitating their sale efforts.

### IV.    WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE

For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtor requests the terms of the Interim Order to become immediately effective to ensure that the

4835-4822-8399.3

Debtor will be able to use its Cash Collateral and to obtain the proposed DIP Facility from the DIP Lender to pay such critical expenses. Based on the foregoing, the Debtor requests that any applicable stay, including the stay provided under Federal Rule 6004, be waived to allow the Interim Order to become immediately effective.

## V.    NOTICE

The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Central District of California – Santa Ana Division, (b) counsel to the DIP Lender; (c) all purported secured parties, including the Noteholders and Bridge Bank; (d) the Internal Revenue Service; (e) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (f) any parties requesting special notice in accordance with Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtor shall provide notice of entry of the order granting such relief upon each of the foregoing parties and any other parties-in-interest as the Court directs. The Debtor submits that such notice is sufficient and that no other or further notice be given.

## VI.    CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (a) grant the relief requested in the Motion on an interim basis; (b) enter an Interim Order in substantially the same form as the order attached hereto as **Exhibit A**; (c) schedule a final hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and (d) grant such further relief as the Court deems just and proper.

4835-4822-8399.3

DATE:  MARCH 22, 2016                         **FOLEY & LARDNER LLP**

                                               _/s/  Victor A. Vilaplana_
                                              Victor A. Vilaplana

                                              John A. Simon (*Pro Hac Vice Pending*)
                                              One Detroit Center
                                              500 Woodward Avenue, Suite 2700
                                              Detroit, MI 48226-3489
                                              Telephone: (313) 234-7117
                                              Facsimile: (313) 234-2800

                                              -and-

                                              Victor A. Vilaplana
                                              Marshall J. Hogan
                                              3579 Valley Centre Drive, Suite 300
                                              San Diego, CA 92130
                                              Telephone: (858) 847-6759
                                              Facsimile: (858) 792-6773

                                              *Proposed Attorneys for Debtor Quantum Fuel
                                              Systems Technologies Worldwide, Inc., dba
                                              Quantum Technologies*

4835-4822-8399.3

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 8:16-BK-11202 |
| Quantum Fuel Systems<br>Technologies Worldwide, Inc., | Chapter 11 |
| Debtor. | INTERIM ORDER AUTHORIZING DEBTOR TO (1) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (2) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (3) GRANTING RELATED RELIEF |

This matter came before the Court on March [__], 2016 (the "Preliminary Hearing"), on the motion (the "Motion") of Quantum Fuel Systems Technologies Worldwide, Inc. (the "Debtor"), requesting, among other things, entry of this interim order (the "Order"):

(a)     authorizing the Debtor to use funds that may constitute Cash Collateral (as defined below);

(b)     authorizing the Debtor to obtain postpetition financing pursuant to a debtor-in-possession credit agreement, substantially in the form annexed to the Motion as **Exhibit B** (as amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement," and together with all related agreements, documents, and instruments contemplated thereby (collectively, the "DIP Credit Documents") by and between the Debtor, as borrower, and Douglas Acquisitions LLC, as lender (together with its successors and assigns, the "DIP Lender"), under which the DIP Lender may make loans of not more than $6 million in principal amount outstanding at any time under a revolving credit facility, and the Debtor will incur Obligations in connection therewith (as defined in the DIP Credit Agreement), such financing to be (i) secured by first-priority senior secured liens on all unencumbered tangible and intangible property of the Debtor

1

of any kind, subject only to the Carve-Out defined below, pursuant to sections 364(c)(2)

of the Bankruptcy Code, and (ii) secured by a perfected lien upon all other tangible and

intangible property of the Debtor that is subject and junior only to the Carve-Out and the

Permitted Liens (as defined in the DIP Credit Documents) pursuant to sections 364(c)(3)

and 364(d)(1) of the Bankruptcy Code; and (c) granting the DIP Lender superpriority

claims pursuant to section 364(c)(1) of the Bankruptcy Code, such claims to be senior in

right of payment over any and all administrative expenses of the kinds specified in

sections 503(b) and 507(b) of the Bankruptcy Code or otherwise, subject only to the

Carve-Out (such credit facility being referred to herein as the "DIP Facility").

      This Court having considered the Motion and the exhibits attached thereto; a

hearing on the Motion having been held before the Court, appearances being noted on the

record; all objections to the Order being resolved, overruled, or withdrawn; and after due

deliberation and consideration and sufficient cause appearing therefor,

      IT IS HEREBY FOUND, AND CONCLUDED that:

      A.     On March 22, 2016 (the "Petition Date"), the Debtor filed a voluntary

petition under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession

of its property, and operating and managing its business as a debtor-in-possession,

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      B.     This Court has jurisdiction over these proceedings and the parties and

property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of this

motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.     The Debtor provided notice of the Motion and the Preliminary Hearing

was given to: (a) the Office of the United States Trustee for the Central District of

California, Santa Ana Division, (b) counsel to the DIP Lender; (c) all purported secured

parties; (d) the Internal Revenue Service; (e) the parties included on the Debtor's list of

20 largest unsecured creditors; and (f) any parties requesting special notice in accordance with Bankruptcy Rule 2002.  Such notice constitutes due and appropriate notice under the circumstances and complies with all applicable Bankruptcy Rules, including Rule 4001(c), and all applicable local rules.  No further notice of the relief sought at the Preliminary Hearing is necessary or required.

D.      A final hearing on the Motion shall be held by this Court on [_____], 2016, at [     ] (the "Final Hearing"). Notice of the Final Hearing shall be given by the Debtor, within two business days of the entry of this Order, to the parties set forth in Paragraph C herein and any other parties as directed by the Court.  Such parties shall also be served with a copy of this Order. Any objection to the relief sought by the Motion at the Final Hearing shall be filed and served by no later than [_____], 2016, and served on counsel to the Debtor, the DIP Lender, the Office of the United States Trustee, and any other parties directed by the Court.  Any replies to any objections shall be filed and served on any objecting party by no later than [_____], 2016.

E.      No statutory committee of unsecured creditors has yet been appointed in this case (a "Committee").

F.      The relief requested by the Motion is necessary to avoid harm to the Debtor's estate, and good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein and the entry of this Order.

G.      The Debtor does not have sufficient available resources of working capital and financing to carry on operations without the DIP Facility and the use of Cash Collateral (as defined below). The Debtor has an immediate need to obtain financing under the DIP Facility and authorization of the use of Cash Collateral (as defined below) to permit, among other things, the Debtor to continue its business operations in an orderly manner, maintain business relationships, and satisfy other working-capital and operational needs.

3

4824-4420-9199.6

H.      The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code. Financing on a postpetition basis is not available to the Debtor unless the Debtor grants (i) the DIP Facility Liens (as defined below) upon the DIP Facility Collateral (defined below), pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to secure the Obligations, and (ii) the Superpriority Claims (as defined below) in respect of the Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code. The DIP Lender has indicated a willingness to make such loans and advances and provide such other financial accommodations pursuant to the terms and conditions of the DIP Credit Documents. Under the circumstances, the Debtor is otherwise unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Documents.

I.      [There is at least one group of creditors asserting security interests in the DIP Facility Collateral whose interests will be subordinated to the DIP Facility Liens. This group is the holders of convertible notes purchased from the Debtor pursuant in September 2013 and June 2015 (the "Noteholders"). The Collateral Agent has consented on behalf of the Noteholders to the DIP Facility Liens and the subordination of the Noteholders' liens to the DIP Facility Liens.]

J.      Based solely on the representations of the Debtor in the Motion and at the Preliminary Hearing, for the purpose of this Order only and without prejudice to any subsequent challenges by any party in interest, the Court finds that (i) creditor Bridge Bank, National Association ("Bridge Bank") holds a senior security interest (the "Bridge Bank Lien") with first priority in substantially all of the assets of the Debtor in existence on the Petition Date, (ii) the Bridge Bank Lien secures an obligation of the Debtor in the amount of approximately $1.3 million, and (iii) the collateral subject to the Bridge Bank

4

Lien is valued at an amount significantly greater than $1.3 million and, therefore, the

Bridge Bank Lien is protected by a substantial equity cushion.

   K.  Other than the liens asserted by the Noteholders and the Permitted Liens,

no other creditor asserts a security interest in proceeds, products, rents and profits thereof,

together with any other property described in section 363(a) of the Bankruptcy Code and

applicable case law constituting "cash collateral" (the "Cash Collateral").

   L.  The Debtor is negotiating an asset purchase agreement pursuant to which

the DIP Lender, subject to various conditions, offer to purchase certain property from the

Debtor, through a Court-approved competitive bidding process under which the DIP

Lender would act as a stalking-horse bidder for the Debtor's property.

   M.  The DIP Facility has been negotiated in good faith and at arms-length

between the Debtor and the DIP Lender. As such, the DIP Facility will be deemed to have

been made in good faith as required by, and within the meaning of, section 364(e) of the

Bankruptcy Code, and the DIP Lender is entitled to the protections of section 364(e) of

the Bankruptcy Code.

   N.  The terms of the DIP Facility and this Order are fair and reasonable,

reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary

duties, and are supported by reasonably equivalent value and fair consideration.

   O.  This Court concludes that entry of this Order is in the best interests of the

Debtor's creditors and its estate because its implementation, among other things, will

allow for the Debtor to remain in business by providing the working capital necessary to

sustain ongoing working-capital requirements and to partially fund the expenses of this

chapter 11 case. Absent the entry of this Order, the Debtor's estate would be immediately

and irreparably harmed.

   P.  Each of the foregoing findings by this Court will be deemed a finding of

fact if and to the full extent that it makes and contains factual findings, and will be

4824-4420-9199.6

deemed a conclusion of law if and to the full extent that it makes and contains legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made by the Debtor before this Court at the hearing on the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED AND ADJUDGED that:

1.    The Motion is granted, subject to the terms and conditions set forth in this Order.

2.    All objections, if any, to the Motion are resolved hereby or, to the extent not resolved, are overruled.

3.    The Debtor is authorized to use Cash Collateral.  All security interests asserted in the Cash Collateral are adequately protected pursuant to section 361 of the Bankruptcy Code.  [The Noteholders have consented to the Debtor's use of Cash Collateral.]  The Bridge Bank Lien is adequately protected because the collateral to which it attaches is worth significantly more than the $1.3 million obligation it secures and a sufficient equity cushion exists to adequately protect the Bridge Bank Lien.  In addition, to the extent the value of any prepetition liens in the Cash Collateral are diminished as a result of the Debtor's use of Cash Collateral, prepetition creditors holding such liens are entitled to claims to the extent provided in section 507(b) of the Bankruptcy Code.

4.    The Debtor is authorized to execute and deliver the DIP Credit Documents together with any other document of any kind required to be executed and delivered in connection therewith. The Debtor shall comply with and perform, and is bound by, all of the terms, conditions, and waivers contained therein, and the Debtor is authorized, directed, and obligated to repay amounts borrowed, with interest, fees, and expenses, and any other charges and amounts, to the DIP Lender in accordance with and subject to the

6

000024

terms and conditions set forth in the DIP Credit Documents. None of the DIP Credit

Documents, nor any provision thereof nor any right arising under any provision thereof,

are voidable or avoidable under section 548 of the Bankruptcy Code, under any

applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act,

Uniform Fraudulent Conveyance Act, or similar statute or common law, or otherwise.

   5.  The Debtor shall (a) pay or reimburse the DIP Lender for all its reasonable

and documented out-of-pocket costs and expenses incurred in connection with the

development, preparation and execution of, and any amendment, supplement or

modification to, the DIP Credit Documents, and the consummation and administration of

the transactions contemplated hereby and thereby, including the reasonable fees and

disbursements of counsel to the DIP Lender and filing and recording fees and expenses,

with statements with respect to the foregoing to be submitted to the Debtor from time to

time as the DIP Lender shall deem appropriate, (b) pay or reimburse the DIP Lender for

all its documented costs and expenses incurred in connection with the enforcement or

preservation of any rights under the DIP Credit Agreement and the other DIP Credit

Documents, including the fees and disbursements of counsel to the DIP Lender, (c) pay,

indemnify, and hold the DIP Lender harmless from, any and all recording and filing fees

and any and all liabilities with respect to, or resulting from any delay in paying, stamp,

excise and other taxes, if any, that may be payable or determined to be payable in

connection with the execution and delivery of, or consummation or administration of any

of the transactions contemplated by, or any amendment, supplement or modification of,

or any waiver or consent under or in respect of, the DIP Credit Documents, and (d)

subject to entry of a final order, pay, indemnify, and hold the DIP Lender, and the

officers, directors, trustees, employees, agents, advisors and affiliates of the DIP Lender

and its officers, directors, members, managers, employees, affiliates, agents and

controlling persons (each, an "Indemnitee") harmless from and against any and all other

4824-4420-9199.6

000025

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

expenses or disbursements of any kind or nature whatsoever with respect to the

execution, delivery, enforcement, performance and administration of the DIP Credit

Documents regardless of whether any Indemnitee is a party hereto and regardless of

whether any such matter is initiated by a third party, the Debtor or any other person),

including

the reasonable fees and expenses of legal counsel in connection with claims,

actions or proceedings by any Indemnitee against the Debtor under any DIP Credit

Document (all the foregoing in this clause (d), collectively, the "Indemnified

Liabilities"), provided, that the Debtor shall have no obligation hereunder to

any Indemnitee with respect to Indemnified Liabilities to the extent such

Indemnified Liabilities are found by a final and nonappealable decision of a court

of competent jurisdiction to have resulted from the bad faith, gross negligence or

willful misconduct of such Indemnitee.  All amounts due under this Paragraph shall be

payable in accordance with requirements and limitations set forth in the DIP Credit

Agreement.

      6.      The Debtor is expressly authorized to borrow from the DIP Lender, on the

terms and subject to the conditions and limitations in availability set forth in the DIP

Credit Documents and this Order, loans in an original principal amount not to exceed

$6 million outstanding at any time, and to incur all Obligations set forth in the DIP Credit

Documents.

      7.      The Debtor is authorized to use the proceeds of the DIP Facility for

ongoing working capital needs and to pay operating costs and expenses of the Debtor

during the pendency of this chapter 11 case in accordance with the terms of the DIP

Credit Agreement and this Order. Without the prior written consent of the DIP Lender, no

portion of the DIP Facility, the DIP Facility Collateral (as defined below), or the DIP

4824-4420-9199.6

000026

Lender's Cash Collateral shall be used (a) to investigate the DIP Lender; (b) to object to or contest in any manner, or raise any defense to (i) the Superpriority Claims (as defined below) or (ii) the DIP Facility Liens (as defined below) granted to the DIP Lender pursuant to this Order; (c) to request authorization to obtain a postpetition loan or other financial accommodation pursuant to sections 364(c) or (d) of the Bankruptcy Code on a non-consensual basis; or (d) to prevent, hinder, or otherwise delay the exercise or enforcement of, or seek to modify, any rights and remedies of the DIP Lender, as applicable, arising under the DIP Credit Documents or this Order.

8.      Pursuant to section 364(c)(1) of the Bankruptcy Code, all Obligations shall constitute allowed claims (the "Superpriority Claims") against the Debtor with priority over any and all administrative expenses, claims under section 507(b) of the Bankruptcy Code for the diminution in value of collateral, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses and other claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the payment of the Carve-Out (defined below).

9.      As security for the Obligations, the DIP Lender shall have and is hereby granted (effective on the date of this Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, or other documents or instruments) valid and perfected security interests and liens (the "DIP Facility Liens") in and on all Cash Collateral as well as all tangible and intangible assets of the Debtor (the "Assets" and together with Cash Collateral, collectively the "DIP Facility Collateral"). The DIP Facility Collateral includes, without limitation, all cash or checks on hand, all cash or securities deposited into any account maintained by the Debtor, and the proceeds of all causes of action. The DIP Facility Liens shall have the following priorities, all subject to the Carve-Out:

9

(a)     pursuant to section 364(c)(2) and (d) of the Bankruptcy Code, a perfected first-priority senior lien on all DIP Facility Collateral of the Debtor that is not subject to Permitted Liens; and

(b)     pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, a perfected lien upon all other DIP Facility Collateral junior only to the Permitted Liens.

10.     Except to the extent expressly set forth in this Order, the DIP Facility Liens granted pursuant to this Order and the DIP Credit Documents to the DIP Lender to secure the Obligations shall not be subordinated to or made pari passu with any other lien or security interest.

11.     The DIP Lender may credit bid the value of the DIP Facility Liens in connection with any sale of the Debtor's assets.

12.     "Carve-Out" means: the (a) unpaid fees of the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of the Debtor's attorneys, a chief restructuring officer for the Debtor, one financial advisor for the Debtor, one investment banker for the Debtor, a claims agent, and attorneys for the Creditors' Committee (collectively, the "Professionals"), but only to the extent approved by the DIP Lender in the Budget (as defined in the DIP Credit Agreement), and only if incurred before the delivery of a Carve-Out Trigger Notice (as defined below), and (c) unpaid and allowed fees and expenses of Professionals in an aggregate amount not to exceed $100,000 (the "Professional Expense Cap") incurred after delivery of notice by the DIP Lender to the Debtor (and its counsel), the U.S. Trustee, and counsel to the Creditors' Committee, if applicable, that an Event of Default (as defined in the DIP Credit Documents) has occurred and is continuing (a "Carve-Out Trigger Notice").  For the avoidance of doubt, the Professional Expense Cap applies only after delivery of a Carve-Out Trigger Notice. The Professional Expense Cap shall be reduced, dollar-for-dollar, by the amount of any

10

000028

fees, costs and expenses incurred and paid to Professionals after delivery of a Carve-Out

Trigger Notice.  No portion of the Carve-Out may be used to pay professional fees and

disbursements incurred in connection with any challenge to the amount, extent, priority,

validity, perfection or enforcement of the indebtedness of the Debtor owing to the DIP

Lender or any Indemnitee. The Debtor may pay compensation and reimbursement of

expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same

may be due and payable, and the same shall not reduce the Carve-Out prior to the

delivery of a Carve-Out Trigger Notice.

13.      Except to the extent of the Carve-Out, neither the Debtor nor its estate

may assert a claim under section 506(c) of the Bankruptcy Code for any costs and

expenses incurred in connection with the preservation, protection, or enhancement of, or

realization by the DIP Lender upon the DIP Facility Collateral. In exercising its rights and

remedies regarding the DIP Facility Collateral upon an Event of Default or otherwise, the

DIP Lender will not be subject to the equitable doctrine of "marshaling" or any other

similar doctrine with respect to any DIP Facility Collateral.

14.      All DIP Facility Liens are binding and perfected automatically upon the

entry of this Order. The DIP Lender will not be required to file or serve financing

statements, mortgages, notices of lien, or similar instruments which otherwise may be

required under federal or state law in any jurisdiction, or take any action, including taking

possession, to validate and perfect the DIP Facility Liens, as applicable. If, however, the

DIP Lender in its reasonable discretion files any financing statements, mortgages,

agreements, notices of lien, or similar instruments, or otherwise takes steps to confirm

perfection of the DIP Facility Liens, the Debtor, at the Debtor's expense, shall cooperate

with and assist in such process to the extent provided in the DIP Credit Documents or this

Order, and all such documents shall be deemed to have been perfected at the time of and

on the date of entry of this Order, with the priorities set forth herein, and shall be and

4824-4420-9199.6

000029

hereby are deemed and adjudicated senior to any other postpetition filing by any other person or entity with respect to the same collateral. A certified copy of this Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

15.     Prior to any Event of Default, the Debtor is hereby authorized to use the Cash Collateral of the DIP Lender solely on the terms and conditions contained in this Order, except as otherwise provided in the DIP Credit Documents, or in any other order entered by the Court with the DIP Lender's consent authorizing use of the DIP Lender's Cash Collateral.

16.     Any "Event of Default" (as defined in the DIP Credit Documents) under any DIP Credit Document is an "Event of Default" under this Order.

17.     Upon the occurrence of and during the continuance of an Event of Default, the DIP Lender will be entitled to exercise its rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code or any other applicable stay or injunction or further order of or application to this Court: (a) terminate its obligation to make further advances under the DIP Credit Agreement; and (b) charge a default rate of interest as set forth in the DIP Credit Agreement.

18.     Upon the occurrence of and during the continuance of an Event of Default, the DIP Lender will be entitled to exercise its rights and remedies and take all or any of the following actions only after obtaining relief from the automatic stay under section 362(d) of the Bankruptcy Code: (a) terminate the Debtor's right to use Cash Collateral and require the Debtor to segregate and preserve all Cash Collateral for the benefit of the DIP Lender; (b) declare the principal of and accrued interest, fees, and other liabilities

12

000030

constituting the Obligations to be immediately due and payable; and/or (c) take any other action or exercise any other right or remedy permitted to the DIP Lender under the DIP Credit Documents, this Order, or by operation of law.  The DIP Lender may bring any motion for stay relief on an expedited basis on seven days' notice.

19.     The Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guaranties at any time held by the DIP Lender with respect to the DIP Facility on which the Debtor may in any way be liable. Upon an Event of Default, so long as the DIP Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), and the Debtor remains in control of the DIP Facility Collateral, (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Facility Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (ii) all risk of loss, damage or destruction of the DIP Facility Collateral shall be borne by the Debtor.

20.     Notwithstanding anything else herein or in the DIP Credit Documents, if the Court enters an order approving the sale of the Debtor's assets to a party other than the DIP Lender, the Obligations shall be due and payable to the DIP Lender 28 days after the entry of that order.

21.     The Debtor is authorized to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Credit Documents as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations, or which otherwise may be reasonably deemed necessary by the DIP Lender to effectuate the terms and conditions of the DIP Credit Documents or

13

this Order. The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any amendments, waivers, or modifications to the DIP Credit Documents that are not materially adverse to the Debtor without further order of this Court.

22.     Having been found to be extending credit to, and permitting the use of Cash Collateral by, the Debtor in good faith, based on the record before this Court, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the DIP Facility Liens created, adjudicated, or authorized by this Order in the event that this Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed, or modified on appeal. Any stay, modification, reversal, or vacation of this Order will not affect the validity of any Obligations of the Debtor to the DIP Lender incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation. Notwithstanding any such stay, modification, reversal, or vacation, all financing extended to the Debtor pursuant to this Order and all Obligations incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions hereof, and the DIP Lender shall be entitled to all the rights, privileges, and benefits, including, without limitation, the liens, security interests, and first priorities granted herein with respect to all such Obligations.

23.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization, (b) converting the case to a chapter 7 case, or (c) dismissing the case. The terms and provisions of this Order, as well as the Superpriority Claims and the DIP Facility Liens granted pursuant to this Order, the DIP Credit Documents, and related documents (as applicable) shall

4824-4420-9199.6

000032

continue in full force and effect notwithstanding the entry of any such order, and such

Superpriority Claims and DIP Facility Liens will maintain their priority as provided by

this Order until all Obligations are indefeasibly paid.

24.     The DIP Lender need not file proofs of claim in this case with respect to

any Obligations to preserve its rights to the Superpriority Claims and the DIP Facility

Liens.

25.     Nothing in this Order, the DIP Credit Documents or any other documents

related to these transactions shall in any way be construed or interpreted to impose or

allow the imposition upon the DIP Lender of any liability for any claims arising from the

prepetition or postpetition activities of the Debtor in the operation of its business, or in

connection with its restructuring efforts. The DIP Lender will not be deemed to be in

control of the operations of the Debtor or to be acting as a "responsible person" or

"owner or operator" with respect to the operation or management of the Debtor (as such

terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any

similar federal or state statute).

26.     The stipulations and admissions contained in this Order shall be binding

upon the Debtor, its estate, and all parties in interest in all circumstances. As such,

pursuant to this Order, (i) the DIP Lender's Obligations will not be subject to

counterclaim, setoff, subordination, recharacterization, defense, or avoidance, for all

purposes in this case and any subsequent chapter 7 case; (ii) the DIP Facility Liens on the

DIP Facility Collateral shall be deemed to be legal, valid, binding, perfected, and of the

priority described in this Order, not subject to recharacterization, subordination,

avoidance, or reduction; and (iii) the Obligations and the DIP Facility Liens on the DIP

Facility Collateral shall not be subject to any challenge by any party in interest, and any

such party in interest shall be enjoined from, seeking to exercise the rights of any of the

4824-4420-9199.6

Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for the Debtor). If any proceeding is filed, the stipulations and admissions contained this Order shall nonetheless remain binding and preclusive on any statutory committee of creditors appointed by the Court and on any other person or entity. Nothing in this Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtor or its estate.

27.     Without prejudice to the rights of any other party, the Debtor waives any and all claims and causes of action against the DIP Lender, and its respective agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys, professionals, and advisors, directly related to the DIP Facility, this Order, or the negotiation of the terms thereof.

28.     The provisions of this Order and the DIP Credit Documents shall be binding upon and inure to the benefit of the parties thereto, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this chapter 11 case or in any subsequent chapter 7 case as a legal representative of the Debtor or its estate.

29.     To the extent any provision of this Order conflicts with any provision of the Motion or any provision of the DIP Credit Documents, the provisions of this Order shall control.

30.     This Court shall retain jurisdiction to enforce this Order and over any matters or disputes arising from or relating to the implementation of this Order.

31.     The stay of this Order set forth in Bankruptcy Rule 6004 is hereby waived and this Order shall be effective immediately upon its entry.

###

16

# EXHIBIT B

[EXECUTION COPY]

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

between

QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC.,
as Borrower,


and


DOUGLAS ACQUISITIONS LLC,
as Lender,



dated as of March 22, 2016.

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS .............................................................................2
    1.1    Defined Terms. ...............................................................................2
    1.2    Other Definitional Provisions. .....................................................10
SECTION 2.    AMOUNT AND TERMS OF COMMITMENT .........................11
    2.1    Commitment. ................................................................................11
    2.2    Procedure for Borrowing ..............................................................11
    2.3    Repayment of the Loan .................................................................11
    2.4    Optional Prepayments ...................................................................11
    2.5    Mandatory Prepayments ...............................................................12
    2.6    Interest Rates and Payment Dates ................................................12
    2.7    Pro Rata Treatment and Payments ................................................12
    2.8    Taxes. ............................................................................................13
    2.9    Priority and Liens. ........................................................................13
    2.10   Security ..........................................................................................15
SECTION 3.    REPRESENTATIONS AND WARRANTIES ............................15
    3.1    Existence; Compliance with Law .................................................15
    3.2    Power; Authorization; Enforceable Obligations ..........................16
    3.3    No Legal Bar .................................................................................16
    3.4    No Default .....................................................................................16
    3.5    Federal Regulations ......................................................................16
    3.6    Investment Company Act; Other Regulations ..............................17
    3.7    Accuracy of Information, etc ........................................................17
    3.8    Financial Statements; No Material Adverse Effect. .....................17
    3.9    Ownership of Property; Liens; Investments. ................................18
    3.10   Secured Superpriority Obligations ...............................................18
SECTION 4.    CONDITIONS PRECEDENT .................................................18
    4.1    Conditions to Effective Date ........................................................18
    4.2    Each Credit Event .........................................................................20
SECTION 5.    AFFIRMATIVE COVENANTS ...............................................21
    5.1    Further Assurances ........................................................................21
    5.2    Use of Proceeds ............................................................................22
    5.3    Preservation of Existence; Business, Etc......................................22

ii

5.4      Budgets; Financial Information; Default Notices..............................22

5.5      Insurance ...........................................................................23

5.6      Sale Motion and Order ........................................................23

SECTION 6.      NEGATIVE COVENANTS ..............................................23

6.1      Liens .................................................................................23

6.2      Indebtedness .....................................................................24

6.3      Investments .......................................................................24

6.4      Fundamental Changes..........................................................24

6.5      Dispositions ......................................................................25

6.6      Change in Nature of Business .............................................25

6.7      Transactions with Affiliates ................................................25

6.8      Accounting Changes............................................................25

6.9      Partnerships, Etc. ..............................................................25

6.10     Speculative Transactions ....................................................25

6.11     Formation of Subsidiaries...................................................26

SECTION 7.      EVENTS OF DEFAULT ...............................................26

7.1      Events of Default ...............................................................26

7.2      Acceleration ......................................................................29

7.3      Application of Proceeds.......................................................29

SECTION 8.      MISCELLANEOUS ......................................................30

8.1      Amendments and Waivers ...................................................30

8.2      Notices .............................................................................30

8.3      No Waiver; Cumulative Remedies ........................................31

8.4      Survival of Representations and Warranties.........................31

8.5      Payment of Expenses and Taxes..........................................31

8.6      Payments Set Aside ...........................................................32

8.7      Successors and Assigns; Assignments .................................32

8.8      Set-off ..............................................................................33

8.9      Counterparts......................................................................33

8.10     Severability ......................................................................33

8.11     Integration ........................................................................33

8.12     GOVERNING LAW ...............................................................33

8.13     Submission To Jurisdiction; Waivers....................................34

8.14     Acknowledgements ............................................................35

DWT 29152205v5 0091125-000008

8.15    Releases of Liens ................................................................35

8.16    WAIVERS OF JURY TRIAL ............................................35

8.17    Regulatory ........................................................................35

8.18    Patriot Act Notice ............................................................35

EXHIBITS:

A      Form of Loan Notice
B      Form of Security Agreement
C      Budget

DWT 29152205v5 0091125-000008

000039

This Superpriority Debtor-in-Possession Credit Agreement (this "Agreement"), dated as of March 22, 2016, is between Quantum Fuel Systems Technologies Worldwide, Inc., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), and Douglas Acquisitions LLC, as lender (together with its successors and assigns, the "Lender").

## PRELIMINARY STATEMENTS

1.     On March 22, 2016 (the "Filing Date"), the Borrower filed a voluntary petition with the Bankruptcy Court initiating the Case. The Borrower continues in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.     The Borrower has requested that the Lender provide a revolving-credit facility to the Borrower with Loans (as defined below) in an aggregate principal amount at any time outstanding not to exceed the Commitment (as defined herein).

3.     The proceeds of the Loans will be used (i) to pay post-Filing Date fees and expenses associated with negotiation, execution and delivery of the Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower not materially inconsistent with the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Borrower's attorneys, chief restructuring officer, a financial advisor, and an investment bank, (iv) to pay the Lender's accrued fees and expenses (including the reasonable and documented fees and expenses of Davis Wright Tremaine LLP) up to the Effective Date pursuant to Section 8.5 of not more than $20,000, (v) to pay Lender a fully earned, non-refundable commitment fee of $60,000, and (vi) to make any other payments permitted to be made in the DIP Order or in the First Day Orders or by the Bankruptcy Court to the extent not prohibited by this Agreement or otherwise consented by the Lender.

4.     To provide security for the repayment of all obligations of the Borrower hereunder and under the other Loan Documents, the Borrower will provide to the Lender the following (all as more fully described herein):

a.     pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, as applicable, a Superpriority Claim in the Case,

b.     pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order, as applicable, a perfected first-priority Lien on all unencumbered property and assets of the Borrower of any kind, subject only to the Carve-Out,

c.     pursuant to Sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a perfected Lien on the property of the Borrower as more fully described herein subject to (i) Liens for unpaid taxes and taxes not yet due and payable, (ii) mechanic's, materialmen's, warehousemen's or similar Liens that

arise by operation of law, (iii) Capital Lease Obligations or purchase-money financings in existence on the Filing Date or permitted to be entered into hereunder, (iv) any personal-property leases to the extent preserved by UCC financing statements filed in the appropriate office(s); (v) liens securing obligations outstanding on March 22, 2016, of not more than $1,300,815 owed to Bridge Bank, plus post-Filing Date interest to the extent required by law (the Liens described in clauses (i) through this clause (v), being "<u>Permitted Liens</u>"), and (vi) the Carve-Out.

The parties hereto hereby agree as follows:

## SECTION 1.    DEFINITIONS

1.1    <u>Defined Terms</u>. As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"<u>Affiliate</u>": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10 percent or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agreement</u>": as defined in the preamble hereto.

"<u>Applicable Rate</u>": 7.5 percent per annum.

"<u>Assignee</u>": as defined in Section 8.7.

"<u>Avoidance Actions</u>": claims and causes of action arising under Sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>": Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>": the United States Bankruptcy Court for the Central District of California.

"<u>Board</u>": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>": as defined in the preamble hereto.

"<u>Budget</u>": initially, the consolidated cash-flow projections for the Borrower for the 13-week period ending June 17, 2016, attached hereto as

2

000041

<u>Exhibit C</u>, as such projections are updated by the Borrower and approved by the Lender from time to time pursuant to Section 5.4(a).

"<u>Business</u>": the business currently carried on by the Borrower and its Subsidiaries.

"<u>Business Day</u>": a day other than a Saturday, Sunday or other day on which commercial banks in California are authorized or required by law to close.

"<u>Capital Lease Obligations</u>": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"<u>Capital Stock</u>": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Carve-Out</u>": as defined in Section 2.9.

"<u>Carve-Out Trigger Notice</u>": as defined in Section 2.9.

"<u>Case</u>": the case of Borrower currently pending under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"<u>Cash Collateral</u>": "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"<u>Code</u>": the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>": all of the "Collateral" referred to in the DIP Order or the other Security Documents and all of the other property and assets that are or are intended under the terms of the DIP Order or the other Security Documents to be subject to Liens in favor of the Lender.

"<u>Commitment</u>": the obligation of the Lender to make Loans to the Borrower in an aggregate outstanding principal amount not to exceed $6 million at any time.

"<u>Commitment Period</u>": the period from and including the Effective Date to the Maturity Date.

DWT 29152205v5 0091125-000008

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Creditors' Committee": the statutory committee of unsecured creditors appointed in the Case.

"Debtor Relief Laws": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default": any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"DIP Order": an order authorizing the Borrower to obtain the post-petition financing provided under this Agreement pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e).

"Disposition" or "Dispose": (a) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by the Borrower (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Capital Stock owned by the Borrower, or any notes or accounts receivable or any rights and claims associated therewith and (b) the issuance of Capital Stock by any Subsidiary of the Borrower to any Person other than the Borrower.

"Dollars": dollars in lawful currency of the United States.

"Effective Date": as defined in Section 4.1.

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

4

"<u>Event of Default</u>": any of the events specified in Section 7.1.

"<u>Filing Date</u>": as defined in the recitals hereto.

"<u>Financial Statements</u>" means the financial statements of the Company, consisting of the consolidated statements of financial condition as of December 31, 2014 and 2013, and the consolidated statements of operations, stockholders' equity and comprehensive income, each for the years ended December 31, 2014 and 2013.

"<u>First Day Orders</u>": as defined in Section 4.1(e).

"<u>GAAP</u>": generally accepted accounting principles in the United States as in effect from time to time.

"<u>Governmental Approval</u>": any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"<u>Governmental Authority</u>": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"<u>Guarantee Obligation</u>": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (i) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (ii) the maximum

5

amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Indemnitee": as defined in Section 8.5.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Interest Payment Date": (a) the first Business Day of each calendar month while any Loan is outstanding, (b) the Maturity Date, and (c) the date of any repayment or prepayment of any Loan.

"Investment": as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this

6

Section 1.1 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>Lender</u>": defined in the preamble hereto.

"<u>Lien</u>": any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"<u>Loan</u>": an extension of credit by the Lender to the Borrower pursuant to Section 2.1.

"<u>Loan Documents</u>": this Agreement, the Security Documents, and any amendment, waiver, supplement or other modification to any of the foregoing.

"<u>Loan Notice</u>": a notice of a borrowing substantially in the form of <u>Exhibit A</u>.

"<u>Material Adverse Effect</u>": any fact, effect, event, change, occurrence or circumstance that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or would be reasonably expected to have a material and adverse effect on (i) the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Borrower or its Subsidiaries, (ii) the ability of the Borrower or its Subsidiaries to perform all of its Obligations or (iii) the Lender's ability to enforce the Loan Documents.

"<u>Maturity Date</u>": the earlier of (a) the Scheduled Maturity Date and (b) the date on which each Loan becomes due and payable pursuant to Section 7.

"<u>Multiemployer Plan</u>": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>": (a) in connection with any Disposition or any Recovery Event, the proceeds thereof in the form of cash and cash equivalents (including any such proceeds actually received from deferred payments), net of attorneys' fees, accountants' fees, investment-banking fees, amounts required to be reserved for indemnification, amounts appropriately reserved for customer returns, adjustment of purchase price or similar obligations pursuant to the agreements governing such Disposition, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Disposition or Recovery Event (other than any

DWT 29152205v5 0091125-000008

000046

Lien created by a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of equity interests or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment-banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Excluded Taxes": as defined in Section 2.8.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of any Loan) the Loans, and all other obligations and liabilities of the Borrower to the Lender arising under, out of, or in connection with any Loan Document, or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Lender that the Borrower must pay pursuant to the Loan Documents), and whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred.

"Ordinary Course of Business" or "in the Ordinary Course": the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Patriot Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens": as defined in the recitals hereto.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee-benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": means a plan of reorganization in the Case.

"Professionals": as defined in Section 2.9.

"Professional Expense Cap": as defined in Section 2.9.

"Properties": the facilities and properties owned, leased or operated by the Borrower.

"Quarterly Financial Statements": the unaudited consolidated financial statements of the Borrower and its Subsidiaries for the fiscal quarters ended March 31, 2015, June 30, 2015 (as restated), and September 30, 2015.

"Recovery Event": any settlement of or payment to the Borrower with respect to any property or casualty insurance claim or any condemnation proceeding relating to any asset of such party.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Requirement of Law": as to any Person, the bylaws and certificate of incorporation or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of the Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations" as defined in the Security Agreement.

"Scheduled Maturity Date": the date that is 91 days after the Effective Date.

DWT 29152205v5 0091125-000008

000048

"Securities Act": the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement": the Security Agreement to be executed and delivered by the Borrower, substantially in the form of Exhibit B.

"Security Documents": the collective reference to the Security Agreement, the DIP Order, and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the Obligations.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim": a claim under Section 364(c)(1) of the Bankruptcy Code against the Borrower in the Case having priority over any claims of any Person, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.

"Uniform Commercial Code" or "UCC": the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"UST": the United States Trustee appointed to serve in the Case.

1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings set forth herein when such terms are used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the

10

words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

       (c)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

       (d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

SECTION 2.   AMOUNT AND TERMS OF COMMITMENT

      2.1    <u>Commitment</u>. Subject to the satisfaction of the conditions set forth in Section 4, the Lender agrees to make Loans to the Borrower from time to time during the Commitment Period, with the aggregate principal amount of all Loans at any time outstanding not to exceed the Commitment. The Lender's Commitment shall terminate immediately and without further action on the date the Commitment Period expires. Amounts repaid or prepaid from time to time may be re-borrowed, subject to the conditions on borrowing in the Loan Documents.

      2.2    <u>Procedure for Borrowing</u>. The Borrower shall deliver to the Lender a fully executed Loan Notice no later than 10:00 a.m. (Pacific time) on the date that is three Business Days prior to the date of a proposed Loan, specifying the amount to be borrowed, in an amount not to exceed the Commitment. If the Borrower has satisfied the conditions to the making of a Loan, the Lender shall make the Loan available to Borrower not later than 3:00 p.m. (Pacific time) on the requested date by wire transfer of same day funds in Dollars to the account that the Borrower specifies in the Loan Notice.

      2.3    <u>Repayment of the Loan</u>. Each Loan of the Lender shall mature on the Maturity Date and shall be indefeasibly repaid in full in immediately available funds on the Maturity Date.

      2.4    <u>Optional Prepayments</u>. The Borrower may at any time and from time to time prepay any Loan, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 10:00 a.m. (Pacific time), one Business Day prior thereto, which notice shall specify the date and amount of prepayment. If any such notice is given, the amount specified in such

11

000050

notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.

2.5     Mandatory Prepayments. If on any date the Borrower receives Net Cash Proceeds from any Disposition outside the ordinary course of business or Recovery Event outside the ordinary course of business, then, within five Business Days of the date of receipt, the Borrower shall pay to the Lender an aggregate amount equal to 100 percent of the Net Cash Proceeds received by the Borrower, up to the amount of the outstanding Obligations. The Borrower shall deliver notice to the Lender no later than 10:00 a.m. (Pacific time) one Business Day prior to the payment specifying the date and amount of the prepayment.

2.6     Interest Rates and Payment Dates. Each Loan shall bear interest at a rate per annum equal to the Applicable Rate. All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.

(a)     (i) On or prior to the Maturity Date, if any Default or Event of Default shall occur, each Loan (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section, plus two percent, (ii) after the Maturity Date, each Loan shall bear interest at a rate per annum equal to the rate then applicable to the Loan, plus two percent and (iii) if all or a portion of any interest payable on any Loan or any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to the Loan plus two percent, in each case, with respect to clauses (i), (ii) and (iii) above, from the date of such non-payment until such amount is indefeasibly paid in full in immediately available funds (as well after as before judgment).

(b)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (a) of this Section shall be payable from time to time on demand.

2.7     Pro Rata Treatment and Payments. All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made by noon, Pacific time, on the due date thereof to the Lender at the office of the Lender specified in Section 8.2 (or such other office as may be specified from time to time by the Lender by written notice to the Borrower), in Dollars and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

12

000051

2.8    <u>Taxes</u>.

(a)    All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("<u>Non-Excluded Taxes</u>") or Other Taxes are required to be withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall be increased to the extent necessary to yield to the Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Lender for its own account a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

(d)    The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.9    <u>Priority and Liens</u>.

(a)    <u>Superpriority Claims and Liens</u>. The Borrower hereby covenants, represents and warrants that, upon entry of the DIP Order, and subject to the Carve-Out (defined below), the Obligations of Borrower under the Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed superpriority claims in the Case having priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of

13

000052

the Bankruptcy Code; (ii) pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of the Borrower that is not subject to post-petition Permitted Liens; and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of the Borrower that is subject to Permitted Liens, junior to such Permitted Liens. "Carve-Out" means the (a) unpaid fees of the Clerk of the Bankruptcy Court and the UST pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of the Borrowers' attorneys, a chief restructuring officer for the Borrower, one financial advisor for the Borrower, one investment banker for the Borrower, a claims agent, and attorneys for the Creditors' Committee (collectively, the "Professionals"), but only to the extent approved by the Lender in the Budget, and only if incurred before the delivery of a Carve-Out Trigger Notice, and (c) unpaid and allowed fees and expenses of Professionals in an aggregate amount not to exceed $100,000 (the "Professional Expense Cap") incurred after delivery of notice by the Lender to the Borrower (and its counsel), the UST and counsel to the Creditors' Committee, if applicable, that an Event of Default has occurred and is continuing (a "Carve-Out Trigger Notice"). For the avoidance of doubt, the Professional Expense Cap shall only apply after the delivery of a Carve-Out Trigger Notice. The Professional Expense Cap shall be reduced, dollar-for-dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals after delivery of a Carve-Out Trigger Notice. No portion of the Carve-Out may be used to pay professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Borrower owing to the Lender or any Indemnitee. The Borrower may pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out prior to the delivery of a Carve-Out Trigger Notice. The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Lender to object to the allowance and payment of such amounts.

(b)      Real Property. Subject in all respects to the terms of the DIP Order, the priorities set forth in Section 2.9(a) and to the Carve-Out, the Borrower grants to the Lender a security interest in, and mortgage on, all of the right, title and interest of the Borrower in all real property owned by the Borrower (including leasehold interests), together in each case with all of the right, title and interest of the Borrower in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto and all proceeds thereof. The Borrower shall acknowledge that, pursuant to the DIP Order, the Liens in favor of the Lender of such real property shall be perfected without the recordation of any instruments of mortgage or assignment. The Borrower agrees that upon the reasonable request of the Lender, the Borrower shall promptly enter into separate mortgages on owned real property in recordable form with respect to such properties on terms reasonably satisfactory to the Lender.

14

(c)     Set-Off. Subject to Section 7 hereof and the DIP Order, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than payroll, trust, withholding and tax accounts) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower under the Loan Documents, whether or not such obligations are then due. The Lender shall notify the Borrower of such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Lender under this Section are in addition to other rights and remedies that the Lender may have upon the occurrence and during the continuance of any Event of Default under the Loan Documents or the DIP Order.

(d)     Discharge. The Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the DIP Order, and described in Section 2.9(a) and the Liens granted to the Lender pursuant to the DIP Order and the Security Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

(e)     DIP Order. In the event and to the extent that the provisions of this Section shall conflict with what is set forth in the DIP Order, the DIP Order shall govern.

2.10   Security. Upon entry of the DIP Order, as security for the prompt payment and performance of all Secured Obligations of the Borrower, the Borrower has granted, in accordance with the provisions of the Security Documents, to the Lender a security interest in all of its right, title and interest in and to all of the Collateral.

SECTION 3.   REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make each Loan, the Borrower represents and warrants to the Lender that:

3.1   Existence; Compliance with Law. The Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry of the DIP Order, has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct its business in a manner in which its business is now being conducted, (c) is in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except to the extent the failure to be so qualified or in

15

good standing could not reasonably be expected to have a Material Adverse Effect, and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

3.2     Power; Authorization; Enforceable Obligations. Subject to the entry of the DIP Order, the Borrower has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to obtain the Loans and other extensions of credit hereunder. The Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize the Loans and other extensions of credit on the terms and conditions of this Agreement. Other than Bankruptcy Court approval, no Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the Loans and other extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except the filings to perfect Liens granted under the Security Documents. Each Loan Document has been duly executed and delivered on behalf of the Borrower. This Agreement constitutes, and each other Loan Document upon execution and upon entry of the DIP Order, will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.3     No Legal Bar. Subject to the entry of the DIP Order, (i) the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings of the Loans hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of the Borrower and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents) and (ii) no Requirement of Law or Contractual Obligation applicable to the Borrower could reasonably be expected to have a Material Adverse Effect.

3.4     No Default. No Default or Event of Default has occurred or is continuing.

3.5     Federal Regulations. No part of the proceeds of any Loan, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board. If requested by the Lender, the Borrower will furnish to the Lender a statement to the

16

000055

foregoing effect in conformity with the requirements of FR Form G-3 or FR Form
U-1, as applicable, referred to in Regulation U.

        3.6    <u>Investment Company Act; Other Regulations</u>. The Borrower is not
an "investment company," or a company "controlled" by an "investment
company," within the meaning of the Investment Company Act of 1940, as
amended. The Borrower is not subject to regulation under any Requirement of
Law that limits its ability to incur Indebtedness.

        3.7    <u>Accuracy of Information, etc</u>. No statement or information
contained in this Agreement, any other Loan Document or any other document,
certificate or statement furnished by or on behalf of the Borrower to the Lender
for use in connection with the transactions contemplated by this Agreement or the
other Loan Documents, contained as of the date such statement, information,
document or certificate was so furnished, any untrue statement of a material fact
or omitted to state a material fact necessary to make the statements contained
herein or therein not misleading. There is no fact known to the Borrower that
could reasonably be expected to have a Material Adverse Effect that has not been
expressly disclosed herein, in the other Loan Documents or in any other
documents, certificates and statements furnished to the Lender for use in
connection with the transactions contemplated hereby and by the other Loan
Documents.

        3.8    <u>Financial Statements; No Material Adverse Effect</u>.

        (a)    The Financial Statements (i) were prepared in accordance
with GAAP consistently applied throughout the period covered thereby, except as
otherwise expressly noted therein, (ii) fairly present in all material respects the
financial condition of the Borrower and its Subsidiaries as of the date thereof and
the results of operations for the period covered thereby in accordance with GAAP
consistently applied throughout the period covered thereby, and (iii) show all
material indebtedness and other liabilities, direct or contingent, of the Borrower
and its Subsidiaries as of the date thereof, including liabilities for taxes, material
commitments and Indebtedness.

        (b)    The Quarterly Financial Statements, and the related
consolidated statements of income or operations, shareholders' equity and cash
flows for such fiscal quarter, (i) were prepared in accordance with GAAP
consistently applied throughout the period covered thereby, and (ii) fairly present
in all material respects the financial condition of the Borrower and its Subsidiaries
as of the date thereof and the results of operations for the period covered thereby.

        (c)    Since the Filing Date, there has been no change, event,
circumstance or development that, individually or in the aggregate, has had or
would reasonably be expected to have a Material Adverse Effect.

17

(d)      The Budget delivered to the Lender pursuant to Section 4.1(f) or most recently pursuant to Section 5.4(a) was prepared in good faith on the basis of the assumptions and qualifications stated therein, which assumptions and qualifications were reasonably believed by the Borrower to be fair in light of the conditions existing at the time of delivery of such Budget, and represented, at the time of delivery, the Borrower's best estimate of its future financial needs (it being understood and agreed that projections, forecasts and budgets, whether delivered on, before or after the Effective Date and whether delivered pursuant to this Section or any other provision in this Agreement or the other Loan Documents, are not viewed as facts and are by their nature speculative and uncertain, subject to significant contingencies and are not a guarantee of financial performance and that actual results may differ from the Budget and the projections therein and such variations may be material).

3.9      Ownership of Property; Liens; Investments.

(a)      The Borrower has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      The property of the Borrower is not subject to any Liens, other than Liens permitted by Section 6.1.

3.10      Secured Superpriority Obligations. On and after the Effective Date, the DIP Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.9 of this Agreement and the DIP Order (it being understood and agreed that in the event and to the extent that the provisions of Section 2.9 shall conflict with what is set forth in the DIP Order, the DIP Order shall govern). The DIP Order is in full force and effect and has not been vacated, reversed, modified, amended, rescinded or stayed without the prior written consent of the Lender.

SECTION 4.   CONDITIONS PRECEDENT

4.1      Conditions to Effective Date. The obligations of the Lender to make Loans shall not become effective until the date (the "Effective Date") on which each of the following conditions is satisfied:

(a)      The Lender shall have received each of the following, each of which shall be originals or electronic copies (followed promptly by originals), each dated on or immediately prior to the Effective Date, each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

(i)      duly executed counterparts of this Agreement,

18

000057

(ii)    the Security Agreement, duly executed by the Borrower, together with:

(A)    certificates representing the Pledged Interests referred to in the Security Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank,

(B)    acknowledgment copies or stamped receipt copies of proper financing statements, duly filed on or before the Effective Date under the Uniform Commercial Code of all jurisdictions that the Lender may reasonably deem necessary in order to perfect and protect the first-priority liens and security interests created under the Security Agreement, covering the Collateral described in the Security Agreement, and

(C)    copies of Uniform Commercial Code, tax and judgment-lien searches with respect to the Borrower in each of the jurisdictions where the Borrower is located, dated on or before the Effective Date, together with copies of all such filings disclosed by such search;

(iii)    such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of the Borrower as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(iv)    such documents and duly executed certifications as the Lender may reasonably require to evidence that the Borrower is duly organized or formed, and that the Borrower is validly existing and in good standing in the jurisdiction where it is formed;

(v)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.1(h) and (i) have been satisfied and (B) as of the Effective Date, there is no change, event, circumstance or development that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; and

(vi)    a Loan Notice.

(b)    The Borrower shall pay, out of the proceeds of the first Loan, a fully earned, non-refundable commitment fee of $60,000, together with fees and costs incurred by the Lender.

(c)    All governmental authorizations and all third party consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) and shall remain in

19

effect; all applicable governmental filings shall have been made and all applicable waiting periods in connection with the transactions contemplated hereby shall have expired without, in either case, any action being taken by any Governmental Authority, and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby.

(d)      A DIP Order shall have been entered by the Bankruptcy Court within seven days after the Filing Date, shall be in full force and effect in form and substance satisfactory to the Lender in its sole discretion, and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(e)      All of the "first day orders" and related orders submitted on or about the date of the commencement of the Case shall be in form and substance reasonably satisfactory to the Lender and the Borrower and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect that is adverse to the interests of the Lender (such orders hereinafter being referred to as "First Day Orders").

(f)      The Lender shall have received a Budget satisfactory to the Lender in its sole discretion.

(g)      The Lender shall have received, at least one Business Day prior to the Effective Date, all documentation and other information that may be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(h)      Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date.

(i)      No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(j)      The Borrower shall have engaged a chief restructuring officer acceptable to the Lender in its sole discretion, and shall have filed with the Bankruptcy Court an application seeking approval.

4.2      Each Credit Event. The obligation of the Lender to make a Loan is subject to the receipt of a proper request under Section 2.2 and the satisfaction of the following conditions:

(a)      The representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Loan, except in the case of any representation or

20

000059

warranty that expressly relates to a prior date or dates, in which case such representation or warranty shall be true and correct on and as of such prior date or dates.

(b)    No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    The outstanding Obligations do not exceed, and after giving effect to the extensions of credit requested to be made on such date will not exceed, the amounts authorized in the Budget. The deviations from the Budget permitted by Section 7.1(r) do not apply to this Section.

Each request by the borrower under Section 2.2 constitutes a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section.

## SECTION 5.   AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Obligations are owing to the Lender, the Borrower shall:

5.1    Further Assurances. At any time or from time to time upon the request of the Lender, at the expense of the Borrower, promptly execute, acknowledge and deliver such additional instruments, certificates or documents, and do all such other acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver, or shall cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from the Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent the Borrower is permitted by applicable law to do so). The Borrower shall fully preserve or cause to be fully preserved the Liens granted by the Security Documents. The Borrower agrees that all costs and expenses reasonably expended or otherwise incurred pursuant to this Section 5.1 (including reasonable attorneys' fees and disbursements) by the Lender shall constitute Obligations and shall be paid by the Borrower in accordance with the terms hereof.

DWT 29152205v5 0091125-000008

000060

5.2     Use of Proceeds. Use the proceeds of the Loan (a) to pay fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (b) for working capital and other general corporate purposes of the Borrower not materially inconsistent with the disbursements contemplated in the Budget and to the extent not prohibited hereunder, (c) to pay fees and expenses of the Borrower's attorneys and other advisors and the attorneys and other advisors to any Creditors' Committee, subject to the restrictions thereon set forth in the DIP Order, and (d) to make any other payments permitted to be made in the DIP Order or in the First Day Orders, or by the Bankruptcy Court to the extent not prohibited by this Agreement or the DIP Order or otherwise consented by the Lender.

5.3     Preservation of Existence; Business, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business; (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated.

5.4     Budgets; Financial Information; Default Notices. Deliver to the Lender, in form and substance satisfactory to the Lender in its sole discretion:

(a)     not later than Wednesday of each week (or if such day is not a Business Day, the next succeeding Business Day), an updated Budget for the immediately following 13-week period, together with a flash report describing the Borrower's actual performance on a cumulative basis during the prior two-week period ending Friday and a comparison of the actual performance for that period against the forecast for that period in the previous Budget, in each case with written explanations of material variances;

(b)     not later than March 31, 2016, an unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for the fiscal year ending on December 31, 2015, setting forth in each case in comparative form the figures for the previous fiscal year, certified by the Borrower's chief financial officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries in accordance with GAAP consistently applied;

(c)     within 45 days after the end of the Borrower's fiscal quarters ending March 31, 2016, and June 30, 2016, an unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and related consolidated statements of operations and cash flows for the then-elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the

22

000061

corresponding period or periods from the prior year, certified by the Borrower's chief financial officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries in accordance with GAAP consistently applied;

(d)    promptly upon request by the Lender, such consolidated balance sheets of the Borrower and its Subsidiaries, related consolidated statements of income or operations, shareholders' equity, and cash flows, cash balance reports or any other financial reports as requested by the Lender; and

(e)    promptly (and in any event within two Business Days) provide written notice to the Lender of the occurrence of any Default or Event of Default, describing the nature of such Default or Event of Default and any remedial actions being taken with respect thereto.

5.5    <u>Insurance</u>. The Borrower shall provide evidence of insurance reasonably satisfactory to the Lender, naming the Lender as additional insured and loss payee.

5.6    <u>Sale Motion and Order</u>. The Borrower shall, within 14 days of the Filing Date, file with the Bankruptcy Court a motion, in form and substance satisfactory to the Lender in its sole discretion, to establish bid procedures and to approve the sale of assets to the Lender, free and clear of all interests, liens, claims and encumbrances, subject to higher and better offers in an auction process pursuant to Section 363 of the Bankruptcy Code.

## SECTION 6.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Obligation us owed to the Lender under any Loan Document, the Borrower shall not directly or indirectly:

6.1    <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document and the DIP Order;

(b)    Liens for unpaid taxes and taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the Borrower in accordance with GAAP;

(c)     landlords', carriers', warehousemen's, mechanic's, materialmen's, repairmen's or other like Liens arising in the ordinary course of business that, to the extent not subject to Section 362 of the Bankruptcy Code, are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the Borrower;

(d)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(e)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the ordinary course of business; and

(f)     Permitted Liens.

6.2     <u>Indebtedness</u>. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents;

(b)     Indebtedness outstanding on March 22, 2016, and owed to Bridge Bank in an aggregate amount not to exceed $1,300,815, plus post-Filing Date interest to the extent required by law; and

(c)     unsecured Indebtedness outstanding on the date hereof and unsecured Indebtedness incurred in the ordinary course of business.

6.3     <u>Investments</u>. Make or hold any Investments, except:

(a)     Investments held by the Borrower in the form of cash or cash equivalents;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(c)     Investments existing on the date hereof.

6.4     <u>Fundamental Changes</u>. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

24

6.5     <u>Dispositions</u>. Make any Disposition or enter into any agreement to make any Disposition, except for the following kinds of Dispositions if made for fair market value:

(a)     Dispositions of obsolete or worn-out property or property no longer used or useful in the business of the Borrower, whether now or hereafter owned or leased, in the ordinary course of business of the Borrower;

(b)     Dispositions of inventory in the ordinary course of business;

(c)     the sale, lease, sub-lease, license, sub-license or consignment of personal property of the Borrower in the ordinary course of business and leases or subleases of real property permitted by clause (a) for which rentals are paid on a periodic basis over the term thereof;

(d)     the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business of the Borrower consistent with past practice; and

(e)     sale, exchange or other disposition of cash and cash equivalents in the ordinary course of business.

6.6     <u>Change in Nature of Business</u>. Engage in any line of business different from those lines of business conducted by the Borrower on the date hereof.

6.7     <u>Transactions with Affiliates</u>. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate.

6.8     <u>Accounting Changes</u>. Make any change in (i) accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Lender, or (ii) the Borrower's fiscal year.

6.9     <u>Partnerships, Etc.</u> Become a general partner in any general or limited partnership or joint venture.

6.10     <u>Speculative Transactions</u>. Engage in any transaction involving any interest-rate-protection agreement, foreign-currency-exchange agreement, commodity-price-protection agreement, or other interest- or currency-exchange-rate or commodity-price hedging arrangement (including caps and collars with respect to interest rates, currency-exchange rates or commodity prices) or futures

25

000064

contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the ordinary course of business of the Borrower.

6.11    <u>Formation of Subsidiaries</u>. Organize or invest in any new Subsidiary.

## SECTION 7.   EVENTS OF DEFAULT

7.1    <u>Events of Default</u>. Each of the following events is an "<u>Event of Default</u>."

(a)    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any other amount payable hereunder or under any other Loan Document, within two days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    the Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 2.9 or 2.10, Section 5 or Section 6; or

(d)    the Borrower shall default in the observance or performance of any provision contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of five days after notice to the Borrower from the Lender; or

(e)    the Borrower shall (i) default in making any payment of any principal of any postpetition Indebtedness (including any Guarantee Obligation) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such postpetition Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such postpetition Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such postpetition Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such postpetition Indebtedness to become due prior to its

26

000065

stated maturity or (in the case of any such postpetition Indebtedness constituting a Guarantee Obligation) to become payable; or

(f)  the Borrower becomes unable or admits in writing its inability or fails to generally to pay its debts incurred postpetition as they become due; or

(g)  (i) the Borrower engages in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Lender, reasonably be expected to have a Material Adverse Effect; or

(h)  any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Borrower or any Affiliate of the Borrower shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(i)  an order (which has not been stayed) with respect to the Case shall be entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(j)  an order with respect to the Case shall be entered by the Bankruptcy Court converting the Case to a Chapter 7 case or the Borrower shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

27

000066

(k)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral; or

(l)     (i) A final DIP Order in form and substance satisfactory to the Lender in its sole discretion shall not have been entered within 21 days after the Effective Date, (ii) the DIP Order shall be vacated, stayed, reversed, modified or amended in any respect, (iii) the DIP Order shall cease to create a valid and perfected Lien or to be in full force and effect or (iv) the Borrower fails to comply with the DIP Order; or

(m)     the Borrower shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) in excess of $20,000 without the express prior written consent of the Lender and the approval of the Bankruptcy Court; or

(n)     the Borrower shall file a motion in the Case (i) to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the express prior written consent of the Lender (it being understood and agreed that the Lender consents to the proposed use of Cash Collateral), (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iii) to take any other action or actions materially adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or the Lender's interest (as lender under the Loan Documents) in any of the Collateral; or

(o)     an order shall be entered by the Bankruptcy Court dismissing the Case that does not contain a provision for termination of the Commitment, and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof; or

(p)     the Bankruptcy Court does not enter an order approving bid procedures for the Borrower's assets within 14 days after the filing of a motion seeking the entry of such an order; or

(q)     the Bankruptcy Court does not enter an order, in form and substance satisfactory to the Lender in its sole discretion, approving a sale of the Borrower's assets to the Lender within 75 days after the Filing Date.

(r)     on the first Friday following the Filing Date, and weekly thereafter, the net amount of the Borrower's receipts and disbursements, as measured on a cumulative basis, varies from the net amount of the Borrower's receipts and disbursements reflected in the Budget for that period, as measured on

DWT 29152205v5 0091125-000008

000067

a cumulative basis, excluding draws and repayments of Loans, by more than the lesser of (i) 15 percent of the amount in the Budget and (ii) $200,000, <u>provided</u> that if in any period, the Borrower's total expenses and disbursements are less than predicted for that period by the Budget, the difference may be carried forward to subsequent periods; or

        (s)     the Borrower's exclusive right to propose a plan of reorganization is terminated or expires; or

        (t)     without the consent of the Lender, the Borrower makes or consents to any material modification of the order setting procedures for the sale of the Borrower's assets that is materially adverse to the Lender; or

        (u)     the Bankruptcy Court has not entered an order approving the engagement of a chief restructuring officer within 25 days of the Filing Date.

       7.2     _Acceleration_. If an Event of Default has occurred and is continuing, then Lender may, by five Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditors' Committee, the UST and the Bankruptcy Court), declare each Loan (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

       7.3     _Application of Proceeds_. If an Event of Default shall have occurred and be continuing, the Lender may at any time apply (a) all payments received by the Lender under the Loan Documents, whether from the Borrower or otherwise and (b) all or any part of proceeds constituting Collateral, in payment of the Obligations in the following order:

        (a)     _first_, to the payment of all costs and expenses of such sale, collection or other realization, all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to compensation, reimbursement and indemnification under any Loan Document and all advances made by the Lender thereunder for the account of the Borrower, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the Loan Documents, all in accordance with Section 8.5 and the other terms of this Agreement and the Loan Documents;

        (b)     _second_, thereafter, to the payment of all other Obligations; and

        (c)     _third_, thereafter, to the payment to or upon the order of the Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

29

## SECTION 8.  MISCELLANEOUS

8.1     <u>Amendments and Waivers</u>. No amendment, supplement, modification or waiver of any of the provisions of this Agreement or any other Loan Document shall be deemed to be made unless the same shall be in writing signed on behalf of the Borrower and the Lender and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Any such waiver and any such amendment, supplement or modification shall be binding upon the Borrower, the Lender and all future holders of the Loans. In the case of any waiver, each of the Borrower and the Lender shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

8.2     <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:     Quantum Fuel Systems
              Technologies Worldwide, Inc.
              25242 Arctic Ocean Drive
              Lake Forest, CA 92630
              Attention: Chief Executive Officer

              *with a copy to:*

              Foley & Lardner LLP
              One Detroit Center
              500 Woodward Avenue, Suite 2700
              Detroit, Michigan 48226-3489
              Attention: John Simon

30

000069

Lender:         Douglas Acquisitions LLC
                125 East Sir Francis Drake Boulevard, Suite 400
                Larkspur, California 94939
                Attention: President

                *with a copy to:*

                Davis Wright Tremaine LLP
                1201 Third Avenue, Suite 2200
                Seattle, Washington 98101
                Attention: Hugh McCullough

provided that any notice, request or demand to or upon the Lender shall not be
effective until received. Notices and other communications to the Lender
hereunder may be delivered or furnished by electronic communications only
pursuant to procedures approved by the Lender in writing.

8.3     No Waiver; Cumulative Remedies. No failure to exercise and no
delay in exercising, on the part of the Lender, any right, remedy, power or
privilege hereunder or under the other Loan Documents shall operate as a waiver
thereof; nor shall any single or partial exercise of any right, remedy, power or
privilege hereunder preclude any other or further exercise thereof or the exercise
of any other right, remedy, power or privilege. The rights, remedies, powers and
privileges herein provided are cumulative and not exclusive of any rights,
remedies, powers and privileges provided by law.

8.4     Survival of Representations and Warranties. All representations
and warranties made hereunder, in the other Loan Documents and in any
document, certificate or statement delivered pursuant hereto or in connection
herewith shall survive the execution and delivery of this Agreement and the
making of the Loan and other extensions of credit hereunder.

8.5     Payment of Expenses and Taxes. The Borrower agrees (a) to pay or
reimburse the Lender for all its reasonable and documented out-of-pocket costs
and expenses incurred in connection with the development, preparation and
execution of, and any amendment, supplement or modification to, this Agreement
and the other Loan Documents, and the consummation and administration of the
transactions contemplated hereby and thereby, including the reasonable fees and
disbursements of counsel to the Lender and filing and recording fees and
expenses, with statements with respect to the foregoing to be submitted to the
Borrower from time to time as the Lender shall deem appropriate, (b) to pay or
reimburse the Lender for all its documented costs and expenses incurred in
connection with the enforcement or preservation of any rights under this
Agreement and the other Loan Documents, including the fees and disbursements
of counsel to the Lender, (c) to pay, indemnify, and hold the Lender harmless
from, any and all recording and filing fees and any and all liabilities with respect
to, or resulting from any delay in paying, stamp, excise and other taxes, if any,

31

that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement and the other Loan Documents, and (d) subject to entry of a final DIP Order, to pay, indemnify, and hold the Lender, and the officers, directors, trustees, employees, agents, advisors and Affiliates of the Lender and its officers, directors, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and the other Loan Documents regardless of whether any Indemnitee is a party hereto and regardless of whether any such matter is initiated by a third party, the Borrower or any other Person), including the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee. All amounts due under this Section 8.5 shall be payable within seven days after written demand therefor. Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the address of the Borrower set forth in Section 8.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lender. The agreements in this Section 8.5 shall survive repayment of the Loan and all other amounts payable hereunder.

8.6    Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

8.7    Successors and Assigns; Assignments. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) the Lender may assign to one or more assignees (each, an

"<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement with notice to the Borrower.

8.8     <u>Set-off</u>. In addition to any rights and remedies of the Lender provided by law, the Lender and its Affiliates shall have the right (subject to the DIP Order), without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any Affiliate of the Lender to or for the credit or the account of the Borrower, as the case may be. The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender or any Affiliate, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

8.9     <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic imaging means shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.10    <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.11    <u>Integration</u>. This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

8.12    <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

DWT 29152205v5 0091125-000008

000072

8.13    Submission To Jurisdiction; Waivers.

(a)    SUBMISSION TO JURISDICTION. THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY CALIFORNIA STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, ANY SUCH CALIFORNIA STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

(b)    WAIVER OF VENUE. THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY CALIFORNIA STATE OR FEDERAL COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    SERVICE OF PROCESS. THE BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

DWT 29152205v5 0091125-000008

000073

8.14    <u>Acknowledgements</u>. The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    the Lender does not have a fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Borrower and the Lender.

8.15    <u>Releases of Liens</u>. At such time as all of the Loans and the other Obligations under the Loan Documents shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

8.16    <u>WAIVERS OF JURY TRIAL</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

8.17    <u>Regulatory</u>. The Borrower will provide, to the extent commercially reasonable or required by any Requirement of Law, such information and take such actions as are reasonably requested by the Lender to assist the Lender in maintaining compliance with applicable law.

8.18    <u>Patriot Act Notice</u>. The Lender hereby notifies the Borrower that pursuant to the Patriot Act, the Lender may be required to obtain, verify and record information that identifies the Borrower, including its legal name, address, tax ID number and other information that will allow the Lender to identify it in accordance with the Patriot Act. The Lender will also require information regarding each personal guarantor, if any, and may require information regarding the Borrower's management and owners, such as legal name, address, social security number and date of birth.

*(Signature pages follow.)*

35

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

QUANTUM FUEL SYSTEMS
TECHNOLOGIES WORLDWIDE, INC.


By:_____
     Name:
     Title:

DWT 29152205v5 0091125-000008

**LENDER:**

DOUGLAS ACQUISITIONS LLC


By:_____
       Tim McGaw
       President

**EXHIBIT A**

**[FORM OF LOAN NOTICE]**

[_____], 2016

Douglas Acquisitions LLC
125 East Sir Francis Drake Boulevard, Suite 400
Larkspur, California 94939
Attention: President

Ladies and Gentlemen:

      The undersigned, Quantum Fuel Systems Technologies Worldwide, Inc., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), refers to the Superpriority Debtor-in-Possession Credit Agreement, dated as of March 22, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the capitalized terms defined therein being used herein as therein defined), among the Borrower and Douglas Acquisitions LLC, as lender (the "Lender"), and hereby gives you notice, irrevocably, pursuant to Section 2.2 of the Credit Agreement, that the undersigned hereby requests a borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such borrowing of the Loan (the "Credit Event") as required by Section 2.2 of the Credit Agreement:

1.  The Business Day of the Credit Event is:      [_____], 2016

2.  Loan:      $[___,___]

3.  The proceeds of the Loan are to be disbursed to      Bank: [_____]
the following account:      ABA: [_____]
     Account No.: [_____]

A-1

The Borrower hereby certifies that:

(A)      each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents are true and correct on and as of the date hereof as if made on and as of the date hereof; and

(B)      no Default or Event of Default has occurred and is continuing on the date hereof or after giving effect to the Credit Event requested to be made on the date specified above.

Sincerely,

QUANTUM FUEL SYSTEMS
TECHNOLOGIES WORLDWIDE, INC.

By: _____
        Name:
        Title:

A-2

**EXHIBIT B**

**FORM OF**

**SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT**

dated March 22, 2016,

between

QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC. and

DOUGLAS ACQUISITIONS LLC.

B-1

## SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT

This Security Agreement dated March 22, 2016 is between Quantum Fuel Systems Technologies Worldwide, Inc., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), and Douglas Acquisitions LLC (together with its successors and assigns, the "Lender").

## PRELIMINARY STATEMENTS.

1.      The Borrower has entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of March 22, 2016 (as it may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") with the Lender.

2.      Pursuant to the Credit Agreement, the Borrower is entering into this Agreement in order to grant to the Lender a security interest in the Collateral (as hereinafter defined).

3.      The grant of the security interest, pledge and Lien contained herein has been authorized and granted pursuant to the Bankruptcy Code by the DIP Order.

4.      To supplement the DIP Order without in any way diminishing or limiting the effect of the DIP Order or the security interest, pledge and Lien granted thereby, the parties hereto desire to more fully evidence such security interest, pledge and Lien.

5.      The Borrower is the owner of the shares of stock or other equity interests set forth opposite the Borrower's name on and as otherwise described in Schedule II hereto and issued by the Persons named therein.

6.      The Borrower has opened deposit accounts (the "Deposit Accounts") with banks, in the name of the Borrower and subject to the terms of this Agreement, as described in Schedule V hereto.

7.      It is a condition precedent to the making of the initial Loan by the Lender under the Credit Agreement that the Borrower shall have granted the assignment and security interest and made the pledge and assignment contemplated by this Agreement.

8.      Terms defined in the Credit Agreement and not otherwise defined in this Agreement are used in this Agreement as defined in the Credit Agreement. Further, unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 8 or 9 of the UCC (as defined below) and/or in the Federal Book Entry Regulations (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9 and/or the Federal Book Entry Regulations. "UCC" means the Uniform Commercial Code as in effect, from time

B-2

to time, in the State of California; <u>provided</u> that, if the attachment, perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority. The term "<u>Federal Book Entry Regulations</u>" means (a) the federal regulations contained in Subpart B ("Treasury/Reserve Automated Debt Entry System (TRADES)") governing book-entry securities consisting of U.S. Treasury bills, notes and bonds and Subpart D ("<u>Additional Provisions</u>") of 31 C.F.R. Part 357, 31 C.F.R. § 357.2, § 357.10 through § 357.15 and § 357.40 through § 357.45 and (b) to the extent substantially similar to the federal regulations referred to in clause (a) above (as in effect from time to time), the federal regulations governing other book-entry securities.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lender to make each Loan under the Credit Agreement, the Borrower hereby agrees with the Lender as follows:

Section 1.    <u>Grant of Security</u>. The Borrower hereby grants to the Lender a security interest in all of the Borrower's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Borrower, wherever located, and whether now or hereafter existing or arising, as security for the Secured Obligations (as defined below) (collectively, the "<u>Collateral</u>"):

(a)    all equipment (any and all such property being the "<u>Equipment</u>");

(b)    all inventory (any and all such property being the "<u>Inventory</u>");

(c)    all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e), or (f) below, being the "<u>Receivables</u>", and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "<u>Related Contracts</u>");

B-3

(d)    the following (the "<u>Security Collateral</u>"):

(i)    all shares of stock and other equity interests from time to time acquired by or owned by the Borrower in any manner (such shares and other equity interests being the "<u>Pledged Interests</u>"), and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other equity interests and all subscription warrants, rights or options issued thereon or with respect thereto;

(ii)    all indebtedness from time to time owed to the Borrower (such indebtedness being the "<u>Pledged Debt</u>") and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness; and

(iii)    all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Borrower has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all subscription warrants, rights or options issued thereon or with respect thereto;

(e)    the following (collectively, the "<u>Account Collateral</u>"):

(i)    the Deposit Accounts and all funds and financial assets from time to time credited thereto (including, without limitation, all cash equivalents), all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such funds and financial assets, and all certificates and instruments, if any, from time to time representing or evidencing the Deposit Accounts;

(ii)    all promissory notes, certificates of deposit, deposit accounts, checks and other instruments from time to time delivered to or otherwise possessed by the Lender for or on behalf of the Borrower, including, without limitation, those delivered or possessed in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)    all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or

otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral;

(f)      the following (collectively, the "Intellectual Property Collateral"):

(i)      all patents, patent applications and inventions claimed or disclosed therein and all improvements thereto ("Patents");

(ii)      all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable law), together, in each case, with the goodwill symbolized thereby ("Trademarks");

(iii)      all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), Internet web sites and the content thereof, whether registered or unregistered ("Copyrights");

(iv)      all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("Computer Software");

(v)      all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "Trade Secrets"), and all other intellectual, industrial and intangible property of any type;

(vi)      all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration set forth in Schedule IV hereto (as such Schedule IV may be supplemented from time to time), together with, as applicable, all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)      all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Borrower accruing thereunder or pertaining thereto;

B-5

(viii)    all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Borrower, now or hereafter, is a party or a beneficiary ("IP Agreements"); and

(ix)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)    all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of the Borrower pertaining to any of the Collateral; and

(h)    all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (g) of this Section 1 and this clause (h)) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, (B) tort claims, including, without limitation, all commercial tort claims and (C) cash; provided, however, that notwithstanding anything to the contrary contained in clause (f) above, Intellectual Property Collateral shall not include intellectual property in relation to which any applicable law, regulation, agreement with a domain-name registrar, or other contractual arrangement, prohibits the creation of a security interest therein or would otherwise invalidate the Borrower's right, title or interest therein.

Section 2.    Security for Obligations. This Agreement and the Collateral secures the payment and performance of all Obligations of the Borrower now or hereafter existing under the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such Obligations being the "Secured Obligations").

Section 3.    Borrower Remains Liable. Anything herein to the contrary notwithstanding, (a) the Borrower shall remain liable under the contracts and agreements included in the Borrower's Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall the Lender be obligated to perform any of the

B-6

obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 5.    <u>Superpriority Claim and Liens</u>. So long as any Loan or any other Obligation (other than indemnification Obligations for which no claims have been made) of the Borrower under any Loan Document shall remain unpaid or unsatisfied or the Lender shall have any Commitment under the Credit Agreement, the Borrower hereby covenants, represents and warrants that, upon entry of the DIP Order, the Obligations of the Borrower under the Loan Documents shall be secured by the Liens and claims to the extent provided in the DIP Order and Sections 2.10 and 2.11 of the Credit Agreement.

Section 6.    <u>Representations and Warranties</u>. The Borrower represents and warrants as follows:

(a)    The Borrower's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in <u>Schedule I</u> hereto. The Borrower is located (within the meaning of Section 9-307 of the UCC) and has its chief executive office and the office in which it maintains the copies of each Related Contract to which the Borrower is a party and all originals of all chattel paper that evidence Receivables of the Borrower, in the state or jurisdiction set forth in <u>Schedule I</u> hereto. The information set forth in <u>Schedule I</u> hereto with respect to the Borrower is true and accurate in all respects. The Borrower has not within the last year changed its name, location, chief executive office, place where it maintains its agreements, type of organization, jurisdiction of organization or organizational identification number from those set forth in <u>Schedule I</u> hereto except as disclosed in <u>Schedule III</u> hereto.

(b)    The Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, claim, option, or right of others, other than Liens permitted under the Credit Agreement and the DIP Order. No effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Borrower or any trade name of the Borrower as debtor is on file in any recording office, except such as may have been filed in favor of the Lender relating to the Loan Documents or as otherwise permitted under the Credit Agreement and the DIP Order.

(c)    The Pledged Interests pledged by the Borrower constitute the percentage of the issued and outstanding equity interests of the issuers thereof indicated on <u>Schedule II</u> hereto.

(d)    As of the Effective Date, the Borrower has no deposit accounts, other than the Account Collateral listed on <u>Schedule V</u> hereto, as such <u>Schedule V</u> may be amended from time to time upon the reasonable request of the Lender.

B-7

(e)        All filings and other actions (other than (A) actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-105 and 9-107 of the UCC and Section 16 of Uniform Electronic Transactions Act and (B) actions necessary to perfect the Lender's security interest with respect to Collateral evidenced by a certificate of ownership) necessary to perfect, to the extent that perfection can be accomplished by such filings or other actions, the security interest in the Collateral of the Borrower created under this Agreement have been (or contemporaneously herewith will be) duly made or taken and, upon the entry by the Bankruptcy Court of the DIP Order, are (or, upon filing or taking of such other actions, will be) in full force and effect, and upon the entry by the Bankruptcy Court of the DIP Order and without in any way diminishing or limiting the effect of the DIP Order, this Agreement creates in favor of the Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral of the Borrower, to the extent that perfection can be accomplished by such filings or actions, subject to the Carve-Out and Liens permitted under the Credit Agreement and the DIP Order, securing the payment of the Secured Obligations. Notwithstanding the foregoing, nothing in this Agreement shall require the Borrower to make any filings or take any actions to record or perfect the security interest in any Intellectual Property Collateral outside the United States.

(f)        Subject to the entry of the DIP Order, no further authorization or approval or other action by, and no further notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Borrower of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Borrower, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority nature of such security interest, subject to the Carve-Out and Liens permitted under the Credit Agreement and the DIP Order), or (iii) the exercise by the Lender of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(g)        Upon entry of the DIP Order, the Borrower has the corporate power and authority and the legal right to execute and deliver, to perform its obligations under, and to grant the Lien on the Collateral pursuant to, this Agreement and has taken all necessary corporate actions to authorize its execution, delivery and performance of, and grant of the Lien on the Collateral pursuant to, this Agreement.

(h)        Upon the entry of the DIP Order, the Borrower is duly authorized to execute and deliver this Agreement to the Lender, and this Agreement constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws

DWT 29152205v5 0091125-000008

000086

affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law).

      Section 7.    <u>Further Assurances</u>.

      (a)    The Borrower agrees that from time to time, at the expense of the Borrower, the Borrower will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Borrower hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Borrower will promptly with respect to Collateral: (i) if an Event of Default shall have occurred and be continuing or if requested by the Lender, and without further order of the Bankruptcy Court, mark conspicuously each document included in Inventory, each chattel paper included in Receivables, each Related Contract and, at the request of the Lender, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Lender, indicating that such document, chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) if any such Collateral shall be evidenced by a promissory note or other instrument or chattel paper individually or in the aggregate in an amount in excess of $100,000, at the reasonable request of the Lender, deliver and pledge to the Lender hereunder such note or instrument or chattel paper duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Lender; (iii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Lender may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted by the Borrower hereunder; (iv) at the reasonable request of the Lender, deliver and pledge to the Lender certificates representing Security Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (v) at the reasonable request of the Lender, take all action necessary to ensure that the Lender has control of Collateral consisting of deposit accounts, electronic chattel paper, investment property, letter-of-credit rights and transferable records as provided in Sections 9-104, 9-105, 9-106 and 9-107 of the UCC and in Section 16 of Uniform Electronic Transactions Act; (vi) at the reasonable request of the Lender, take all action to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership; (vii) at the reasonable request of the Lender, cause the Lender to be the beneficiary under all letters of credit that constitute Pledged Collateral, with the exclusive right to make all draws under such letters of credit, and with all rights of a transferee under Section 5-114(e) of the UCC; and (viii) at the reasonable request of the Lender, deliver to the Lender evidence that all other action that the Lender may reasonably deem necessary in order to perfect and protect the security interest created by the Borrower under this Agreement has been taken.

B-9

(b)      The Borrower hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Borrower, in each case without the signature of the Borrower, and regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. The Borrower ratifies its authorization for the Lender to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c)      The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral of the Borrower and such other reports in connection with such Collateral as the Lender may reasonably request, all in reasonable detail and similar in nature and scope to other statements and schedules required under or constituting a part of this Agreement.

Section 8.      Post-Closing Changes; Collections on Receivables and Related Contracts.

(a)      The Borrower will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 6(a) of this Agreement without first giving at least 15 days' prior written notice to the Lender and taking all action reasonably required by the Lender for the purpose of perfecting or protecting the security interest granted by this Agreement. The Borrower will hold and preserve its records relating to the Collateral, including, without limitation, the Related Contracts.

(b)      Except as otherwise provided in this subsection (b), the Borrower will continue to have the right to collect, at its own expense, all amounts due or to become due the Borrower under the Receivables and Related Contracts. In connection with such collections, the Borrower may take (and, during an Event of Default at the Lender's direction, will take) such action as the Borrower or, during an Event of Default, the Lender may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; provided, however, that the Lender shall have the right at any time, upon the occurrence and during the continuance of an Event of Default and upon written notice to the Borrower of its intention to do so, to notify each person obligated under any Receivables and Related Contracts (each, an "Obligor") of the assignment of such Receivables and Related Contracts to the Lender and to direct such Obligors to make payment of all amounts due or to become due to the Borrower thereunder directly to the Lender and, upon such notification and at the reasonable expense of the Borrower, to enforce collection of any such

B-10

Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Borrower might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Borrower of the notice from the Lender referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Borrower in respect of the Receivables and Related Contracts of the Borrower shall be received in trust for the benefit of the Lender hereunder, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement) to be applied as provided in Section 15(b) and (ii) the Borrower will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof, or allow any credit or discount thereon. The Borrower will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 9.     Intellectual Property Collateral.

(a)     The Borrower shall take all steps which it or the Lender deems reasonable and appropriate under the circumstances to preserve and protect each item of its material Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks.

(b)     The Borrower agrees that should it obtain an ownership interest in any item of the type set forth in Section 1(f) that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto. Within 10 days of acquiring After-Acquired Intellectual Property, the Borrower shall give prompt written notice to the Lender identifying the After-Acquired Intellectual Property acquired, and the Borrower shall execute and deliver to the Lender with such written notice, or otherwise authenticate, an agreement covering the registered or applied for U.S. After-Acquired Intellectual Property, in form and substance acceptable to the Lender, which the Lender may record with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or any other U.S. governmental authorities necessary to perfect the security interest hereunder in such registered or applied for After-Acquired Intellectual Property.

B-11

Section 10.        <u>Voting Rights; Dividends; Etc.</u>

(a)        So long as no Event of Default shall have occurred and be continuing:

(i)        The Borrower shall be entitled to exercise any and all voting and other consensual rights pertaining to the Security Collateral of the Borrower or any part thereof for any purpose;

(ii)        The Borrower shall be entitled to receive and retain any and all dividends, interest and other distributions paid in respect of the Security Collateral of the Borrower if and to the extent that the payment thereof is not otherwise prohibited by the terms of the Loan Documents; <u>provided</u>, <u>however</u>, that any and all

(A)        dividends, interest and other distributions paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Security Collateral,

(B)        dividends and other distributions paid or payable in cash in respect of any Security Collateral of the Borrower in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and

(C)        cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Security Collateral of the Borrower,

shall be, and shall be forthwith delivered to the Lender to hold as, Security Collateral and shall, if received by the Borrower, be received in trust for the benefit of the Lender, be segregated from the other property or funds of the Borrower and be forthwith delivered to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

(iii)        The Lender will execute and deliver (or cause to be executed and delivered) to the Borrower all such instruments as the Borrower may reasonably request for the purpose of enabling the Borrower to exercise the voting and other rights that it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments that it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)        Upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the DIP Order:

(i)        All rights of the Borrower (A) to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be

DWT 29152205v5 0091125-000008

entitled to exercise pursuant to Section 10(a)(i) shall, upon notice to the Borrower by the Lender, cease and (B) to receive the dividends, interest and other distributions that it would otherwise be authorized to receive and retain pursuant to Section 10(a)(ii) shall automatically cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights and to receive and hold as Security Collateral such dividends, interest and other distributions.

(ii)     All dividends, interest and other distributions that are received by the Borrower contrary to the provisions of paragraph (i) of this Section 10(b) shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

Section 11.     <u>Transfers and Other Liens; Additional Shares</u>.

(a)     The Borrower agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, other than sales, assignments and other dispositions of Collateral, and options relating to Collateral, permitted under the terms of the Credit Agreement or expressly permitted by the DIP Order, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral of the Borrower except for the pledge, assignment and security interest created under this Agreement and Liens permitted under Section 6.1 of the Credit Agreement or expressly permitted by the DIP Order; <u>provided</u> that in no event shall any of the Security Collateral be sold, assigned or disposed of or be or become subject to a Lien (other than the Liens created under this Agreement).

(b)     The Borrower agrees that it will (i) cause each issuer of the Pledged Interests pledged by the Borrower not to issue any equity interests or other securities in addition to or in substitution for the Pledged Interests issued by such issuer, except to the Borrower, and (ii) pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional equity interests or other securities.

Section 12.     <u>Lender Appointed Attorney-in-Fact</u>. Subject to the DIP Order, the Borrower hereby irrevocably appoints the Lender the Borrower's attorney-in-fact, with full authority in the place and stead of the Borrower and in the name of the Borrower or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, in the Lender's discretion, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     to obtain and adjust insurance claims with respect to the Collateral,

B-13

(b)      to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)      to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)      to file any claims or take any action or institute any proceedings that the Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

Section 13.     <u>Lender May Perform</u>. If the Borrower fails to perform any agreement contained herein, the Lender may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by the Borrower under Section 15.

Section 14.     <u>The Lender's Duties</u>. The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 15.     <u>Remedies</u>. If any Event of Default shall have occurred and be continuing, within five Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditors' Committee, the UST and the Bankruptcy Court) and subject to the terms of the DIP Order:

(a)      The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's

B-14

offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable; (iii) occupy any premises owned or leased by the Borrower where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to the Borrower in respect of such occupation; and (iv) exercise any and all rights and remedies of the Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Borrower agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Any cash held by or on behalf of the Lender and all cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Lender pursuant to Section 15) in whole or in part by the Lender against, all or any part of the Secured Obligations, as set forth in Section 7.3 of the Credit Agreement. Any surplus of such cash or cash proceeds held by or on behalf of the Lender and remaining after payment in full of all of the Secured Obligations shall be paid over to the Borrower or to whomsoever may be lawfully entitled to receive such surplus.

(c)     All payments received by the Borrower in respect of the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement).

(d)     The Lender may at any time or from time to time, charge, set-off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account. The Lender agrees to notify the Borrower promptly after any such charge or set-off; provided that failure to give such notice shall not affect the validity of such charge or set-off.

B-15

(e)     In the event of any sale or other disposition of any of the Intellectual Property Collateral of the Borrower, the goodwill symbolized by any Trademarks subject to such sale or other disposition shall be included therein, and the Borrower shall supply to the Lender or its designee the Borrower's know-how and expertise relating to such Intellectual Property Collateral, and documents relating to any Intellectual Property Collateral subject to such sale or other disposition, and the Borrower's customer lists and other records and documents relating to such Intellectual Property Collateral and to the manufacture, distribution, advertising and sale of products and services of the Borrower that relate to such Intellectual Property Collateral.

(f)     If the Lender shall determine to exercise its right to sell all or any of the Security Collateral of the Borrower pursuant to this Section 15, the Borrower agrees that, upon request of the Lender, the Borrower will, at its own expense, do or cause to be done all such other acts and things as may be necessary to make such sale of such Security Collateral or any part thereof valid and binding and in compliance with applicable law.

(g)     The Lender is authorized, in connection with any sale of the Security Collateral pursuant to this Section 15, to deliver or otherwise disclose to any prospective purchaser of the Security Collateral any information in its possession relating to such Security Collateral.

(h)     At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Lender may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of the Borrower (all said rights being also hereby waived and released to the extent permitted by applicable law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Lender from the Borrower as a credit against the purchase price, and the Lender may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Borrower therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Lender shall be free to carry out such sale pursuant to such agreement and the Borrower shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Lender shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full.

(i)     In the event and to the extent that the provisions of this Section 15 conflict with what is set forth in the DIP Order, the DIP Order shall govern.

B-16

Section 16.    Indemnity and Expenses.

(a)    The Borrower agrees to indemnify, defend and save the Lender and each of its Affiliates and its respective officers, directors, employees, agents, sub-agents and advisors (each, an "Indemnified Party") from, and hold harmless each Indemnified Party against, and shall pay on demand, any and all claims, damages, losses, liabilities and related expenses (including, without limitation, the fees, charges and disbursements of counsel for any Indemnified Party) incurred by or asserted against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

(b)    The Borrower will upon demand pay to the Lender the amount of any and all reasonable documented out-of-pocket expenses, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral of the Borrower, (iii) the exercise or enforcement of any of the rights of the Lender or (iv) the failure by the Borrower to perform or observe any of the provisions hereof.

Section 17.    Amendments; Waivers; Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and, with respect to any amendment, the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 18.    Notices, Etc. All notices, requests and demands to or upon the Lender or the Borrower hereunder shall be effected in the manner provided for in Section 8.2 of the Credit Agreement.

Section 19.    Continuing Security Interest; Assignments under the Credit Agreement. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitments have been terminated, (b) be binding upon the Borrower, its successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder and its respective successors and permitted

B-17

assigns. Without limiting the generality of the foregoing clause (c), the Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of its Commitment and the Obligations) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender herein or otherwise, in each case as provided in Section 8.7 of the Credit Agreement.

Section 20.    Release; Termination. At such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrower. Upon any such termination, the Lender will, at the Borrower's expense, promptly execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

Section 21.    Execution in Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic imaging means shall be effective as delivery of a manually executed counterpart hereof.

Section 22.    Governing Law. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of California, and to the extent applicable, the Bankruptcy Code.

*(Signature pages follow.)*

B-18

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

QUANTUM FUEL SYSTEMS
TECHNOLOGIES WORLDWIDE, INC.

By_____
    Name:
    Title:

B-19

DOUGLAS ACQUISITIONS LLC


By_____
        Tim McGaw
        President

DWT 29152205v5 0091125-000008

000098

**EXHIBIT C**

**BUDGET**

C-1

DWT 29152205v5 0091125-000008

000099

# EXHIBIT C

000100

**Quantum Fuel Systems Technologies Worldwide Inc.**
DIP Financing - Cash Flow
($000s)

| Week Ending | 3/25/16 | 4/1/16 | 4/8/16 | 4/15/16 | 4/22/16 | 4/29/16 | 5/6/16 | 5/13/16 | 5/20/16 | 5/27/16 | 6/3/16 | 6/10/16 | 6/17/16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | | | | | | |
| Customer Receipts | 120 | 118 | 211 | 516 | 240 | 278 | 290 | 402 | 246 | 465 | 465 | 840 | 840 | 5,031 |
| **Non-Operating:** | | | | | | | | | | | | | | |
| DIP Financing - Draw / (Paydown) | 2,288 | 1,114 | 256 | 693 | 232 | 1,302 | 171 | (1,866) | 102 | 1,248 | 91 | (86) | 326 | 5,870 |
| Schneider Power – Asset Sale | - | - | - | - | - | - | - | 2,238 | - | - | - | - | - | 2,238 |
| Total Financing Proceeds | 2,288 | 1,114 | 256 | 693 | 232 | 1,302 | 171 | 372 | 102 | 1,248 | 91 | (86) | 326 | 8,108 |
| **Total Receipts and Financing Proceeds** | **2,408** | **1,232** | **467** | **1,209** | **472** | **1,580** | **461** | **774** | **348** | **1,713** | **556** | **754** | **1,166** | **12,871** |
| **Disbursements:** | | | | | | | | | | | | | | |
| **Operations:** | | | | | | | | | | | | | | |
| Trade Accounts Payable | (1,837) | (619) | (165) | (604) | (215) | (840) | (190) | (215) | (215) | (923) | (283) | (265) | (583) | (6,954) |
| Section 503(b)(9) Administrative Expenses (1) | - | - | - | - | (72) | - | - | - | - | - | - | - | - | (100) |
| Payroll | - | (367) | - | (410) | - | (369) | - | (369) | - | (369) | - | (369) | - | (2,559) |
| Facilities | (36) | - | (36) | - | (90) | - | (36) | - | (36) | (60) | (36) | - | (36) | (399) |
| Insurance | (120) | (146) | (53) | - | (60) | (136) | (53) | (15) | (72) | (136) | (53) | - | (72) | (706) |
| Capital Expenditures | (3) | - | - | (20) | (30) | - | - | - | (20) | - | - | (20) | (20) | (128) |
| Total | (2,068) | (1,132) | (254) | (1,034) | (467) | (1,345) | (279) | (599) | (343) | (1,488) | (372) | (654) | (811) | (10,846) |
| **Non-Operating:** | | | | | | | | | | | | | | |
| Company Restructuring Advisors / CRO (Accrued) | - | (95) | - | (95) | - | (95) | - | (95) | - | (95) | - | (95) | - | (570) |
| Debtor Counsel (Accrued) | - | - | (200) | - | - | - | (150) | - | - | - | (150) | - | - | (500) |
| Unsecured Creditor Committee (Accrued) | - | - | - | (75) | - | - | - | (75) | - | - | - | - | - | (150) |
| Claims Agent (Accrued) | - | - | - | - | - | (75) | - | - | - | (75) | - | - | (75) | (225) |
| Investment Banker | (10) | - | - | - | - | (50) | - | - | - | (50) | - | - | - | (100) |
| Securities Counsel | - | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (70) |
| US Trustee | - | - | - | - | - | (10) | - | - | - | - | - | - | - | (10) |
| Liquidation Trustee, Wind Down Costs, etc. | - | - | - | - | - | - | - | - | - | - | - | - | (250) | (250) |
| Retainers / Deposits | (225) | - | - | - | - | - | - | - | - | - | - | - | - | (225) |
| Interest and Fees | (135) | (100) | (8) | (75) | - | (27) | (75) | - | (5) | - | (29) | (100) | (25) | (223) |
| Total | (370) | (100) | (213) | (175) | (5) | (235) | (182) | (175) | (5) | (225) | (184) | (100) | (355) | (2,324) |
| **Total Disbursements** | **(2,438)** | **(1,232)** | **(467)** | **(1,209)** | **(472)** | **(1,580)** | **(461)** | **(774)** | **(348)** | **(1,713)** | **(556)** | **(754)** | **(1,166)** | **(13,169)** |
| | | | | | | | | | | | | | | |
| Beginning Book Balance | 80 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Total Weekly Receipts | 2,408 | 1,232 | 467 | 1,209 | 472 | 1,580 | 461 | 774 | 348 | 1,713 | 556 | 754 | 1,166 | |
| Total Weekly Disbursements | (2,438) | (1,232) | (467) | (1,209) | (472) | (1,580) | (461) | (774) | (348) | (1,713) | (556) | (754) | (1,166) | |
| Ending Book Balance | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |

Note:
(1) Estimate based on high level discussions with the Company.

000101

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| VICTOR A. VILAPLANA, CA Bar No. 58535<br>MARSHALL J. HOGAN, CA Bar No. 286147<br>3579 Valley Centre Drive, Suite 300<br>San Diego, CA 92130<br>P: 858.847.6700  F:  858.792.6773<br>JOHN A. SIMON (Pro Hac Vice Pending)<br>FOLEY & LARDNER LLP<br>500 Woodward Avenue, Ste. 2700<br>Detroit, MI 48226-3489<br>P: 313.234.7100  F: 313.234.2800<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Debtor Quantum Fuel Systems Tech | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -  SANTA ANA DIVISION**

| In re:<br><br>QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC., DBA QUANTUM TECHNOLOGIES,<br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 8:16-BK-11202<br>CHAPTER: 11<br><br>**STATEMENT REGARDING**<br>**CASH COLLATERAL OR**<br>**DEBTOR IN POSSESSION FINANCING**<br>**[FRBP 4001; LBR 4001-2]**<br><br>DATE:          03/28/2016<br>TIME:          2:00 PM<br>COURTROOM: 6C<br>ADDRESS:     411 WEST FOURTH STREET<br>                      SANTA ANA, CA 92701 |

| Secured party(ies): | Affected parties asserting security interests in the collateral (as defined in the Motion): Bridge Bank, Noteholders |
|---|---|

The Debtor has requested the approval of either (1) a motion for use of cash collateral, or postpetition financing, or both, or (2) through a separately-filed motion, a stipulation providing for the use of cash collateral, or postpetition financing, or both.  The proposed form of order on the motion or the stipulation contains the following provisions or findings of fact:

| | Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B) | Page No.: | Line No. (if applicable) |
|---|---|---|---|
| ☒ | (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)" | 8 | |
| ☒ | (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim"<br>☐ Cross-collateralization, *i.e.*, clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law<br>☐ Roll-up, *i.e.*, provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | 7 | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | |
|---|---|---|
| *Continued from page 1* <br>      ☐   Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | | |
| ☐   (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim" | | |
| ☒   (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay" <br>      ☐   Automatic relief from the automatic stay upon occurrence of certain events. | 13 | |
| ☐   (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364" | | |
| ☐   (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order" | | |
| ☐   (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien" | | |
| ☐   (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action" | | |
| ☒   (ix): "[T]he indemnification of any entity" | 7 | |
| ☐   (x): "[A] release, waiver, or limitation of any right under § 506(c)" <br>      ☐   The granting of any lien on any claim or cause of action arising under § 506(c) | | |
| ☒   (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)" | | |
| **Additional Disclosures Required by LBR 4001-2** | **Page No.:** | **Line No. (if applicable)** |
| ☐   With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | | |
| ☐   Pay down prepetition principal owed to a creditor | | |
| ☐   Findings of fact on matters extraneous to the approval process | | |

03/23/2016     Victor A. Vilaplana                   /s/ Victor A. Vilaplana

*Date*             *Printed Name*                       *Signature*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:


A true and correct copy of the foregoing document entitled: **STATEMENTREGARDING CASH COLLATERAL OR DEBTOR IN POSSESSION FINANCING [FRBP 4001; LBR 4001-2]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


_____   _____   _____
*Date*                       *Printed Name*                                              *Signature*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

3579 Valley Centre Drive, Suite 300, San Diego, CA  92130
A true and correct copy of the foregoing document entitled (*specify*): DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO (1) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (2) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (3) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF


will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 23, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Megan M Adeyemo    madeyemo@gordonrees.com, dhouser@gordonrees.com
Jeffrey D Cawdrey    jcawdrey@gordonrees.com,
slemos@gordonrees.com;jmydlandevans@gordonrees.com;amontgomery@gordonrees.com
Jennifer E Duty    jduty@gordonrees.com, jmydlandevans@gordonrees.com
Michael J Hauser    michael.hauser@usdoj.gov
Marshall J Hogan    mhogan@foley.com, vgoldsmith@foley.com
Steven G Polard    stevenpolard@dwt.com, melissastrobel@dwt.com;Linapearmain@dwt.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
Victor A Vilaplana    vavilaplana@foley.com, rhurst@foley.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **March 23, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 23, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**(Via attorney service for delivery first a.m. 3/24/16)**
Hon. Mark S. Wallace
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street
Santa Ana, CA  92701

**See attached list**

☒ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/23/16 | Raechelle Hurst | /s/  Raechelle Hurst |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (continued)**

List of creditors served via email:

List of Creditors Who Have 20 Largest Unsecured Claims

| | |
|---|---|
| Asola Automotive<br>Solar Deutschland<br>GmbH<br>99099 Erfurt Germany<br>erfurt@reinhardtinsolvenzverwalter.de | Baker Hostetler<br>P.O. Box 70189<br>Cleveland, OH<br>44190-0189<br>Joan Finlin<br>jfinlin@bakerlaw.com |
| Clean Air Power, Inc.<br>13615 Stowe Drive<br>Poway, CA 92064<br>Amy Hoover<br>accounting@cleanairpower.com | Columbus Transportation & Logistics, LLC<br>725 280th Road<br>Milford, NE 68405<br>Shannon Duggan<br>columbustransportation@gmail.com<br>Kathy@daws-trucking.com |
| Concise Fabricators, Inc.<br>3220 E. Lincoln Street<br>Tucson, AZ 85714<br>Andy Platt<br>aplatt@concisefab.com | Convenience Transportation, LLC<br>2122 Oak St.<br>La Crosse, WI 54603<br>Carl Suhr<br>CSuhr@kwiktrip.com |
| Dowding Industries, Inc.<br>449 Marlin Avenue<br>Eaton Rapids, MI 48827<br>Rebecca Roberts<br>rroberts@dowdingindustries.com<br>cdowding@dowdingindustries.com | Duggan Manufacturing LLC<br>50150 Ryan Road<br>Utica, MI 48317<br>Julie Neagos<br>JNeagos@dugganmfg.com |
| Exotic Rubber& Plastics<br>34700 Grand River Ave<br>Farmington, MI 48335<br>Carole Atkins<br>catkins@erpc.com | Haskell & White LLP<br>8001 Irvine Center Drive Suite 300<br>Irvine, CA 92618<br>Kiera Smith<br>ksmith@hwcpa.com |
| ITT Industries Conoflow Inc.<br>105 Commerce Way<br>Westminster, SC 29693<br>Christina Carlino<br>Christina.Carlino@itt.com | Mainstay Fuel Technologies LLC<br>32 Concourse Way<br>Greer, SC 29650<br>Charm Lowe<br>accounting@mainstayfueltech.com<br>rod@mainstayfueltech.com |
| Mitsubishi Rayon - Sacramento<br>5900 88th Street<br>Sacramento, CA 95828<br>Martin Kokoshka<br>martin.kokoshka@MRCFAC.com | Performance Composites, Inc.<br>1418 Alameda Street<br>Compton, CA 90221<br>Mayra Garcia<br>mgarcia@performancecomposites.co m |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                          **F 9013-3.1.PROOF.SERVICE**

| | |
|---|---|
| Donald.carter@MRCFAC.com | |
| Praxair Inc.<br>1555 E. Edinger<br>Ave. Santa Ana, CA 92705<br>Dick Leon<br>Dick_Leon@praxair.com | Sonoco Protective Solutions, Inc.<br>One North 2nd Street<br>Hartsville, SC 29550<br>Ryan McCutchen<br>Ryan.Mccutchen@ sonoco.com |
| The Nasdaq<br>805 King Farm Blvd.<br>Rockville, MD 20850<br>Dan Paulo Vizconde<br>DanPaulo.Vizconde@nasdaq.com | Toray Carbon Fiber America, Inc.<br>700 Parker Square<br>Flower Mound, TX 75028<br>Erin Earnest<br>Erin.Earnest@toraycfa.com |
| WEH Technologies, Inc. (USA)<br>24903 Laguna Edge Drive<br>Katy, TX 77494<br>Tiffany Horsman<br>tiffany.horsman@eh.us | West Coast Gasket Co. Inc.<br>300 Ranger Street<br>Brea, CA 92821<br>Angel Harren<br>aharren@westcoastgasket.com<br>lrussell@westcoastgasket.com |
| Bridge Bank, National<br>Association<br>55 Almaden Blvd.<br>San Jose, CA 95113<br>lori.edwards@bridgebank.com | Metropolis Gardens, LLC<br>c/o Cynthia Stelzer Esq.<br>Kimball, Tirey & St. John LLP<br>7676 Hazard Center Dr, Suite 900B<br>San Diego, CA 92108<br>customerservice@gardencommunities.com |
| NMHG Financial Services, Inc.<br>10 Riverview Drive<br>Danbury, CT 06810<br>service@nmhgfinancial.com | Timothy McGaw<br>125 E. Sir Francis Drake<br>Blvd.<br>Suite 400<br>Larkspur, CA 94939-1820<br>tmcgaw@dougtel.com |
| OCE Financial Services, Inc.<br>5450 North Cumberland<br>Chicago, IL 60656-0149<br>customercare@csa.cannon.com | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**