VICTOR A. VILAPLANA, CA Bar No. 58535
  vavilaplana@foley.com
MARSHALL J. HOGAN, CA Bar No. 286147
  mhogan@foley.com
FOLEY & LARDNER LLP
3579 Valley Centre Drive, Suite 300
SAN DIEGO, CA 92130
P:  858.847.6700   F:   858.792.6773

JOHN A. SIMON (*Pro Hac Vice Pending*)
  jsimon@foley.com
FOLEY & LARDNER LLP
500 Woodward Avenue, Ste. 2700
Detroit, MI 48226-3489
P: 313.234.7100   F: 313.234.2800

Proposed Attorneys for Debtor Quantum Fuel
Systems Technologies Worldwide, Inc. dba
Quantum Technologies

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| IN RE<br><br>QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC. DBA QUANTUM TECHNOLOGIES<br><br>DEBTOR, | ) CASE NO: 8:16-BK-11202-MW<br>)<br>) Chapter 11<br>)<br>) JUDGE: HON. MARK S. WALLACE<br>)<br>) **FIRST DAY DECLARATION OF WILLIAM**<br>) **BRIAN OLSON IN SUPPORT OF**<br>) **VOLUNTARY PETITION AND FIRST DAY**<br>) **MOTIONS**<br>)<br>) **HEARING DATE AND TIME:**<br>) **DATE:        March 28, 2016**<br>) **TIME:        2:00 PM**<br>) **CTRM:        6C**<br>)              **411 West Fourth Street**<br>)              **Santa Ana, CA 92701** |

4833-6564-4591.4

## TABLE OF CONTENTS

I.    BACKGROUND AND FACTUAL OVERVIEW .......................................................... 2

    A.    Debtor's Formation and Business Overview .......................................... 2

    B.    Business Operations ........................................................................... 2

    C.    The Debtor's Financing Arrangements ................................................. 3

        1.    Bridge Bank Line of Credit ...................................................... 3
        2.    Convertible Notes. ................................................................... 4

    D.    The Debtor's Equity Structure ........................................................... 5

    E.    Debtor's Restructuring Efforts and Events Leading to Chapter 11 Filing ................ 5

II.    FIRST DAY MOTIONS ........................................................................................ 6

    A.    Debtor's Emergency Motion For Entry Of Interim And Final Orders
Authorizing Debtor To (1) Use Cash Collateral Pursuant To 11 U.S.C. § 363,
(2) To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362
And 364, And (3) Granting Related Relif (the "DIP Financing Motion") ................ 6

    B.    Debtor's Emergency Motion for Order Pursuant to Sections 105(a), 363(b),
and 507(a) of the Bankruptcy Code Authorizing (I) Payment of Wages
Compensation and Employee Benefits; (II) Continuation of Employee
Benefit Programs; and (III) Financial Institutions to Honor and Process
Checks and Transfers Related Thereto (the "Employee Payments Motion"). .......... 8

    C.    The Debtor's Prepetition Employee Obligations ................................... 9

        1.    Wages, Salaries, and Compensation .......................................... 9
        2.    Payroll Taxes ......................................................................... 10
        3.    Expense Reimbursements ........................................................ 10
        4.    Employee Benefits .................................................................. 11
        5.    PTO Plans ............................................................................. 11
        6.    Health and Welfare Plans ........................................................ 12
        7.    Medical and Dental Plans. ....................................................... 12
        8.    Life Insurance. ....................................................................... 12
        9.    Disability Benefits. ................................................................. 13
        10.    Workers' Compensation Plans ................................................. 13
        11.    401(k) and Roth Plans ............................................................. 13
        12.    Flex Accounts ....................................................................... 14
        13.    It is Necessary for the Debtor to Pay the Employment Obligations ............ 14
        14.    Employees are Employed and Not Insiders ................................ 14
        15.    Debtor's Ability to Pay Employee Obligations and Outlook .............. 15

    D.    Debtor's Emergency Motion for Entry of an Order Limiting Notice and
Related Relief (the "Limit Notice Motion") ......................................... 15

E.    **Debtor's Emergency Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And 366: (i) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service, (ii) Determining Adequate Assurance Of Payment For Future Utility Services, And (iii) Establishing Procedures For Determining Adequate Assurance Of Payment (the "Utilities Motion")** ........................................ 16

4833-6564-4591.4

I, William Brian Olson ("Olson"), declare (the "Declaration"), pursuant to 28 U.S.C. § 1746, as follows:

I am the President and Chief Executive Officer ("CEO") of Quantum Fuel Systems Technologies Worldwide, Inc. (the "Debtor"), a corporation organized under the laws of the State of Delaware.  The Debtor is the debtor-in-possession in the Case; and, I am authorized to submit this Declaration on behalf of the Debtor.

As a result of my work for the Debtor as its CEO and my review of public and non-public documents relating to the Debtor, I am personally familiar with the Debtor's day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could testify competently to such matters.

I was appointed President and Chief Executive Officer of Quantum Fuel Systems Technologies Worldwide Inc. in May of 2012.  I also serve on Quantum's Board of Directors.  Prior to my appointment as President and CEO, I was Quantum's Chief Financial Officer and Treasurer.

On March 22, 2016, (the "Petition Date"), the "Debtor filed a petition for relief (the "Petition") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Central District of California, Southern Division (the "Court").  I am informed and believe the Debtor intends to continue in possession of its property and to operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Further, to enable the Debtor to minimize the adverse effects of the Chapter 11 filing on the business, the Debtor intends to request various types of relief in "first day" motions (collectively, the "First Day Motions").

I submit this Declaration in support of the Debtor's Chapter 11 petition and the First Day Motions.  Part I of this Declaration describes the Debtor's business and the circumstances surrounding the commencement of its Chapter 11 case.  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions.

1

## I. BACKGROUND AND FACTUAL OVERVIEW

### A. Debtor's Formation and Business Overview

The Debtor is based in Lake Forest, California.  It is a Delaware corporation, formed in October 2000.  On July 23, 2002, the Debtor became a publicly traded company.  The Debtor is a leader in innovating, developing and producing compressed natural gas (CNG) fuel storage tanks and packaged fuel storage systems for heavy-, medium-, and light-duty trucks and passenger vehicles.  The Debtor also produces integrated vehicle system technologies, including engine and vehicle control systems and drivetrains.  The Debtor supplies its tanks and systems to truck and automotive original equipment manufacturers (OEM) and aftermarket and OEM truck integrators worldwide.

The Debtor's principal office is located in Lake Forest, California.  The Debtor conducts its corporate operations, manufacturing, assembly, design, testing, and research and development n leased spaces of approximately 156,000 total square feet.

The Debtor has 111 full-time employees and 3 part-time employees, none of which are parties to a collective bargaining agreement.  During certain periods of peak demand, the Debtor has had to temporarily increase its workforce.

### B. Business Operations

In May 2014, the Debtor announced a shift in its direction from a CNG tank product platform to a complete CNG fuel storage systems platform. During the second half of 2014, the Debtor invested significant human and financial resources into building its production capabilities and expanding its customer base. As a result, I am informed and believe the Debtor significantly increased its market share during the second half of 2014.

Over the past two years, depressed oil prices have adversely affected the Debtor's growth.  A critical factor in Debtor's success is the spread between the cost of diesel fuel and natural gas because the initial cost of a CNG fuel system is more expensive than a diesel fuel truck.  As this spread has narrowed due to declining oil prices, the Debtor has experienced decreased customer interest in investing in the Debtor's tanks and systems.

In the second half of 2015, the Debtor commenced research and development into a new product offering for CNG "virtual pipeline" applications.  Virtual pipeline is a process whereby natural gas is

2

compressed and transported by truck rather than by pipe. During the second half of 2015 and continuing through the first few months of 2016, the Debtor focused on this application. However, the Debtor did not generate sufficient revenue streams nor was it able to raise sufficient capital to meet its obligations and on March 14, 2016 it defaulted on a line of credit through Bridge Bank, discussed in greater detail below. This default constituted an Event of Default under agreements underlying two issuances of convertible notes, which are discussed in greater detail below.

C.  **The Debtor's Financing Arrangements**

    1.  **Bridge Bank Line of Credit.**

On May 7, 2012, Debtor and Bridge Bank, National Association ("Bridge Bank"), entered into a Loan and Security Agreement that established a $10 million line of credit for Debtor's financing and liquidity needs (the "Bridge Bank LOC") and purporting to grant Bridge Bank a security interest in all of Debtor's existing and thereafter acquired assets and personal property. That agreement had a maturity date of May 7, 2014.

The Bridge Bank LOC has been modified several times. On May 20, 2013, Debtor and Bridge Bank entered into a Loan and Security Modification Agreement that reduced the Bridge Bank LOC to $5 million.

On March 14, 2014, Debtor and Bridge Bank further modified the Bridge Bank LOC through the Second Loan and Security Modification Agreement that extended the maturity date to March 14, 2016.

On February 6, 2015, Debtor and Bridge Bank executed a Third Loan and Security Modification Agreement, which increased the Bridge Bank LOC to $7.5 million. On January 2, 2014, Debtor and Bridge Bank executed an Intellectual Property Security Agreement asserting a security interest in Debtor's intellectual property in favor of Bridge Bank (collectively, all security interests held by Bridge Bank in assets and property of the Debtor, the "Bridge Bank Lien"). Each of the subsequent modifications only effectuated amendments to the original Loan and Security Agreement or the modified terms thereof.

On March 14, 2016, the Bridge Bank LOC matured. It was not paid and the Debtor is currently in default. As of the Petition Date, approximately $1.3 million was outstanding. I am informed and

3

believe that the collateral purportedly secured by the Bridge Bank Lien is valued at an amount significantly greater than $1.3 million.

       **2.**    **Convertible Notes.**

Debtor issued two sets of convertible notes through a Convertible Note and Warrant Purchase Agreement dated September 15, 2013 (the "2013 Note Agreement") and a Convertible Note Purchase Agreement dated June 29, 2015 (the "2015 Note Agreement").

Through the 2013 Note Agreement, Debtor raised capital through executing a series of Senior Secured Convertible Notes issued to the following parties in the following amounts:

|  | **Initial Value** |
|---|---|
| • Douglas Irrevocable Descendant's Trust | $6,000,000.00 |
| • K&M Douglas Trust | $4,000,000.00 |
| • W. Brian Olson | $100,000.00 |
| • Bradley Timon | $100,000.00 |
| • Mark Arold | $25,000.00 |
| • David & Kristina Mazaika Trust U/A/D 5/3/2008 | $100,000.00 |
| • Jonathan Lundy | $50,000.00 |
| • G. Scott Samuelsen | $50,000.00 |
| • Timothy McGaw | $50,000.00 |
| • Dave Wambeke | $125,000.00 |
| • Kevin Harris | $150,000.00 |
| • Brad Baker | $100,000.00 |
| • Rick Hartfiel | $100,000.00 |
| • Jim Zavoral | $50,000.00 |

In connection with signing the 2013 Note Agreement, Debtor and investor Kevin Douglas ("Douglas"), in his capacity as the "Collateral Agent," executed a Subordinated Security Agreement and a Subordinated Patent Security Agreement, both dated September 18, 2013. The Subordinated Security Agreement and Subordinated Patent Security Agreement assert certain security interests in favor of Kevin Douglas as the Collateral Agent for the benefit of the purchasers of the Senior Secured Convertible Notes.

In accordance with the 2015 Note Agreement, Debtor raised capital through the execution a series of Senior Secured Series B Convertible Notes issued to the following parties in the following amounts:

4

**Initial Value**

- Douglas Irrevocable Descendant's Trust          $900,000.00
- The K & M Douglas Trust                         $600,000.00
- Daniel Kern                                     $500,000.00

Additionally, on June 29, 2015, holders of notes under the 2013 Note Agreement and 2015 Note Agreement and Douglas, as the collateral agent, entered into an Intercreditor Agreement.  The Intercreditor Agreement provides that all security interests owned by the noteholders are equal and rank "pari passu" with each other. Also on June 29, 2015,  Douglas, as the Collateral Agent, entered into a Subordination Agreement with Bridge Bank in which Douglas agreed to subordinate the security interests held by the holders of the convertible notes to Bridge Bank.  Under the 2013 Note Agreement and 2015 Note Agreement, an "Event of Default" includes a default of the Bridge Bank LOC.  In connection with the DIP Facility and this Motion, Douglas, on behalf of the Noteholders, has consented to the subordination of the Noteholder liens to the DIP Lien.

I am informed and believe that the proposed lender of the Debtor's post-petition financing, Douglas Acquisitions LLC., is affiliated with Douglas.  I am informed and believe Douglas is also affiliated with The Douglas Irrevocable Descendant's Trust and The K&M Douglas Trust, who hold an aggregate of $11.5 million in convertible notes pursuant to the 2013 Note Agreement and the 2015 Note Agreement.

### D.    The Debtor's Equity Structure

Debtor is a publicly traded corporation.  As of March 7, 2016, Debtor had 28,080,611 shares of common stock owned by 195 total shareholders of record.  One shareholder, Cede & Co., is the street name for shares held by individuals in brokerage accounts.

### E.    Debtor's Restructuring Efforts and Events Leading to Chapter 11 Filing

Debtor undertook significant efforts prior to the Chapter 11 filing to restructure its obligations outside of Court.  These efforts included attempts to raise additional equity and debt capital from third parties and significant discussions with secured creditors.  Unfortunately, these efforts were not successful.

4833-6564-4591.4

Debtor has also attempted to find a buyer that could purchase the business in its entirety. In that respect, Debtor entered into a non-binding Letter of Intent with an unrelated third party and entered into discussions for the merger of the Debtor's business. These discussions were not successful in part I believe because the Noteholders were unwilling to consent to the transactions as proposed. Unfortunately, the Debtor was unable to find an alternate commercial lender for a refinancing or new loan, or to obtain the requisite consent of the holders of Convertible Notes to another transaction. Based upon the maturity of the Bridge Bank loan, Debtor has no viable alternative to a Chapter 11 filing.

## II.    FIRST DAY MOTIONS[1]

The Debtor plans to file certain First Day Motions and respectfully requests that the Court grant such First Day Motions. I am familiar with the basis of each of the First Day Motions and I believe the relief sought in each of the First Day Motions is (a) vital to enable the Debtor to make the transition to, and operate in, Chapter 11 with minimal interruption or disruption to its business and productivity; and is (b) critical for preserving the value of Debtor's business. The First Day Motions are as follows:

### A.    Debtor's Emergency Motion For Entry Of Interim And Final Orders Authorizing Debtor To (1) Use Cash Collateral Pursuant To 11 U.S.C. § 363, (2) To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (3) Granting Related Relief (the "DIP Financing Motion")

By the DIP Financing Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to, among other things: (a) use Cash Collateral in accordance with the terms of the DIP Financing Motion; (b) obtain post-petition financing, and (c) for other relief.

The Cash Collateral which the Debtor seeks to use under the DIP Financing Motion are (i) approximately $200,000 cash held in an account, which was deposited after Bridge Bank seized approximately one million dollars held within the accounts at Bridge Bank on March 20, 2016 and (ii) the cash proceeds which are received post-petition.

I believe the Debtor's continued access to Cash Collateral during the interim period (and thereafter) is absolutely necessary to preserve and maximize value for the Debtor's stakeholders. The

---

[1] Capitalized terms used but not otherwise defined in the description of the various First Day Motions shall have the meanings ascribed to them in the respective First Day Motion described.

6

4833-6564-4591.4

Debtor uses Cash Collateral in the ordinary course of business to procure goods and services from vendors, pay their employees, and satisfy other working capital needs. Absent expedited approval of the Debtor's use of Cash Collateral, the Debtor will be effectively unable to fulfill its purchase orders, generate revenue, operate its business, or pay its employees, in addition to funding its reorganization process. I believe the Debtor's bankruptcy estate will be immediately and irreparably harmed if the Debtor is unable to meet these financial obligations and therefore the DIP Financing Motion should be granted and it should be granted on expedited relief. Due to the Debtor's current financial condition, I believe the use of Debtor's available funds alone will be insufficient to meet the Debtor's ability to pay immediate and ongoing expenses. The Debtor requires funding to maintain its business and preserve the value of its assets while the Debtor pursues the sale and auction of its business as a going concern or other reorganization. The Debtor has concluded that the use of Cash Collateral as contemplated by the DIP Financing Motion will help preserve the Debtor as a going concern pending the contemplated sale of substantially all of its assets.

Due to these needs, the Debtor and its advisers sought out an appropriate DIP financing facility. The Debtor entered into arms'-length and good faith discussions with Douglas Acquisitions LLC (the "DIP Lender"), who offered to provide the Debtor with the DIP Facility of up to approximately $6 million and to allow the Debtor to use the Cash Collateral subject to the terms of the DIP Credit Agreement, in the form substantially similar to **Exhibit B** attached to the DIP Financing Motion, and in accordance with the Budget, in the form substantially similar to **Exhibit C** attached to the DIP Financing Motion and as updated and approved by the DIP Lender from time to time in accordance with the DIP Credit Agreement. The DIP Lender was unwilling to extend financing on terms more favorable to the Debtor, and the Debtor was not able to obtain alternative sources of financing upon more favorable terms. Without prompt approval of the proposed financing, the Debtor will not have sufficient funds to operate, which will jeopardize the successful sale of substantially all of its assets or other chances of restructuring and likely diminish recoveries for their stakeholders.

Based on the Debtor's Budget, which sets forth the Debtor's projected cash receipts and cash disbursements for the 13-week period following the Petition Date, I believe that the proposed DIP

Facility will provide the Debtor with sufficient funds to maintain operations until the Debtor is sold at auction process pursuant to section 363 of the Bankruptcy Code or otherwise restructures.

Prior to entering into the DIP Credit Agreement with the DIP Lender, the Debtor was unable to obtain sufficient interim and long-term financing on terms and subject to conditions more favorable than under the DIP Credit Agreement.  After considering alternatives, the Debtor concluded in its business judgment that the DIP Credit Facility proposed by the DIP Lender represents the best financing presently available to the Debtor.  I believe the terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances and reflect the Debtor's prudent business judgment consistent with its fiduciary duties.  No consideration is being provided to any party to the DIP Credit Agreement other than as described in the DIP Financing Motion.

     **B.**     **<u>Debtor's Emergency Motion for Order Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code Authorizing (I) Payment of Wages Compensation and Employee Benefits; (II) Continuation of Employee Benefit Programs; and (III) Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Employee Payments Motion").</u>**

As of the Petition Date, the Debtor had 111 employees and 3 part-time employees.  The work of these employees is critical to the Debtor's business.

By the Employee Payments Motion, the Debtor seeks an order authorizing: (a) the Debtor to pay, in its sole discretion, all prepetition obligations incurred under or related to Wage Obligations, Payroll Taxes, Expense Reimbursements, and other Employee Benefits and all costs incident to such obligations; (b) the Debtor to pay, in its sole discretion, all Employee Obligations; (c) the Debtor to maintain and continue to honor the Employee Benefits, including practices, plans (including vacation and holiday plans), programs, and policies, available for employees as they were in effect as of the Petition Date or as they may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's business; and (d) the Debtor's banks and other financial institutions to receive, honor, process, and pay any and all checks drawn on the Disbursement Accounts and automatic payroll transfers, to the extent that the checks or transfers relate to Employee Obligations.

The employees possess the institutional knowledge, experience and skills necessary to support the Debtor. Because of the Debtor's need for the continued commitment of its employees, the Debtor is requesting the relief set forth in the Employee Payments Motion to minimize any hardship to the employees resulting from the commencement of the Debtor's Chapter 11 case. I believe that the continued employment of these employees will be essential for the Debtor's continued operation and successful reorganization.

### C.    The Debtor's Prepetition Employee Obligations

In the ordinary course of its business, the Debtor incurs payroll obligations to its employees as compensation for the performance of services. As of the Petition Date, the Debtor employed approximately 111 full-time employees (the "Full-Time Employees") and approximately 3 part-time employees (the "Part-Time Employees," and together with the Full-Time Employees, the "Employees"). The work of the Employees is critical to the Debtor's business. Out of the Full-Time Employees and the Part Time Employees, approximately 56 are hourly employees (the "Hourly Employees") and approximately 59 are salaried employees (the "Salaried Employees").

The Debtor has costs and obligations in respect of the Employees relating to the period prior to the Petition Date, as set forth specifically below. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtor's businesses after the Petition Date.

### 1.    Wages, Salaries, and Compensation

Prior to the Petition Date and in the ordinary course of business, the Debtor typically paid obligations relating to wages, salary, and compensation for the Employees as follows: (a) Salaried Employees receive compensation on a bi-weekly basis; Salaried Employees receive compensation on a bi-weekly basis and are paid one week in arrears (collectively, the "Wage Obligations"). The Debtor pays the Wage Obligations through direct deposits into the account directed by the Employee or by check made out to the Employee. To facilitate payment of the Wage Obligations, the Debtor engages a payroll service, Automatic Data Process, LLP. ("ADP"). ADP draws the money for the relevant payroll every Wednesday and Thursday, and then distributes the payroll to the Debtor's Employees every Friday.

4833-6564-4591.4

Upon information and belief, the current estimated bi-weekly gross payroll for all employees is approximately $400,000.00.   Prior to filing chapter 11, in the ordinary course of its business, the Debtor's total bi-weekly payments to employees on March, 2016, was approximately $400,000.00.  I am informed and believe that as of the Petition Date, the Debtor has accrued approximately $180,055.00 in unpaid prepetition wages, salary, compensation and payroll taxes for employees.

### 2.    Payroll Taxes

The Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").   In addition, upon information and belief, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").   I am informed and believe that the Payroll Taxes are approximately $158,000.00 on a bi-weekly basis.  ADP draws the money for the Payroll Taxes and generally pays them a day before payroll is disbursed to employees. As of the Petition Date, I am informed and believe that the Debtor has accrued approximately $51,762.00 in Payroll Taxes that relate to the Employees for the period prior to the Petition Date.

### 3.    Expense Reimbursements

The Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses, including amounts charged on personal or business-issued credit cards.  Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's businesses, the Debtor directly pays or reimburses the Employees in full for these expenses (the "Expense Reimbursements"), subject to the submission of proper documentation to the appropriate accounting department.  A majority of Expense Reimbursements are travel-related expenses related to sales, trade shows or client development.  The Debtor reimburses expenses on a rolling basis, with a time lag of up to two weeks between submission of the request for reimbursement and payment.  While the Debtor

10

believes that there are no Expense Reimbursements outstanding, it is difficult to determine what Expense Reimbursements that accrued prepetition are outstanding on the Petition Date because of the lag time in the submission of such requests. However, I believe that approximately $3,000.00 is a fair estimate of prepetition Expense Reimbursements outstanding as of the Petition Date.

## 4.    Employee Benefits

In the ordinary course of business, the Debtor has established various benefit plans and policies for its Employees that fall into the following categories: (i) paid time off plans, including vacation days, paid holidays, bereavement leave, and jury duty (collectively, the "PTO Plans"); (ii) medical insurance, dental insurance, prescription coverage, life insurance, and disability insurance plans and programs (collectively, the "Health and Welfare Plans"); (iii) workers' compensation plans and programs (the "Workers' Compensation Plans"); (iv) a 401(k) plan (the "401(k) Plan") and (v) flexible spending accounts (the "Flex Accounts," and together with the PTO Plans, Health and Welfare Plans, and the Workers' Compensation Plans, the "Employee Benefits"). In connection with certain of the Employee Benefits, such as medical insurance and 401(k) Plan contributions, the Debtor directly deducts specified amounts from eligible Employees' wages. The Employee Benefits are described below.

### a.    PTO Plans

Under the PTO Plans, Employees are eligible, in certain circumstances, to receive full wages for, among other things, vacation and holidays. Generally, Employees are eligible for paid vacation time after their first ninety (90) days. Generally, Hourly Employees are eligible for 80 hours of paid vacation time and Salaried Employees are eligible for 120 hours of paid vacation time annually.

Employees earn their vacation on a bi-weekly basis throughout the year. Employees may take vacation time before it is earned, but if an Employee leaves the company or is terminated, the "advanced" vacation must be repaid to the Debtor.

The Debtor cashes out in full the accrued, but unused, vacation of Employees who depart from the Debtor's employment, and pays each employee for earned but unused vacation in the last month each year.

The Debtor provides its Employees with certain paid holidays during the calendar year after they have been employed. The Debtor reserves the right to change the holiday schedule in its discretion.

11

Generally, paid holidays include: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

The Debtor provides Employees who have been employed for 90 days and are not on probation with three (3) days paid bereavement leave for a death in their immediate family. Employees may use vacation time if they are required to attend jury duty.

### b.    Health and Welfare Plans

The Debtor sponsors several Health and Welfare Plans to provide benefits to Employees, including, without limitation, (i) medical, dental, vision or other health plans, (ii) life insurance, and (iii) disability benefits as described below.

### (i)    Medical and Dental Plans.

The Debtor offers various health benefits, including, among others, medical, dental, prescription drug, and vision coverage (the "Medical Plans"). Employees are eligible for coverage on the beginning of the following calendar month from the date for their employment. The Medical Plans are provided through AETNA, which provides the Debtor with a bundled rate.

I am informed and believe that the Debtor generally pays approximately 75% of the cost of the Medical Plan coverage for Employees and their enrolled family members depending on the size of the enrollment (individual Employee v. Employee and family) with the balance contributed by the Employees through payroll withholding. I am informed and believe that the Debtor withholds approximately $15,214.88 per month in the aggregate from Employees' wage compensation for the Medical Plan and remit such amounts to the medical health care plan providers (the "Medical Plan Withholdings"). I am informed and believe that the Debtor pays approximately $120,000.00 per month for the Medical Plans. As of the Petition Date, I am informed and believe that the Debtor has approximately $40,170.00 in accrued and unpaid prepetition obligations with respect to the Medical Plans.

### (ii)    Life Insurance.

The Debtor maintains basic life insurance coverage (the "Life Insurance Plans") for all active full-time Employees. AETNA provides the Debtor's Life Insurance Plans. Under the Life Insurance Plans, an Employee's beneficiary is entitled to receive either $125,000.00 or $60,000.00 depending on

12

the level of the employee.  The cost of the Life Insurance Plans is included in the $120,000.00 that the Debtor pays to AETNA each month as part of a bundled cost.

### (iii)     Disability Benefits.

The Debtor provides Employees both Long Term Disability through Imperial Premium Financing Specialists ("IPFS") and Short Term Disability insurance through the California State Disability Insurance ("SDI") (the "Disability Plans").  I am informed and believe that the Debtor spends an average of $5,200.00 a month for the cost of the Disability Plans.

### (iv)     Workers' Compensation Plans

The laws of the states in which the Debtor operates require it to maintain workers' compensation policies and programs to provide the relevant Employees with coverage for claims arising from or related to their employment with the Debtor.  The Debtor uses IPFS for the Workers' Compensation Plans. I am informed and believe that the monthly premium for the Debtor's workers' compensation policy is approximately $25,000.00.  As of the Petition Date, I am informed and believe that the Debtor holds approximately $17,000.00 in accrued and unpaid premiums and administrative fees relating to the Workers' Compensation Plans.

### (v)     401(k) and Roth Plans

The Debtor sponsors a retirement investment plan and withholds from the wages of participating Employees contributions towards the 401(k) and Roth Plans.  All Employees are eligible to participate in the 401(k) and Roth Plans after their 90th day of employment so long as they work a minimum of one thousand hours per year.  I am informed and believe that the Debtor withholds approximately $28,945.45 per each bi-weekly pay period for the 401(k) and Roth Plans.  In addition to this amount, the Debtor pays matching contributions in the amount of 50% of employee contributions up to 4% of the Employee's salary with a salary cap.  I am informed and believe that the Debtor withholds approximately $11,576.99 per each bi-weekly pay period in matching funds for 401(k) contributions.

MassMutual Financial Group ("MassMutual") administers the 401(k) Plan for all of the Employees, and holds the 401(k) Plan res in trust as the trustee.  The withholding contributions are withheld from payroll payments and debited to MassMutual, at the same time as payroll is paid.  I am

informed and believe that as of the Petition Date, the Debtor holds $55,384.88 of unpaid accrued obligations related to withholding contributions.

### (vi)    Flex Accounts

The Debtor offers its Employees the use of Flex Accounts for various medical claims and other claims not otherwise covered or payable by the Medical Plans.  The flexible spending benefits (the "Flex Benefits") are administered by Wageworks, Inc. ("Wageworks").  Employees make contributions to the Flex Accounts each pay period.  The contributions are held by the Debtor until an Employee submits a claim.  Once a claim is submitted, Wageworks debits the Debtor's account for the amount of the claim. I am informed and believe that the Debtor currently retains Employee contributions for 2015 totaling approximately $25,416.80, which can be claimed until March 31, 2016, and $5,812.08 for 2016.  The Debtor pays approximately $50.00 a month for administration of the Flex Benefits.

### 5.    It is Necessary for the Debtor to Pay the Employment Obligations

The uninterrupted continuation of the Debtor's business is critically dependent upon a stable work force.  I believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtor's business, resulting in immediate and irreparable harm to the estate and its creditors.

There is a real, immediate risk that if the Debtor is not authorized to continue to honor its prepetition Employment Obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtor, thereby crippling its business operations and damaging the value of the Debtor materially.  Consequently, the Debtor strongly believes that it is critical that it be permitted to pay pre-petition wages and payroll taxes and continue with the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

### 6.    Employees are Employed and Not Insiders

The Employees that are the subject of this Motion continue to be employed by the Debtor and are not insiders.

I am informed and believe that employee claims that are the subject of this Motion are less than $12,475.00, excluding obligations under the PTO Plan, which are not current cash pay obligations of the Debtor, and therefore are within the limits established by 11 U.S.C. § 507.

### 7.    Debtor's Ability to Pay Employee Obligations and Outlook

I believe that the Debtor has the means to pay the Employee Obligations as they are in the budget for the Debtor's DIP financing, and the Debtor will not be rendered administratively insolvent by their payments.

While early in the case, I believe that the Debtor has strong prospects for a successful reorganization through the proposed going concern sale process.

For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Employee Payments Motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

### D.    Debtor's Emergency Motion for Entry of an Order Limiting Notice and Related Relief (the "Limit Notice Motion")

Based on the Debtor's books and records, the Debtor has nearly 500 creditors and almost 200 equity security holders.  I submit that many of the motions and applications that will be filed in this case will not actually affect a majority of creditors or equity interest holders.

I believe that administrative costs will be reduced as a result of the noticing procedures proposed in the Limit Notice Motion.  For the sake of the Debtor and its creditors, I would like to effectuate this reduction of costs as soon as practicable.  Therefore, I believe bringing this Motion on an emergency basis is warranted.

I believe the proposed noticing procedures are necessary and appropriate for several reasons. First, having to provide notice of certain matters to all creditors may delay and hamper the conduct of the Debtor's business and impede the consummation of transactions and negotiation of settlements which may be advantageous to the Debtor's estate and creditors.  Adoption of the noticing procedures set forth in the Limiting Notice Motion will allow the Debtor to better focus its energies on maximizing value for creditors of the estate.  Second, sending notice to all creditors would substantially increase the copying and postage costs of this case, resulting in less value being potentially available to the estate. Third, I am informed and believe that any party in interest may, by special request, receive all notices and the proposed noticing procedure ensure notice to such parties. Fourth, any party against whom direct

relief is sought by a motion, application or otherwise, will be afforded notice by the Debtor as a matter of course.

I believe the noticing procedures proposed in the Limiting Notice Motion will reduce the burden, complication, delay, and cost to the Debtor's estate associated with mailing notice of all pleadings and other papers filed in this case to all creditors without significantly affecting creditors' participation in this case.

**E.**  **Debtor's Emergency Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And 366: (i) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service, (ii) Determining Adequate Assurance Of Payment For Future Utility Services, And (iii) Establishing Procedures For Determining Adequate Assurance Of Payment (the "Utilities Motion")**

In connection with the operation of its business, the Debtor obtains electricity, natural gas, water, telephone, internet, and/or similar services through various utility companies (collectively, the "Utility Companies"). A detailed list of the Utility Companies, the services provided by each, and the average monthly bill for each is attached to the Utilities Motion as Exhibit B.

Through the Utilities Motion, the Debtor seeks to establish Utility Deposits for each necessary Utility Company in an amount equal to the cost of two weeks of service for each Utility Company, to create a process by which a Utility Company may challenge the Utility Deposit, and to ensure that no Utility Company will alter, refuse, or discontinue providing service to the Debtor without further order of the Court. For the sake of the Debtor and its creditors, I would like to effectuate this relief as soon as practicable in order to insure uninterrupted utility service to. Therefore, I believe bringing this Motion on an emergency basis is warranted.

Uninterrupted utility services are critical to the Debtor's ability to sustain its operations during the pendency of this chapter 11 case. The Debtor's facilities are dependent on electricity and gas service for lighting, use of the manufacturing facilities, and general office use. In addition, telephone and internet service is necessary to permit the Debtor to conduct sales and marketing functions and to communicate with customers, vendors, and among other Debtor personnel. Continued water service is necessary to maintain sanitary facilities for employees and for plant operations. Any interruption of

4833-6564-4591.4

these services would severely disrupt the Debtor's day-to-day operations, harming the value of the estate.

In accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to, as necessary in accordance with the procedures detailed herein, provide each Utility Company with the Utility Deposit within 21 days after this Court enters an order approving the Utilities Motion.  The Debtor will supplement the list of Utility Companies as needed, and the additional Utility Companies will receive the appropriate Utility Deposit, as outlined in the Utilities Motion.

The procedures proposed in the Utilities Motion are designed to ensure that the Utility Companies receive the "adequate assurance" contemplated by section 366(c) of the Bankruptcy Code by providing for a fair and orderly method for processing requests by the Utility Companies for additional or different Utility Deposits or for the Utility Companies to object to the procedures themselves. Because the proposed procedures will ensure that the Debtor will continue to receive Utility Services without prejudice to the Utility Companies, the Debtor submits, and I believe, that the relief requested in the Utilities Motion is necessary, appropriate, and in the best interests of the Debtor and its estate and creditors.

F. **Debtor's Emergency Motion of the Debtor for Order Authorizing Payment of Prepetition Claims of Critical Vendors**

The Debtor requires the goods and services of a number of Critical Vendors essential to the Debtor's ongoing businesses that cannot be readily replaced without severe disruption and irreparable harm to the Debtor's business.

The majority of the Critical Vendors are single-source suppliers who have undergone rigorous testing and certification in order to be able to provide parts to the Debtor. This includes certification by the United States Department of Transportation. Many of the Critical Vendors have worked with the Debtor's engineering and production teams for extended periods to design and refine the parts they provide.  The Critical Vendors have also developed internal processes to meet the Debtor's necessarily strict quality and safety standards.  I have been told that Critical Vendors will not provide the required goods and services unless they are paid.  I have been told that the Critical Vendors have informed the

17

4833-6564-4591.4

Debtor that they will no longer provide goods and services if they are not paid on account of their pre-petition claims.

I believe that if the Critical Vendors refused to supply the Debtor with the good and services they currently provide, the Debtor would be forced to begin a lengthy re-sourcing search, which would consume significant financial resources and time. I believe that the Debtor would need to re-engineer customized parts and component, which would lead to a recertification process by various government agencies, as well as ensure that the new vendors could provide the same level and quality and safety control. If the Debtor was forced to do this, I believe that it would be unable to meet its obligations under the UPS Contract.

The Debtor has key customer contracts which will provide revenue to its operations and it is critical to the Debtor's continued business efforts and the Debtor believes that it must take any actions necessary to protect it.  The Debtor is relying on key customer contracts to meet the requirements of its Debtor in Possession Financing. If it cannot fulfill those contracts, I believe the estate and the creditors will be significantly harmed.

Upon information and believe, the Debtor owes Critical Vendors approximately $4,300,000.00 as of the Petition Date. I believe that that the essential Critical Vendors of goods and services will be willing to continue to provide such goods and services to the Debtor post-petition, on pre-petition terms if the Debtor makes payments to the essential Critical Vendors.

To avoid undue delay and disruption in the provision of such essential services and goods, and the consequent harm to the Debtor's property, estate and creditors, and to maximize the value of the Debtor's assets, I believe that it is appropriate to pay, on a case-by- case basis, the claims of Critical Vendors, in an amount not to exceed $2,500,000.00.

I believe that approval to pay Critical Vendors will be beneficial to the Debtor as the Debtor intends, subject to the Court's approval, to pay the Critical Vendor claims only to the extent necessary to preserve its businesses and maximize the value of its assets for the benefit of its estate and creditors. To that end, the Debtor proposes to condition the payment of Critical Vendor claims upon each vendor's agreement to continue supplying goods and services on terms that are acceptable to the Debtor. The Debtor will use its reasonable best efforts to require the applicable Critical Vendor to provide trade

18

credit terms for the post-petition delivery of goods and services that are at least as favorable as pre-petition trade terms. Specifically, in some circumstances, the Debtor may require certain Critical Vendors to enter into a contractual agreement evidencing such terms.

**[Signature Contained on the Following Page]**

4833-6564-4591.4

Additionally, the Debtor requests that if a Critical Vendor does not continue to provide goods or services on agreed-upon trade terms, that: (a) any payment to that Critical Vendor on account of a Critical Vendor claim is an improper post-petition transfer, and, therefore, recoverable from the Critical Vendor; and (b) upon recovery of the payment by the Debtor, the Critical Vendor claim shall be reinstated as if the payment had not been made. In lieu of recovery of such payments, if there exists an outstanding post-petition balance due from the Debtor to a Critical Vendor, the Debtor may recharacterize and apply any payment made pursuant to an order granting this Motion to such outstanding post-petition balance and such Critical Vendor will be required to repay to the Debtor such paid amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed this _23_ day of March, 2016 at Lake Forest, California.

By: _____
W. Brian Olson

19

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

3579 Valley Centre Drive, Suite 300, San Diego, CA  92130

A true and correct copy of the foregoing document entitled (*specify*): **First Day Declaration of William Brian Olson In Support of Voluntary Petition and First Day Motions** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 23, 2016,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Megan M Adeyemo    madeyemo@gordonrees.com, dhouser@gordonrees.com
Jeffrey D Cawdrey    jcawdrey@gordonrees.com,
slemos@gordonrees.com;jmydlandevans@gordonrees.com;amontgomery@gordonrees.com
Jennifer E Duty    jduty@gordonrees.com, jmydlandevans@gordonrees.com
Michael J Hauser    michael.hauser@usdoj.gov
Marshall J Hogan    mhogan@foley.com, vgoldsmith@foley.com
Steven G Polard    stevenpolard@dwt.com, melissastrobel@dwt.com;Linapearmain@dwt.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
Victor A Vilaplana    vavilaplana@foley.com, rhurst@foley.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **March 23, 2016,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 23, 2016,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**(Via attorney service for delivery first a.m. 3/24/16)**
Hon. Mark S. Wallace
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street
Santa Ana, CA  92701

**See attached list**

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/23/16 | Raechelle Hurst | /s/  Raechelle Hurst |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (continued)**

List of creditors served via email:

List of Creditors Who Have 20 Largest Unsecured Claims

| | |
|---|---|
| Asola Automotive<br>Solar Deutschland<br>GmbH<br>99099 Erfurt Germany<br>erfurt@reinhardtinsolvenzverwalter.de | Baker Hostetler<br>P.O. Box 70189<br>Cleveland, OH<br>44190-0189<br>Joan Finlin<br>jfinlin@bakerlaw.com |
| Clean Air Power, Inc.<br>13615 Stowe Drive<br>Poway, CA 92064<br>Amy Hoover<br>accounting@cleanairpower.com | Columbus Transportation & Logistics, LLC<br>725 280th Road<br>Milford, NE 68405<br>Shannon Duggan<br>columbustransportation@gmail.com<br>Kathy@daws-trucking.com |
| Concise Fabricators, Inc.<br>3220 E. Lincoln Street<br>Tucson, AZ 85714<br>Andy Platt<br>aplatt@concisefab.com | Convenience Transportation, LLC<br>2122 Oak St.<br>La Crosse, WI 54603<br>Carl Suhr<br>CSuhr@kwiktrip.com |
| Dowding Industries, Inc.<br>449 Marlin Avenue<br>Eaton Rapids, MI 48827<br>Rebecca Roberts<br>rroberts@dowdingindustries.com<br>cdowding@dowdingindustries.com | Duggan Manufacturing LLC<br>50150 Ryan Road<br>Utica, MI 48317<br>Julie Neagos<br>JNeagos@dugganmfg.com |
| Exotic Rubber& Plastics<br>34700 Grand River Ave<br>Farmington, MI 48335<br>Carole Atkins<br>catkins@erpc.com | Haskell & White LLP<br>8001 Irvine Center Drive Suite 300<br>Irvine, CA 92618<br>Kiera Smith<br>ksmith@hwcpa.com |
| ITT Industries Conoflow Inc.<br>105 Commerce Way<br>Westminster, SC 29693<br>Christina Carlino<br>Christina.Carlino@itt.com | Mainstay Fuel Technologies LLC<br>32 Concourse Way<br>Greer, SC 29650<br>Charm Lowe<br>accounting@mainstayfueltech.com<br>rod@mainstayfueltech.com |
| Mitsubishi Rayon - Sacramento<br>5900 88th Street<br>Sacramento, CA 95828<br>Martin Kokoshka<br>martin.kokoshka@MRCFAC.com | Performance Composites, Inc.<br>1418 Alameda Street<br>Compton, CA 90221<br>Mayra Garcia<br>mgarcia@performancecomposites.co m |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                    **F 9013-3.1.PROOF.SERVICE**

| | |
|---|---|
| Donald.carter@MRCFAC.com | |
| Praxair Inc.<br>1555 E. Edinger<br>Ave. Santa Ana, CA 92705<br>Dick Leon<br>Dick_Leon@praxair.com | Sonoco Protective Solutions, Inc.<br>One North 2nd Street<br>Hartsville, SC 29550<br>Ryan McCutchen<br>Ryan.Mccutchen@ sonoco.com |
| The Nasdaq<br>805 King Farm Blvd.<br>Rockville, MD 20850<br>Dan Paulo Vizconde<br>DanPaulo.Vizconde@nasdaq.com | Toray Carbon Fiber America, Inc.<br>700 Parker Square<br>Flower Mound, TX 75028<br>Erin Earnest<br>Erin.Earnest@toraycfa.com |
| WEH Technologies, Inc. (USA)<br>24903 Laguna Edge Drive<br>Katy, TX 77494<br>Tiffany Horsman<br>tiffany.horsman@eh.us | West Coast Gasket Co. Inc.<br>300 Ranger Street<br>Brea, CA 92821<br>Angel Harren<br>aharren@westcoastgasket.com<br>lrussell@westcoastgasket.com |
| Bridge Bank, National<br>Association<br>55 Almaden Blvd.<br>San Jose, CA 95113<br>lori.edwards@bridgebank.com | Metropolis Gardens, LLC<br>c/o Cynthia Stelzer Esq.<br>Kimball, Tirey & St. John LLP<br>7676 Hazard Center Dr, Suite 900B<br>San Diego, CA 92108<br>customerservice@gardencommunities.com |
| NMHG Financial Services, Inc.<br>10 Riverview Drive<br>Danbury, CT 06810<br>service@nmhgfinancial.com | Timothy McGaw<br>125 E. Sir Francis Drake<br>Blvd.<br>Suite 400<br>Larkspur, CA 94939-1820<br>tmcgaw@dougtel.com |
| OCE Financial Services, Inc.<br>5450 North Cumberland<br>Chicago, IL 60656-0149<br>customercare@csa.cannon.com | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**