VICTOR A. VILAPLANA, CA Bar No. 58535
    vavilaplana@foley.com
MARSHALL J. HOGAN, CA Bar No. 286147
    mhogan@foley.com
FOLEY & LARDNER LLP
3579 Valley Centre Drive, Suite 300
SAN DIEGO, CA 92130
P: 858.847.6700   F:   858.792.6773

JOHN A. SIMON (*Pro Hac Vice Pending*)
    jsimon@foley.com
FOLEY & LARDNER LLP
500 Woodward Avenue, Ste. 2700
Detroit, MI 48226-3489
P: 313.234.7100   F: 313.234.2800

Proposed Attorneys for Debtor Quantum Fuel Systems
Technologies Worldwide, Inc. dba Quantum Technologies

FILED & ENTERED

MAR 29 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

CHANGES MADE BY COURT

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| IN RE<br><br>QUANTUM FUEL SYSTEMS TECHNOLOGIES WORLDWIDE, INC. DBA QUANTUM TECHNOLOGIES<br><br>DEBTOR, | ) CASE NO: 8:16-BK-11202-MW<br>)<br>) Chapter 11<br>)<br>) **INTERIM ORDER AUTHORIZING DEBTOR**<br>) **TO OBTAIN POST-PETITION FINANCING**<br>) **PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND**<br>) **364 AND GRANTING RELATED RELIEF**<br>)<br>) DATE:        March 28, 2016<br>) TIME:        2:00 pm<br>) CTRM:       6C<br>)              411 West Fourth Street<br>)              Santa Ana, CA 92701<br>)<br>) JUDGE:       HON. MARK S. WALLACE<br>)<br>) |

        This matter came before the Court on March 28, 2016 (the "Preliminary Hearing"), on the

motion (the "Motion") of Quantum Fuel Systems Technologies Worldwide, Inc. (the "Debtor"),

requesting, among other things, entry of this interim order (the "Order")

1

4824-4420-9199.10

(a) authorizing the Debtor to obtain postpetition financing pursuant to a debtor-in-possession credit agreement, substantially in the form annexed to the Motion as **Exhibit B**, as amended by this Order (as amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement," and together with all related agreements, documents, and instruments contemplated thereby (collectively, the "DIP Credit Documents") by and between the Debtor, as borrower, and Douglas Acquisitions LLC, as lender (together with its successors and assigns, the "DIP Lender"), under which the DIP Lender may make loans of not more than $6 million in principal amount outstanding at any time under a revolving credit facility, and the Debtor will incur Obligations in connection therewith (as defined in the DIP Credit Agreement), such financing to be (i) secured by first-priority senior secured liens on all unencumbered tangible and intangible property of the Debtor of any kind, subject only to the Carve-Out defined below, pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) secured by a perfected lien upon all other tangible and intangible property of the Debtor that is subject and junior only to the Carve-Out and the Permitted Liens (as defined in the DIP Credit Documents and as such definition is modified by this Order) pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code; and

(b) granting the DIP Lender superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code, such claims to be senior in right of payment over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code or otherwise, subject only to the Carve-Out (such credit facility being referred to herein as the "DIP Facility").

This Court having considered the Motion and the exhibits attached thereto and the Opposition to the Motion filed by Western Alliance Bank, as successor in interest to Bridge Bank, National Association ("Bridge Bank"); a hearing on the Motion having been held before the Court, appearances being noted on the record; all objections to the Order being resolved, overruled, or withdrawn; and after due deliberation and consideration and sufficient cause appearing therefor,

IT IS HEREBY FOUND, AND CONCLUDED that:

A.    On March 22, 2016 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property, and operating and managing its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the

4824-4420-9199.10

Bankruptcy Code.

B.      This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of this motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The Debtor provided notice of the Motion and the Preliminary Hearing to: (a) the Office of the United States Trustee for the Central District of California, Santa Ana Division, (b) counsel to the DIP Lender; (c) all purported secured parties; (d) the Internal Revenue Service; (e) the parties included on the Debtor's list of 20 largest unsecured creditors; and (f) any parties requesting special notice in accordance with Bankruptcy Rule 2002.  Such notice constitutes due and appropriate notice under the circumstances and complies with all applicable Bankruptcy Rules, including Rule 4001(c), and all applicable local rules.  No further notice of the relief sought at the Preliminary Hearing is necessary or required.

D.      A final hearing on the Motion shall be held by this Court on April 13, 2016, at 9:00 a.m. (the "Final Hearing"). Notice of the Final Hearing shall be given by the Debtor, within two business days of the entry of this Order, to the parties set forth in Paragraph C herein and any other parties as directed by the Court.  Such parties shall also be served with a copy of this Order. Any objection to the relief sought by the Motion at the Final Hearing shall be filed and served by no later than April 7, 2016, and served on counsel to the Debtor, the DIP Lender, the Office of the United States Trustee, and any other parties directed by the Court.  Any replies to any objections shall be filed and served on any objecting party by no later than April 11, 2016.

E.      No statutory committee of unsecured creditors has yet been appointed in this case (a "Committee").

F.      The relief requested by the Motion is necessary to avoid harm to the Debtor's estate, and good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein and the entry of this Order.

G.      The Debtor does not have sufficient available resources of working capital and financing to carry on operations without the DIP Facility. The Debtor has an immediate need to obtain financing

3

under the DIP Facility to permit, among other things, the Debtor to continue its business operations in an orderly manner, maintain business relationships, and satisfy other working-capital and operational needs.

H.      The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code. Financing on a postpetition basis is not available to the Debtor unless the Debtor grants (i) the DIP Facility Liens (as defined below) upon the DIP Facility Collateral (defined below), pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to secure the Obligations, and (ii) the Superpriority Claims (as defined below) in respect of the Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code. The DIP Lender has indicated a willingness to make such loans and advances and provide such other financial accommodations pursuant to the terms and conditions of the DIP Credit Documents. Under the circumstances, the Debtor is otherwise unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Documents.

I.      There is one group of creditors related to the DIP lender asserting security interests in the DIP Facility Collateral whose interests will be subordinated to the DIP Facility Liens.  This group is the holders of convertible notes purchased from the Debtor pursuant in September 2013 and June 2015 (the "Noteholders").  The Collateral Agent has consented on behalf of the Noteholders to the DIP Facility Liens and the subordination of the Noteholders' liens to the DIP Facility Liens.

J.      Based solely on the representations of the Debtor in the Motion and at the Preliminary Hearing, without the benefit of a full and factual evidentiary finding, for the purpose of this Order only and without prejudice to any subsequent challenges by any party in interest, the Court finds that (i) creditor Bridge Bank, National Association ("Bridge Bank") holds a senior security interest (the "Bridge Bank Lien") with first priority in substantially all of the assets of the Debtor in existence on the Petition Date and as permitted by section 552 of the Bankruptcy Code, (ii) the Bridge Bank Lien secures obligations of the Debtor, including an obligation of the Debtor in the principal amount of approximately $1.6 million, and (iii) the collateral subject to the Bridge Bank Lien is valued by the

4

Debtor at an amount greater than the obligations to Bridge Bank it secures and, therefore, Bridge Bank is protected by a sufficient equity cushion.

K.      The Debtor is negotiating an asset purchase agreement pursuant to which the DIP Lender, subject to various conditions, would offer to purchase certain property from the Debtor, through a Court-approved competitive bidding process under which the DIP Lender would act as a stalking-horse bidder for the Debtor's property.

L.      The DIP Facility has been negotiated in good faith and at arms-length between the Debtor and the DIP Lender. As such, the DIP Facility will be deemed to have been made in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

M.      The terms of the DIP Facility and this Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

N.      This Court concludes that entry of this Order is in the best interests of the Debtor's creditors and its estate because its implementation, among other things, will allow for the Debtor to remain in business by providing the working capital necessary to sustain ongoing working-capital requirements and to partially fund the expenses of this chapter 11 case. Absent the entry of this Order, the Debtor's estate would be immediately and irreparably harmed.

O.      Each of the foregoing findings by this Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings, and will be deemed a conclusion of law if and to the full extent that it makes and contains legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made by the Debtor before this Court at the hearing on the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED AND ADJUDGED that:

1.      The Motion is granted, subject to the terms and conditions set forth in this Order.

2.      All objections, if any, to the Motion are resolved hereby or, to the extent not resolved, are overruled.

4824-4420-9199.10

3.      The Debtor is authorized to execute and deliver the DIP Credit Documents together with any other document of any kind required to be executed and delivered in connection therewith. The Debtor shall comply with and perform, and is bound by, all of the terms, conditions, and waivers contained therein, except as amended by Court Order, and the Debtor is authorized, directed, and obligated to repay amounts borrowed, with interest, fees, and expenses, and any other charges and amounts, to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Credit Documents. None of the DIP Credit Documents, nor any provision thereof nor any right arising under any provision thereof, is voidable or avoidable under section 548 of the Bankruptcy Code, under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law, or otherwise.

4.      The Debtor shall (a) pay or reimburse the DIP Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, the DIP Credit Documents, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of counsel to the DIP Lender and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Debtor from time to time as the DIP Lender shall deem appropriate, (b) pay or reimburse the DIP Lender for all its reasonable documented costs and expenses incurred in connection with the enforcement or preservation of any rights under the DIP Credit Agreement and the other DIP Credit Documents, including the fees and disbursements of counsel to the DIP Lender, (c) pay, indemnify, and hold the DIP Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the DIP Credit Documents, and (d) subject to entry of a final order, pay, indemnify, and hold the DIP Lender, and the officers, directors, trustees, employees, agents, advisors and affiliates of the DIP Lender and its officers, directors, members, managers, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or

disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement,

performance and administration of the DIP Credit Documents regardless of whether any Indemnitee is a

party hereto and regardless of whether any such matter is initiated by a third party, the Debtor or any

other person), including the reasonable fees and expenses of legal counsel in connection with claims,

actions or proceedings by any Indemnitee against the Debtor under any DIP Credit Document (all the

foregoing in this clause (d), collectively, the "<u>Indemnified Liabilities</u>"), provided, that the Debtor shall

have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent

such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent

jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such

Indemnitee.  All amounts due under this Paragraph shall be payable in accordance with requirements

and limitations set forth in the DIP Credit Agreement.

   5.  The Debtor is expressly authorized to borrow from the DIP Lender, on the terms and

subject to the conditions and limitations in availability set forth in the DIP Credit Documents and this

Order, loans in an original principal amount not to exceed $6 million outstanding at any time, and to

incur all Obligations set forth in the DIP Credit Documents.

   6.  The DIP Credit Agreement shall be and is hereby modified in the following manner:

     a.  The definition of "Permitted Liens," found in Preliminary Statement 4(c) of the

DIP Credit Agreement, is modified as follows: clause (v) of the definition, which reads "liens securing

obligations outstanding on March 22, 2016, of not more than $1,300,815 owed to Bridge Bank, plus

post-Filing Date interest to the extent required by law," shall be stricken and modified to read as follows:

"perfected liens securing any and all obligations owed to Bridge Bank including under that certain Loan

and Security Agreement dated as of May 7, 2012, as amended or modified, as of March 22, 2016 and

thereafter as permitted by law,"

     b.  Paragraph (k) of section 7.1 of the DIP Credit Agreement is hereby stricken in its

entirety.

     c.  Paragraph (l) of section 7.1 of the DIP Credit Agreement is hereby stricken in its

entirety and replaced by the following language: "(i) the DIP Order shall be vacated, stayed, reversed,

modified or amended in any respect, (ii) the DIP Order shall cease to create a valid and perfected Lien or to be in full force and effect or (iii) the Borrower fails to comply with the DIP Order ."

        d.      Paragraph (m) of section 7.1 of the DIP Credit Agreement is hereby stricken in its entirety.

        e.      Paragraph (p) of section 7.1 of the DIP Credit Agreement is hereby stricken in its entirety and replaced by the following language: "the Bankruptcy Court does not enter an order approving bid procedures for the Borrower's assets within 32 days after the filing of a motion seeking the entry of such an order."

        f.      Paragraph (q) of section 7.1 of the DIP Credit Agreement is hereby stricken in its entirety but paragraph 7 below shall apply.

        g.      Paragraph (u) of section 7.1 of the DIP Credit Agreement is hereby stricken in its entirety.

        7.      In light of the exigencies of this case, including that the Debtor requires significant loans from the DIP Lender to continue operations throughout the contemplated sale process, including to pay wages and salaries of employees, and to make payments to critical vendors pursuant to the budget authorized pursuant to the DIP Credit Agreement, and as authorized in separate orders entered by the Court, pursuant to section 105 of the Bankruptcy Code, the Court sets the following schedule for this case:

        a.      The Debtor shall file and serve its motion to approve the sale of substantially all of its assets to the DIP Lender (as the "Stalking Horse Bidder") (the "Sales Procedure and Sale Motion") on or before April 5, 2016. The Sales Procedure and Sale Motion shall contain a proposed order governing sale procedures to be followed by the Debtor, the Stalking Horse Bidder, other bidders and parties-in-interest (the "Sale Procedures Order"). The Sale Procedures Order shall include, among other provisions, provisions governing the timing and content of alternative bids, the timing for and conduct of an auction (if there are alternative bids), solicitation of alternative bids, assumption and assignment of executory contracts, and proposed notice procedures related to the foregoing.

        b.      Provided that the Debtor timely files and serves the Sales Procedure and Sale Motion, the hearing on sale procedures shall be held on or before May 3, 2016. Objections to the Sale

8

Procedures aspect of the Sales Procedure and Sale Motion and replies if any shall be due as set out in the Notice of the Sales Procedure and Sale Motion.

        c.      Provided that a Sales Procedures Order is timely entered by the Court, and subject to the rights of parties in interest to object to the Sales Procedures Order, the Court tentatively sets the final hearing on the Sale Motion for June 30, 2016 at 9:00 a.m.

        9.      The Debtor's authority to borrow from the DIP Lender under this Order, and the DIP Lender's obligation to make loans to the Debtor, each ends at 5:00 p.m. (Pacific time) on April 13, 2016. This Order shall remain in full force and effect after that date and time, but no additional loans may be extended or incurred thereafter. As contemplated by Section 4.1(d) of the DIP Credit Agreement, this paragraph may not be amended, modified, stayed, or reversed without the prior written consent of the DIP Lender. The DIP Lender shall have no obligation to make loans after April 13, 2016, absent the entry of an order authorizing additional loans that is in form and substance satisfactory to the DIP Lender in its sole discretion.

        10.      The Debtor is authorized to use the proceeds of the DIP Facility for ongoing working capital needs and to pay operating costs and expenses of the Debtor during the pendency of this chapter 11 case in accordance with the terms of the DIP Credit Agreement and this Order. Without the prior written consent of the DIP Lender, no portion of the DIP Facility, the DIP Facility Collateral (as defined below), or the DIP Lender's Cash Collateral shall be used (a) to investigate the DIP Lender; (b) to object to or contest in any manner, or raise any defense to (i) the Superpriority Claims (as defined below) or (ii) the DIP Facility Liens (as defined below) granted to the DIP Lender pursuant to this Order; (c) to request authorization to obtain a postpetition loan or other financial accommodation pursuant to sections 364(c) or (d) of the Bankruptcy Code on a non-consensual basis; or (d) to prevent, hinder, or otherwise delay the exercise or enforcement of, or seek to modify, any rights and remedies of the DIP Lender, as applicable, arising under the DIP Credit Documents or this Order.

        11.      Pursuant to section 364(c)(1) of the Bankruptcy Code, all Obligations shall constitute allowed claims (the "Superpriority Claims") against the Debtor with priority over any and all administrative expenses, claims under section 507(b) of the Bankruptcy Code for the diminution in value of collateral, and all other claims against the Debtor, now existing or hereafter arising, of any kind

4824-4420-9199.10

whatsoever, including, without limitation, all administrative expenses and other claims of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the payment of the

Carve-Out (defined below).  The Superpriority Claims shall in all respects be junior to the claims of

Bridge Bank.

12.    As security for the Obligations, the DIP Lender shall have and is hereby granted

(effective on the date of this Order and without the necessity of the execution by the Debtor of

mortgages, security agreements, pledge agreements, financing statements, or other documents or

instruments) valid and perfected security interests and liens (the "DIP Facility Liens") in and on all Cash

Collateral as well as all tangible and intangible assets of the Debtor now owned or hereafter acquired,

wherever located, and whether now existing or hereafter arising, as well as all proceeds, products, rents,

and profits of the foregoing, except causes of action arising under sections 544, 545, 547, 548, 549,

553(b), 723(a), or 724(a) (the "Assets" and together with Cash Collateral, collectively the "DIP Facility

Collateral"). The DIP Facility Collateral includes, without limitation, all cash or checks on hand, all cash

or securities deposited into any account maintained by the Debtor, and the proceeds of all causes of

action. The DIP Facility Liens shall have the following priorities, all subject to the Carve-Out:

(a)    pursuant to section 364(c)(2) and (d) of the Bankruptcy Code, a perfected first-priority

senior lien on all DIP Facility Collateral that is not subject to Permitted Liens (as defined in the DIP

Credit Agreement and as such definition is modified by this Order); and

(b)    pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, a perfected lien upon

all other DIP Facility Collateral junior only to the Permitted Liens (as defined in the DIP Credit

Agreement and as such definition is modified by this Order).

13.    The DIP Facility Liens shall in all respects be junior to the perfected liens of Bridge Bank

and except to the extent expressly set forth in this Order, the DIP Facility Liens granted pursuant to this

Order and the DIP Credit Documents to the DIP Lender to secure the Obligations shall not be

subordinated to or made pari passu with any other lien or security interest.

14.    The DIP Lender may credit bid the value of the DIP Facility Liens in connection with any

sale of the Debtor's assets.

15.    "Carve-Out" means: the (a) unpaid fees of the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of the Debtor's attorneys, a chief restructuring officer for the Debtor, one financial advisor for the Debtor, one investment banker for the Debtor, a claims agent, and attorneys for the Creditors' Committee (collectively, the "Professionals"), but only to the extent approved by the DIP Lender in the Budget (as defined in the DIP Credit Agreement), and only if incurred before the delivery of a Carve-Out Trigger Notice (as defined below), and (c) unpaid and allowed fees and expenses of Professionals in an aggregate amount not to exceed $100,000 (the "Professional Expense Cap") incurred after delivery of notice by the DIP Lender to the Debtor (and its counsel), the U.S. Trustee, and counsel to the Creditors' Committee, if applicable, that an Event of Default (as defined in the DIP Credit Documents) has occurred and is continuing (a "Carve-Out Trigger Notice").  For the avoidance of doubt, the Professional Expense Cap applies only after delivery of a Carve-Out Trigger Notice.  The Professional Expense Cap shall be reduced, dollar-for-dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals after delivery of a Carve-Out Trigger Notice.  No portion of the Carve-Out may be used to pay professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtor owing to the DIP Lender or any Indemnitee. The Debtor may pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out prior to the delivery of a Carve-Out Trigger Notice.

16.    Except to the extent of the Carve-Out, neither the Debtor nor its estate may assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the DIP Facility Collateral. In exercising its rights and remedies regarding the DIP Facility Collateral upon an Event of Default or otherwise, the DIP Lender will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Facility Collateral.

17.    All DIP Facility Liens are binding and perfected automatically upon the entry of this Order. The DIP Lender will not be required to file or serve financing statements, mortgages, notices of lien, or similar instruments which otherwise may be required under federal or state law in any

jurisdiction, or take any action, including taking possession, to validate and perfect the DIP Facility

Liens, as applicable. If, however, the DIP Lender in its reasonable discretion files any financing

statements, mortgages, agreements, notices of lien, or similar instruments, or otherwise takes steps to

confirm perfection of the DIP Facility Liens, the Debtor, at the Debtor's expense, shall cooperate with

and assist in such process to the extent provided in the DIP Credit Documents or this Order, and all such

documents shall be deemed to have been perfected at the time of and on the date of entry of this Order,

with the priorities set forth herein, and shall be and hereby are deemed and adjudicated senior to any

other postpetition filing by any other person or entity with respect to the same collateral. A certified copy

of this Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording

offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar

instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for

filing and recording.

18.    Prior to any Event of Default, the Debtor is authorized to use the Cash Collateral of the

DIP Lender solely on the terms and conditions contained in this Order, except as otherwise provided in

the DIP Credit Documents, or in any other order entered by the Court with the DIP Lender's consent

authorizing use of the DIP Lender's Cash Collateral.

19.    Any "Event of Default" (as defined in the DIP Credit Documents) under any DIP Credit

Document is an "Event of Default" under this Order.

20.    Upon the occurrence of and during the continuance of an Event of Default, the DIP

Lender will be entitled to exercise its rights and remedies and take all or any of the following actions

without further relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code or any

other applicable stay or injunction or further order of or application to this Court: (a) terminate its

obligation to make further advances under the DIP Credit Agreement; and (b) charge a default rate of

interest as set forth in the DIP Credit Agreement.

21.    Upon the occurrence of and during the continuance of an Event of Default, the DIP

Lender will be entitled to exercise its rights and remedies and take all or any of the following actions

only after obtaining relief from the automatic stay under section 362(d) of the Bankruptcy Code: (a)

terminate the Debtor's right to use Cash Collateral and require the Debtor to segregate and preserve all

Cash Collateral for the benefit of the DIP Lender; (b) declare the principal of and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and payable; and/or (c) take any other action or exercise any other right or remedy permitted to the DIP Lender under the DIP Credit Documents, this Order, or by operation of law.  The DIP Lender may bring any motion for stay relief on an expedited basis on seven days' notice.

22.     The Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guaranties at any time held by the DIP Lender with respect to the DIP Facility on which the Debtor may in any way be liable. Upon an Event of Default, so long as the DIP Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), and the Debtor remains in control of the DIP Facility Collateral, (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Facility Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (ii) all risk of loss, damage or destruction of the DIP Facility Collateral shall be borne by the Debtor.

23.     Notwithstanding anything else herein or in the DIP Credit Documents, if the Court enters an order approving the sale of the Debtor's assets to a party other than the DIP Lender, the Obligations shall be due and payable to the DIP Lender 28 days after the entry of that order.

24.     The Debtor is authorized to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Credit Documents as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations, or which otherwise may be reasonably deemed necessary by the DIP Lender to effectuate the terms and conditions of the DIP Credit Documents or this Order. The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any amendments, waivers, or modifications to the DIP Credit Documents that are not materially adverse to the Debtor or Bridge Bank without further order of this Court.

25.    Having been found to be extending credit to the Debtor in good faith, based on the record before this Court, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the DIP Facility Liens created, adjudicated, or authorized by this Order in the event that this Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed, or modified on appeal. Any stay, modification, reversal, or vacation of this Order will not affect the validity of any Obligations of the Debtor to the DIP Lender incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation. Notwithstanding any such stay, modification, reversal, or vacation, all financing extended to the Debtor pursuant to this Order and all Obligations incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions hereof, and the DIP Lender shall be entitled to all the rights, privileges, and benefits, including, without limitation, the liens, security interests, and first priorities granted herein with respect to all such Obligations.

26.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization, (b) converting the case to a chapter 7 case, or (c) dismissing the case. The terms and provisions of this Order, as well as the Superpriority Claims and the DIP Facility Liens granted pursuant to this Order, the DIP Credit Documents, and related documents (as applicable) shall continue in full force and effect notwithstanding the entry of any such order, and such Superpriority Claims and DIP Facility Liens will maintain their priority as provided by this Order until all Obligations are indefeasibly paid.

27.    The DIP Lender need not file proofs of claim in this case with respect to any Obligations to preserve its rights to the Superpriority Claims and the DIP Facility Liens.

28.    Nothing in this Order, the DIP Credit Documents or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business, or in connection with its restructuring efforts. The DIP Lender will not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or

14

"owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

29.    The stipulations and admissions contained in this Order shall be binding upon the Debtor, its estate, and all parties in interest in all circumstances. As such, pursuant to this Order, (i) the DIP Lender's Obligations will not be subject to counterclaim, setoff, subordination, recharacterization, defense, or avoidance, for all purposes in this case and any subsequent chapter 7 case; (ii) the DIP Facility Liens on the DIP Facility Collateral shall be deemed to be legal, valid, binding, perfected, and of the priority described in this Order, not subject to recharacterization, subordination, avoidance, or reduction; and (iii) the Obligations and the DIP Facility Liens on the DIP Facility Collateral shall not be subject to any challenge by any party in interest, and any such party in interest shall be enjoined from, seeking to exercise the rights of any of the Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for the Debtor). If any proceeding is filed, the stipulations and admissions contained this Order shall nonetheless remain binding and preclusive on any statutory committee of creditors appointed by the Court and on any other person or entity. Nothing in this Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtor or its estate.

30.    Without prejudice to the rights of any other party, the Debtor waives any and all claims and causes of action against the DIP Lender, and its respective agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys, professionals, and advisors, directly related to the DIP Facility, this Order, or the negotiation of the terms thereof.

31.    The provisions of this Order and the DIP Credit Documents shall be binding upon and inure to the benefit of the parties thereto, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this chapter 11 case or in any subsequent chapter 7 case as a legal representative of the Debtor or its estate.

32.    To the extent any provision of this Order conflicts with any provision of the Motion or any provision of the DIP Credit Documents, the provisions of this Order shall control.

33.     This Court shall retain jurisdiction to enforce this Order and over any matters or disputes arising from or relating to the implementation of this Order.

34.     The stay of this Order set forth in Bankruptcy Rule 6004 is hereby waived and this Order shall be effective immediately upon its entry.

___

APPROVED AS TO FORM:

DATED: March 29, 2016

/s/  Jeffrey D. Cawdrey

Counsel for Western Alliance Bank,
as successor in interest to Bridge Bank, National Association

DATED: March 29, 2016

/s/  Michael Hauser
Michael Hauser
Counsel for Office of the United States Trustee

The parties submitting this order has obtained the consent of the person whose electronic signature appears above to use such signature as to the form of this order.

###

Date: March 29, 2016

Mark S. Wallace
United States Bankruptcy Judge

4824-4420-9199.10