ORIGINAL

Quantum Shareholders Group

P.O. Box 270022

Louisville, Colorado 80027

303-666-7779

dmaxwell@qwestoffice.net



FILED

JUL 26 2018

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SANTA ANA DIVISION

**Case No. 8:16-BK-11202-MW**

In Re:                                  **Chapter 11**

QF Liquidation, Inc.

(f/k/a) Quantum Fuel Systems          **Motion to Dismiss Debtor's**

Technologies Worldwide, Inc.          **Chapter 11 case under 11 U.S.C.**

Bda Quantum Technologies              **1112(b) due to Debtor committed**

                                      **various prepetition bad acts,**

DEBTOR                                **Concealment of the "True Market**

                                      **Value" of the Debtor's Assets,**

                                      **Non-Disclosure of Income, and**

                                      **Numerous "Bad Faith" violations**


                                      **Date: September 17, 2018**

                                      **Time:2:00 P.M.**

                                      **Courthouse: 6C**

                                      **Judge Hon. Mark S. Wallace**

**TO THE HONORABLE JUDGE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER INTEREST PARTIES**

## I    INTRODUCTION

The Courts should order the dismissal of the Debtor's bankruptcy on violations under 11 U.S. Code 1112 (b).   The Debtor's bankruptcy was structured by a group of insiders (the "insiders") that colluded to deceive, mislead, and defraud shareholders, investors, and creditors by filing a deceitful bankruptcy that is made up with false statements, omissions, concealments of the true "Fair Market Value" of Debtor's assets, contracts, partnerships, and business alliances.  The group of insiders colluded with the purchaser of the Debtor's assets to guarantee a "Chill Competitive Bidding" even though evidence indicates that the Debtor may not have been in the "Zone" or "Vicinity of Insolvency".  The Debtor failed to disclose a conflict of interest to the U.S. Bankruptcy Courts and the U.S. Trustee office that lead to numerous violations of not "Acting in Good Faith" on behalf of the shareholders and creditors of the Debtor.   The Debtor's management and directors were entrusted to manage the assets of the Debtor and instead they abused their positions to BILK the Debtor's shareholders, investors and creditors out of "tens of millions" in asset value in Debtor's Intellectual Properties (IP), patents, technology, copyrights, trademarks, trade secrets, long term contracts, and partnerships.

The absence of a Special Committee to evaluate sale and restructuring transactions involving a control party may evidence the transactions fundamental unfairness of the Debtor's asset sale.

Prospective Bidders must have access to senior management, and need senior management's involvement in the actual bidding process and the selection of the ultimate transaction to be implemented as part of the Chapter 11 to avoid perceived or actual conflicts of interest. In this bankruptcy case, the Debtor's senior management (the "insiders") and board of directors (the "insiders") were convertible note holders with Kevin Douglas (Douglas) since September, 2013. Douglas had a control interest with the Debtor; was a convertible note & warrant holder with the Debtor, was the Debtor-in-Possession for the Debtor; and was the "Stalking Horse" bidder of the Debtor's assets.

In dealing with and on behalf of a corporation, directors owe a fiduciary duty of loyalty to the corporations, which demand that there be no conflicts between the corporation's interest and the director's interest. A disqualifying interest can exist because a director is "dominated" or "controlled" by a party interest in a corporation.

Under the "Business Judgement Rule", there is "a presumption that in making a business decision a director of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interest of the company." Standard of Judicial review is used by courts to determine when close scrutiny of a transaction is warranted. When directors have fulfilled their duties of care and loyalty in good faith, courts presume, under the "Business Judgement Rule", that their decisions are valid. We have overcome the presumptions of the "Business Judgement Rules" by showing that the Debtor's board have failed to act with due care or loyalty, or lack good faith in carrying out their duties, in which case the court should dismiss the Debtor's Bankruptcy.

The Debtor-in Possession (DIP) also has a duty of loyalty to "maximize the value of the estate", refrain from self-dealing, and treat all parties fairly.

The Chapter 11 DIP owes a fiduciary duty to all the creditors, shareholders, and other interest holders of its bankruptcy estate to maximize value. The DIP for the Debtor was a company owned by "control person" Douglas. The Debtor and DIP must design a sale process that does not create unnecessary barriers to prospective bidders or otherwise "chill" competitive bidding. The Debtor's "363 sale" gave the DIP more control in the disposition of assets unlike the trustee is allowed to sell the assets under Chapter 7 liquidation bankruptcy. The DIP controls the bulk of assets under the protection of the bankruptcy courts, giving the Debtor the opportunity to control the deal terms during the bidding auction. In the case of this Debtor, the Debtor filed for bankruptcy on March 23, 2016 ("petition date") secures a $6 million DIP from Douglas ("control person"). The Debtor expects to expedite its quest for a "stalking horse" bid; Douglas is the "stalking horse" bidder. Shortly after the Debtor files for bankruptcy, the Debtor removes from their website: all their quarterly and annual reports filed from 2003-2015; press releases; presentations; and earning call transcripts making it very difficult to attract any prospective bidders. The Debtor notifies NASDAQ to immediately delist their stock even though NASDAQ gave them until June 27, 2016 to regain compliance. The insiders took this action not to attract "bidders" for the "363 sale" but to discourage interest parties making a bid for the Debtor's assets and the $31 million in new orders the Debtor received a month before filing for bankruptcy.

At the Debtor's 341(a) meeting of creditors (April 28, 2016) a report from Armory Securities was read that they have 100 interest parties and 34 were already pre-qualified bidders. What happened to all the bidders? In the end the only Bidder was the "stalking horse" bidder, Douglas.

*Exhibit 1- list of press releases and sec filings*
*Exhibit 2- copies of the 1st, 2nd, 3rd quarter earnings call transcipts*

Members of our group and our attorney were denied several times access to the Data Bank ("DB") and the Sales Agreement ("SA") even after offering to sign a non-disclosure agreement ("NDA"). Without viewing a copy of the "SA" it is hard to gauge the "fairness of the sale" if you are denied access.

As such, to ensure the goal of this case is achieved, it would be to the best interest of the creditors and shareholders to dismiss the Debtor's Bankruptcy on violations under 11 U.S. Code 1112 (b).

## II    BACKGROUND

March 14, 2016 the Debtor defaulted on the Debtor's Credit Facility with Bridge Bank. The event of default also constituted an event of default (cross-default) under the Convertible Notes and Warrant Agreement

*Exhibit 3- news announcement on default*

March 16, 2016 the Debtor files a notice with Securities Exchange Commission (SEC) they will not be filing their quarterly report on form 10Q for the 4th quarter 2015 or their annual report on form 10K for the year ending December 31, 2015.  *Form NT 10K filed 03/23/2016*

March 23, 2016 the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Courts in the United States Bankruptcy Court for the Central District of California. The Debtor will continue to mange its properties and operate its business as debtor-in-possession. The Debtor seeks to implement a sale of substantially all assets of the Debtor pursuant to section 363(b) of the bankruptcy March 29, 2016 Interim Order approving the DIP Credit Agreement and issued the final order approving the DIP Credit Agreement on April 13, 2016.

April 8, 2016 the Debtor entered into a "stalking horse" agreement with Douglas Acquisitions, LLC; the K&M Douglas Trust; and the Douglas

Irrevocable Descendant's Trust which amended on April 22, 2016. The purchasers agreed to purchase all of the assets of the Debtor for a purchase price equal to approximately $22.0 million. ***Form 8-K filed 04/25/2016***

***\*\*Go to SEC.GOV to view all the Debtor's financials and filings. I will make references throughout this motion on what form and the date of filings to view some documents. Go to SEC's website; go to Filings on the top of the page; Under filings go to COMPANY FILINGS SEARCH; on the upper right side under FAST SEARCH put in QTWW symbol. That will take you to pages of filings the Debtor filed since June 17, 2002 -2016***

## III    CAUSE EXISTS TO DISMISS THE BANKRUPTCY

Bankruptcy Code Section 1112(b) (1) provides that "on request of a party in interest and after notice and a hearing, the court can dismiss a case under this chapter, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interest of creditors and the estate." The Bankruptcy court has a broad discretion in determining what constitutes "cause" adequate for dismissal under 11 U.S.C. 1112(b). While section 1112(b)(4) identifies a number of factors that can constitute "cause" for dismissal of a case, the list is not exhaustive.

There are many violations under 1112(b) to constitute the dismissal of the Debtor's Bankruptcy.

(1)    The Debtor failed to disclose a conflict of interest with the Debtor's senior management, directors and Kevin Douglas. A list of the convertible note holders names can be found:

***Form S-3 filed 10/25/2013 page 16 of 31***

A copy of the Convertible Note and Warrant agreement dated

September 18, 2013 can be found on:

**_Form 8-K filed 09/19/2013_**

The Debtor's bankruptcy document #119 filed April 8, 2016 showed on page 282

of 425,  Exhibit D that the Debtor entered into a "Subordinated Patent Security

Agreement" with Douglas on 09/18/2013.  The agreement assigned 16 patents to

Douglas.  The shareholders and investors were not aware of this agreement until

the Debtor filed for bankruptcy and filed document 119.  The Debtor needed

shareholder approval to enter into any assignment of the Debtor's Assets.  Bridge

Bank was supposed to have first lien on all the Debtor's operating assets.

    (2)    The Debtor concealed the "True Market Value" of the Debtor's

            technology, IP, patents copyrights, trademarks and trade secrets.

            The Debtor reported on Bankruptcy Document 104, part 10, page 6:

    " Intangible and Intellectual Patents "Value not Determined" or $0 Value"

The Debtor has been in business since 2002 as Quantum Fuel Systems

Technologies Worldwide, Inc. and was doing business under IMPCO Technologies

(IMCO) from 1997-2002.  The Debtor reported on their 10Qs and 10Ks:

(a) Investing $271,452,570 in their IP, technology, and patents

(b) Received $185,435,219 on development fees from GM, Toyota, Fisker Auto

    And U.S. Army

(c) Development projects or programs with various government agencies

(d) Prototype projects or programs with 50 companies

(e) Strategic Alliance Agreement in place with GM from July 2002-March, 2016;

    They co-owned technology, patents and IPs.  Under the alliance GM has "right

    of refusal" in event the Debtor decides to discontinue operations or the Debtor

    is insolvent.  GM has the right to purchase at a price to be determined by an

"Independent Appraisal Firm. GM values their Hydrogen Fuel Cell program at $2.5 billion www.triplepundit.com

The "insiders" lacked "good faith" by not selling the co-owned technology, patents, and IP to GM and avoid Bankruptcy. Which brings into question, was GM invited to participate in the "363 Sale"? In Debtor's bankruptcy document #441 filed 01/18/2017, Nishant Machado's declaration states "GM and Agility objections have been resolved. How was GM's objection resolved? Did the "stalking horse" bidder sell any of the co-owned technology, patents, and IP that the Debtor and GM co-owned? How was Agility's objections Resolved? The debtor co-owned technology and patents with Agility Fuel Systems as well.

***Exhibit 4 – list of patents***

***Forms 10Qs and Forms 10Ks filed various dates from 2002-2015 -QTWW***

***Forms 10Qs and Forms 10Ks filed various dates from 1997-2002 - IMCO***

***Exhibit 5- list of companies the Debtor had prototype projects or programs***

(3)     The Debtor concealed the true "Fair Market Value" of the Debtor's Sales Agreements, Licensing Agreements, and Master Agreements surrounding the Debtor's IP, patents, technology, copyrights, trademarks, and trade secrets that were transferred or assigned to Douglas Acquisitions LLC, the K&M Douglas Trust, and the Douglas Irrevocable Trust for "$0 Value" or "No Consideration".

These contracts have generated a steady stream of revenue for the Debtor since 1997. There are 52 contracts that the Debtor listed in their 10Ks and 10Qs that represents Sales Agreements, Joint Development Agreements, Master Supply Agreements, Licensing Agreements and including: IP and patents surrounding the partnerships and long term contracts with Linde Hydrogen.

The Debtor reported on their bankruptcy documents generating Annual Revenue of $40,466,251 from these contracts for 2015. These contracts are ongoing business from GM, Linde, Kenworth, Peterbilt, Karma Automotive, Ryder, U.S. Gain, Westport, Xpress Natural Gas (refer to the Debtor's 10Ks and 10Qs)

*Less than 3 months after the "stalking horse" bidder acquired the Debtor's Assets:* "Quantum Fuel Systems" achieves Zero-Debt Balance Sheet and Enhanced Customer Focus under Direction from Douglas Acquisitions, LLC.

The press release refers to "a New Management" team. The Debtor's CEO and VP (both convertible note holders ("insiders") were offered new management positions at Quantum Fuel Systems LLC.

*A list products and press releases on Quantum Fuel Systems LLC go to: qtww.com*

**Exhibit 6 - press release 10/17/2016**

**Exhibit 7 - list of Debtor's contracts**

    (4)    The Debtor concealed from the Shareholders, Investors, and Creditors a merger of the Debtor's business sometime between Summer 2015-March, 2016. The Debtor reported this on document #13 filed March 23, 2016 Section F; "Debtor entered into a Letter of Intent with an unrelated third party and entered discussions for the merger of the Debtor's business. These discussions were unsuccessful, in part, the discussions failed because the lenders under the convertible notes were unwilling to consent to the transaction as proposed.

If an offer or offers presented to the Debtor on a "merger" of "buyout" of the company the Debtor's management and directors had a fiduciary duty to inform their shareholders and creditors. The shareholders were the only ones that could vote on "mergers" or "buyouts". The "Insiders" deliberately concealed this "merger" from the shareholders and creditors.

Since the merger was held under an "Umbrella of Secrecy" by the "Insiders", the Debtor should be duty bound by the U.S. Bankruptcy Courts to turn over the details of this merger proposal. There is a very high probability that the third party could have been in negotiations with the Debtor right up to the day the Debtor defaulted on the credit facility with Bridge Bank.

(5)    The Debtor did not disclose in their bankruptcy documents receiving a $10 million + re-order they received on March 14, 2016.
"UPS invest $100 million in alternative fuel, advanced technology fleet." UPS will spend $100 million to build an additional 12 CNG fueling stations and add 380 CNG Tractors. The new CNG tractors will be manufactured by Kenworth, Agility and Quantum Fuel Systems will provide the CNG Storage Systems."

*The Debtor's nondisclosure on this re-order was a deliberate falsehood since UPS and the Debtor had an established business relationship since April 1, 2015.*

The press release put out by UPS confirms the Debtor got the order. The "Money Down" received from this order would have prevented the Debtor from defaulting on the credit facility with Bridge Bank (principal amount $2.6 million). At the 341(a) meeting of creditors the Debtor admitted under oath starting the order immediately. Since the Debtor would not talk about the UPS re-order claiming "Inside Information" we went over at the meeting what UPS reported about the order and came up with a calculation of $11.025 million minimum order on the CNG fuel Systems. This size order would have taken months to negotiate. In conclusion, the group of "Insiders" deliberately held back information from the U.S. Bankruptcy Courts. **Special Note***:* Kenworth and the Debtor have a Sales Agreement and a Supply Contract in place since 2014.

*Exhibit 8 – 2015, 2016, 2017, and 2018 UPS press release*

*Exhibit 9- Debtor-in Possession Receipts and Disbursement Schedule*

(6)    The "insiders" intentionally held back information, contracts, orders
and partnerships surrounding their involvement in the Virtual Pipeline
industry. The "insiders" intentionally downplayed the "True Market
Value" of their VP products and the availability of the VP Products.
The "insiders" intentionally delayed the special permits for the VP
trailer until the Debtor's Assets sold.

The Debtor became involved with CNG VP Pipeline Industry under a "Blanket of
Secrecy" in 2014. Sometime in the 4th quarter of 2014, the Debtor entered into
some type of agreement/partnership with a foreign company. At the Debtor's
annual meeting of shareholders on May 21, 2015 the Debtor was asked if they
were introducing any new products that the shareholders should be aware of and
the Debtor said, "Not at this time." Less than 3 weeks after the meeting, an article
appears in an Australian newspaper that Quantum Technologies ships the first 100
CNG VP tanks to an Australian Co. (June 12, 2015). Under shareholder pressure,
the Debtor was forced to put out their own press release (June 15, 2015) but would
not discuss any details of the alliance/partnership. Debtor applied for a special
permit with the Department of Transportation on June 18, 2015 on the CNG VP
tanks. June 30, 2015 the "Insiders" allow Douglas to acquire more Convertible
Notes and Warrants. November 12, 2015 the Debtor attends the HHP Summit
convention and unveiled a "Virtual Pipeline Trailer" for transporting CNG. Once
again, the shareholders are not informed the Debtor designed a new VP product.
The "Insiders" kept the details of the CNG VP products, alliances, and partnerships
under a "Blanket of Secrecy."

The Debtor did share with their shareholders in December, 2015 that they were in
discussions with UPS, Ryder, and several other companies about their newest
product CNG VP Trailers. The companies were very interested in the Debtor's

trailer to use as a "Mobile Fueling Station." The Debtor's CNG VP Trailer could be used for Power (open new terminals) and fueling their CNG tractors at any remote area in America or the world that does not have access to natural gas. There is a very high probability that the Debtor could be involved in the new CNG stations that UPS has been opening since 2015. Under extreme pressure from the shareholders the Debtor was forced to put out a press release about getting involved in the CNG VP trailer. December 14, 2015 The Debtor announces it is offering its new VP-650 VP Trailer. Orders are being taken "NOW" for customer delivery in mid-2016.

February 10, 2016 the Debtor awarded an $8.4 million purchase order for 15 natural gas VP trailers with $13 million option for upgrades and additional 20 natural gas VP trailer. This new purchase order was not included in the Debtor's bankruptcy document nor is the "Money Down" reflected anywhere in the Debtor's bankruptcy documents. The "Money down" on this order would have prevented the Debtor from defaulting on the credit facility with Bridge Bank on March 14, 2016. As stated earlier in this motion, we were denied access to the "DB" and "SA" making it difficult to know what is included in the "SA" on the Debtor's VP business. At the 341(a) meeting of creditors we asked the Debtor, "When they expected to get the validation on the VP trailer?" The Debtor responded "around the first week in July" we responded how convenient a week after the Asset Sales" and they laughed. The Debtor received notice from U.S. Governmental Publishing Office (GOP) estimated date of completion on new special permit for Quantum fuel Systems Technologies Worldwide Inc. May 31, 2016. The Debtor had the Prototype CNG VP Trailer ready the first quarter 2016. The Debtor already had several trailers leased by the first quarter 2016 (XTRA lease listed as a creditor in debtor's bankruptcy documents. The Debtor received

On June 10, 2016 from the Australian company they were seeking approval from the government to enter into a 5 year Master License Agreement with the debtor to supply VP products.

Recently I attended the April 30-May 3, 2018 Annual Advanced Clean Transportation Expo (ACT) at Long Beach, California. Quantum Fuel Systems had a booth displaying a portion of the VP trailer and VP tanks. Their marketing and operation person shared with a group of us that they have over 200 VP trailer on the road in the last 2 years. The average cost per trailer around "$600,000." Expecting to have permitting for Canada by June-July 2018, and permitting in Mexico by year end 2018. Very good revenue considering the Debtor claimed in their bankruptcy documents "Value not determined" or $0 Value in March, 2016. The "Insiders" were fully aware what the natural gas VP Industry was going to be worth after Morgan Stanley and Goldman Sachs testified November 21-24, 2014 to Permanent Subcommittee on investigations of the United States Senate; after Morgan Stanley filed an application with the Department of Energy's office of Fossil Energy in May, 2014 seeking "long-term authorization" to export containerized gas. *a copy of the 341(a) hearing is available on Audio CD.
*"Wall Street Involvement with Physical Commodities"*
   *www.hsgac.senate.gov/subcommittee/hearings*


*Exhibit 10 – Press Release from Australian company-June 12, 2015*
*Exhibit 11- Press Release from Debtor-June 15, 2015*
*Form 8-K filed Jul 1, 2015 – Douglas acquires more convertible notes*
*Exhibit 12- Debtor applies for special Permit*
*Exhibit 13- Debtor unveils new CNG VP Trailer at HHP convention*
*Exhibit 14-Debtor press release December 14, 2015*

*Exhibit 15- Notice from GPO on special permitting*

*Exhibit 16- Notice from Australian company to enter in a 5 year agreement*

*Exhibit 17- Report that Quantum supplying VP trailers to the client 01/2017*

*Exhibit 18 – Virtual Pipeline Industry 129.77 billion industry by 2020*

(7)     Convertible Note Holders were not shareholders

In the Debtor's bankruptcy documents #104 section E pages 157-172

The Debtor reported:

"As of March 14, 2016 the Debtor had 28,080,611 shares owned by

195 shareholders."

In almost every instance when you buy or sell securities with a Broker, your name is not actually on the stock certificate.  The name that appears on the certificate is that of your broker or other nominee, and that is referred to as being **"held in street name."**  The nominee that held our groups stock was: "Cede & Co." "Cede and Co." held 27,281,006 shares as of 03/24/2016.

The Debtor has listed Cede & Co. as 1 shareholder; 46 shareholders held under 10 shares; 17 shareholders held between 11-100 shares; 60shareholders held between 101-1000 shares.  The Debtor's management, board and the convertible note holders held 353,946 shares only.  The Debtor was trying to give the bankruptcy courts the impression that the Debtor had a limited amount of shareholders when the truth of the matter is that the Debtor had hundreds of shareholders under the Cedes & Co. nominee.  The 195 shareholders that the Debtor listed only represent 799,605 shares.   Voting shares are shares that give the stockholder the right to vote on matters of corporate policy.  The holders of voting shares have the ability to weigh in on decisions about a company's future direction.  If a company is considering an acquisition offer by another company or a group of investors, the

owners of voting shares would be able to cast their vote on the offer.  Shareholders

who own voting shares typically receive regular communications from the

company regarding matters that would require a vote for the organization to act.

The Debtor "did not Act in Good Faith" with their shareholders.

*Exhibit 19- shareholders list*

(8)    On April 18, 2018 the Debtor received a notice from IRS that the

2015 return they filed on or around February 16, 2018 would not be

handled under the prompt determination process because they were

prepetition periods and taxes.  Furthermore, the Debtor received a

penalty because the Debtor did not file Form 5471 (information return

of U.S. persons with respect to certain foreign corporations.)

The courts should order the dismissal of the Debtor's bankruptcy on

violations under 11 U.S. Code 1112(b).  while section 1112(b)(4) identifies a

number of factors that can constitute "cause" for dismissal of a case I believe that I

have demonstrated sufficient cause for the courts to order the dismissal of the

Debtor's bankruptcy.

## IV    CONCLUSION

Based upon the forgoing, there is cause to dismiss the bankruptcy.

Respectfully submitted,

By: _Donna Maxwell_

Donna Maxwell

Member and Representative for

Quantum Shareholders Group

SUSAN LEISA SILKEY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19984028237
MY COMMISSION EXPIRES OCTOBER 23, 2018

7/23/2018

### Declaration of Donna Maxwell

I, Donna Maxwell, declare as follows:

1. I represent a group of shareholders that lost $ tens of millions because of the "Bad Faith" actions of the Debtor.   The following matters are true and correct and within my own personal knowledge and belief and if called as a witness, I could and would competently testify thereto.

2. On February 10, 2016 The Debtor awarded an $8.4 million purchase order for 15 natural gas virtual pipeline trailer with $13 million option for upgrades and additional 20 natural gas trailers.

3. March 15, 2016 UPS reported "UPS will spend $100 million additional 12 CNG fueling stations and add 380 CNG tractors.  The new tractors will be manufactured by Kenworth, Agility and Quantum Fuel Systems will provide the CNG systems.  UPS is an existing customer of the Debtor since April 1, 2015.

4. On March 15, 2016 the Debtor reported an event under the company's Credit facility with Bridge Bank occurred on March 14, 2016 as a result of the Debtor's failure to make a $2.7 million principal payment when the credit facility matured on March 14, 2016.  The event of default under the Bridge Bank credit facility also constituted an event of default (a cross default) under the under the secured convertible notes.  The Convertible Note holders are the Debtors Senior Management and the Board of Directors ("insiders") and Kevin Douglas ("control person").

5. March 22, 2016 Debtor filed a voluntary petition for relief under Chapter 11 of the Unites States Bankruptcy Courts.  The Debtor listed assets of $22,275,065 and liabilities of $22,435,892.

6. The Debtor reported on their 10Ks and 10Qs from 1997-September 30, 2015 Invested $505,837,789 in their Intellectual Properties, Patents, Technology, Copyrights, Trademarks, and Trade Secrets. The Debtor reported on their bankruptcy documents, "Value not determined" or $0 value.

7. The UPS order and the order for the natural gas VP trailers were Excluded from the Debtor's the bankruptcy documents. The "Money Down" the Debtor would have received on these orders doesn't reflect on the Debtor's bankruptcy documents or in the "Debtor in Possession" schedule.

8. April 8, 2016, the Debtor entered into an Assets Purchase agreement with Douglas Acquisitions LLC; K&M Douglas Trust; and the Douglas Irrevocable Descendant's Trust. Douglas agreed to acquire substantially all of the assets of the Debtor and the Debtor agreed to assume and assign certain executory contracts and leases to Douglas.

9. The Debtor concealed the true "Fair Market Value" of the Debtor's Sales Agreements, Licensing Agreements, and Master Agreements surround the Debtor's Intellectual Properties, Patents, Technology, Copyrights, Trademarks and Trade Secrets. The transfer or assignment on the 52 contracts was valued at "No Consideration" or $0 value. The Debtor reported to the U.S. Bankruptcy Courts receiving revenue of $40,466,251 in 2015 from these same contracts.

10. In the last few months, I became aware of the amount of orders and contracts the Debtor had concealed from the U.S. Bankruptcy Courts surrounding their Intellectual Patents, Technology, Patents, Copyrights, and Trade Secrets and ask that the Courts should order the dismissal of the Debtor's bankruptcy on violations under 11 U.S. Code 1112(b).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23th day of July, 2018 at Louisville, Colorado

Donna Maxwell

SUSAN LEISA SILKEY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19984028237
MY COMMISSION EXPIRES OCTOBER 23, 2018

7/23/2018

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
P.O. Box 270022  Louisville, Colorado 80027

A true and correct copy of the foregoing document entitled (*specify*): Motion to Dismiss Debtor's Cahpter 11 case under
11 u.s.c. 1112(b) due to Debtor committed various prepetition bad acts, Concealment of the "True Market Value" of the
Debtor's Assets, Non-Disclosure of Income, and Numerous "Bad Faith" violations

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) __07/23/2018__, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☑ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __07/23/2018__, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

```
SUSAN LEISA SILKEY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19984028237
MY COMMISSION EXPIRES OCTOBER 23, 2018
```

7/23/2018

☑ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/23/2018 | Donna Maxwell | *Donna Maxwell* |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Service List
In re: QF Liquidation, Inc. (f/k/a) Quantum
Fuel Systems Technologies Worldwide, Inc.
8:16-bk-11202-MW


VIA First Class Mail


Hon. Mark S. Wallace
U.S. Bankruptcy Court
411 West Forth St.
Suite 6135
Santa Ana, CA 92701-4593


Megan M. Adeyemo
Gordon & Rees LLP
101 West Broadway
Suite 2000
San Diego, CA  92101
(619) 230-7469
madeyemo@gordonrees.com

Debtor
Quantum Fuel Systems Technologies
Worldwide, Inc.
25242 Artic Ocean Dr.
Lake Forest, CA 92630


Isaiah Benjamin Blady
Blady Weinreb Law Group LLP
5757 Wilshire Blvd Ste 535
Los Angeles, Ca 90036
(323) 933-1352
bblady@bwlawgroup.com

Chief Restructuring Officer
Nishant Machado
Mackinac Partners LLC
201 Wilshire Blvd.
2nd Floor
Santa Monica, CA 90401


Jeffrey Wayne Broker
Broker-Dealer Law Group
18111 Von Karman Ave. Ste. 460
Irvine, CA 92612
(949) 478-4855
jbroker@brokerlaw.biz          `

Special Corporate Counsel for Debtor
Michael Gibson, Esq.
Jason W. Bank, Esq.
Kerr, Russell and Weber, Plc
500 Woodward Ave.
Suite 2500
Detroit, MI  48226

Frank Cadigan
Office of the United States Trustee
411 West Fourth Street
Suite 7160
Santa Ana, CA 92701
(714) 338-3400
frank.cadigan@usdoj.gov

Financial Advisor to the Official
Committee of Unsecured Creditors
James Wong
Armory Consulting Company
3943 Irvine Blvd.
Suite 253
Irvine, CA 92602


Jeffrey D. Cawdrey
Gordon & Rees LLC
101 W. Broadway
Suite 2000
San Diego, CA 92101
(619) 230-7469
jcawdrey@grsm.com


Lisa Chandler
Imperial PFS Corporation
3 Hutton Center Drive
Suite 630
Santa Ana, CA 92707
(877) 305-0611
Lisa.chandler@ipfs.com


Natalie B. Daghbandan
Bryan Cave LLP
3161 Michelson Drive, Suite 1500
Irvine, CA 92612-4414
(949) 223-7000
natalie.daghbandan@bryancave.com

Jennifer Eileen Duty
National Funding
9820 Towne Center Dr.
San Diego, CA 92121
(888) 733-2383

jduty@mintz.com
Anna Gumport
Sidley Austin LLP
555 West Fifth Street, suite 4000
Los Angeles, CA 90013
(213) 896-6000
agumport@sidley.com


Michael J. Hauser
Office of the United States Trustee
411 West Fourth Street
Suite 7160
Santa Ana, CA 92701
(714) 338-3400
Michael.hauser@usdoj.gov


Marshall Hogan
Foley & Lardner LLP
3579 Valley Centre Drive
Ste. 300
San Diego, CA 92130
(858) 847-6700
mhogan@foley.com

Robbin L. Itkin
DLA Piper LLP
550 South Hope Street
Suite 2400
Los Angeles, CA 90071-2678
(310) 500-3390
robbin.itkin@dlapiper.com

Alexandra S. Kelly
Liner LLP
1100 Glendon Avenue, 14th floor
Los Angeles, CA. 90224-3518
(310) 500-3500
akelly@linerlaw.com

John Kurtz
Hawley Troxell Ennis & Hawley LLP
877 W. Main Street
Ste. 1000
Boise, Idaho 83702
(208) 344-6000
jkurtz@hawleytroxell.com


Hugh McCullough
Davis Wright Tremaine LLP
1202 Third Avenue
Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
hughmccullough@dwt.com


Laura A. Meyerson
Southern California Edison Company
2244 Walnut Grove Avenue. Site 331
Rosemead, CA 91770
(626) 302-6931
laura.meyerson@sce.com


Sean A. O'Keefe
OKEEFE & ASSOCIATES LAW CORPORATION
575 Anton Blvd., Suite 1050
Costa Mesa, CA 92626
(949) 334-4135
sokeefe@okeefelc.com


Stephen G. Polard
Eisner Jaffee
9601 Wilshire Blvd.
7th floor
Beverly Hills, CA 90210
(310) 855-3200
spolard@eisnerlaw.com

Ragan Powers
Davis Wright Tremaine LLP
865 S. Figueroa St.
Suite 2400
Los Angeles, CA 90017-2566
(213) 633-6800
raganpowers@dwt.com


Kenneth John Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th floor
Los Angeles, CA 90017
(213) 443-3000
johnshaffer@quinnemanuel.com


Leonard M. Shulman
SHULMAN HODGES & BASTIAN LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA  92618
(949) 340-3400
Lshulman@shbllo.com


Office of the United States Trustee
Region 16: Central District of California (Santa Ana Division)
411 West Fourth Street
Suite 7160
Santa Ana, CA 92701
(714) 338-3400
Ustpregion16.sa.eci@usdoj.gov


Victor A, Vilaplana
Foley & Lardner LLP
3579 Valley Centre Drive, Ste. 300
San Diego, CA 92130
(858) 847-6700
vavilaplana@foley.com

Matthew S, Walker
Pillsbury Winthrop Shaw Pittman, LLP
12255 El Camino Real, Suite 300
San Diego, CA 92130-4088
(619) 234-5000
matthew.walker@pillsburylaw.com


Glenn S. Walter
Honigman Miller Schwartz and Cohn LLP
660 Woodward Avenue
Suite 2290
Detroit, MI 48226
(313) 465-7712
gwalter@honigman.com


William P. Weintraub
Goodwin Procter LLP
The New York Times Building
620 Eighth Ave.
New York, NY  10018
(212) 813-8800
WWeintraub@goodwinprocter.com


Emily Young
Angela Ferrante
Garden City Group, LLC
1985 Marcus Avenue, suite 200
Lake Success, New York 11042-1013
(855) 907-3240
paceteam@gardencitygroup.com